IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                    :
                                          :        Chapter 11
JACKSON HEWITT TAX SERVICE                :
INC., et al.,                             :        Case No. 11-11587 (___)
                                          :
          Debtors.[1]                     :
                                          :        Joint Administration Pending
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DECLARATION OF DANIEL P. O'BRIEN, CHIEF FINANCIAL
OFFICER OF JACKSON HEWITT TAX SERVICE INC., IN SUPPORT
OF CHAPTER 11 PETITIONS AND
FIRST DAY PLEADINGS**

I, Daniel P. O'Brien, being duly sworn, deposes and says:

1.      I am the Executive Vice President, Chief Financial Officer, and

Treasurer of Jackson Hewitt Tax Service Inc. ("Jackson Hewitt" or the "Company"), a

company incorporated under the laws of the state of Delaware that is the direct or indirect

parent of each of the other debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "Debtors").  I am authorized to submit this Declaration

in support of the Debtors' chapter 11 petitions and the first day pleadings described herein.

2.      I am familiar with the Debtors' day-to-day operations, business

affairs, and books and records.  I have also reviewed the Debtors' "First Day Motions and

Orders" and am familiar with the facts alleged therein and relief requested.  Certain of the

disclosures herein relate to matters within the knowledge of other employees of the

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Jackson Hewitt Tax Service Inc. (9692), Jackson Hewitt Inc. (9705), Jackson Hewitt Technology Services LLC (2409), Tax Services of America, Inc. (7427), Jackson Hewitt Corporate Services Inc. (2415), and Hewfant Inc. (0545). The address for each of the Debtors, with the exception of Jackson Hewitt Technology Services LLC, is 3 Sylvan Way, Parsippany, NJ 07054.  The address for Jackson Hewitt Technology Services LLC is 501 N. Cattlemen Rd., Sarasota, FL 34232.

Debtors and are based on information provided by them. I otherwise have personal

knowledge of the matters set forth herein or have gained knowledge of such matters from

the Debtors' employees or retained advisers that report to me in the ordinary course of my

responsibilities as the Company's Chief Financial Officer and, if called as a witness,

would testify thereto.

**A.      Overview of the Debtors' Business**

3.      Jackson Hewitt provides computerized preparation services for

federal, state and local individual income tax returns in the United States through a

nationwide network of franchised and company-owned offices operating under the brand

name Jackson Hewitt Tax Service. The market for paid tax preparation services is highly

fragmented, with tens of thousands of paid tax return preparers throughout the country.

Jackson Hewitt is the second largest paid tax return preparer in the United States, having

prepared approximately 2.6 million tax returns for the 2011 tax season, which is between

3% and 4% of the total market for paid tax return preparation services.

4.      The core of Jackson Hewitt's business is its franchise network. As

of the date hereof (the "Petition Date"), Jackson Hewitt had approximately 700

franchisees who collectively operated a total of 4,846 offices. In 2011, the franchisees

prepared approximately 84% of the total number of tax returns prepared by Jackson

Hewitt. The franchise business generates revenue for Jackson Hewitt from royalties,

marketing and advertising fees, and other revenue. In 2010, this revenue constituted

approximately 44% of Jackson Hewitt's total revenue.

5.      Jackson Hewitt also operates approximately 1,110 company-

owned offices. These company-owned offices recognize service revenues primarily from

the preparation of tax returns.  In 2010, revenue from company-owned offices constituted approximately 34% of Jackson Hewitt's total revenue.  The balance of Jackson Hewitt's 2010 revenues, which comprised approximately 22% of total revenue in 2010, was derived principally from the sale, by third-party financial institutions, of financial products, including, in particular, assisted refunds ("ARs") and refund anticipation loans ("RALs") in Jackson Hewitt Tax Service locations.

6.     ARs enable customers to pay for tax return preparation fees and other charges out of their tax refunds, so that no out-of-pocket payment is required at the time of tax preparation.  Pursuant to this arrangement, the bank establishes a temporary bank account to enable a more accelerated receipt of tax refund amounts than receiving a check in the mail from the Internal Revenue Service ("IRS").  A RAL is a short-term consumer loan made by a third-party financial institution to a customer in anticipation of a refund being paid by the IRS.  The customer receives the loan amount within 24 hours of filing his or her tax return, and the loan is repaid when the IRS funds the tax refund.  The RAL is secured by the customer's anticipated tax refund.

7.     Another critically important and highly successful aspect of Jackson Hewitt's business is its relationship with Wal-Mart.  In 2010, Jackson Hewitt entered into an arrangement with Wal-Mart which granted the Company the exclusive right to provide tax preparation services within Wal-Mart stores during the 2010 and 2011 tax seasons.  This led to a significant increase in the number of Jackson Hewitt store locations.  In 2011, Jackson Hewitt, through its franchisees and company-owned stores, operated tax preparation kiosks in over 2,000 Wal-Mart stores.  Approximately 24% of the tax returns prepared by the Company in 2011 were generated in Wal-Mart stores.

8.     Jackson Hewitt's business is highly seasonal resulting in substantially all of the Company's revenues and cash flow being generated during the period from January 1st through April 30th of each year, and the Company's workforce also peaks during this period. From May 1, 2010 to April 30, 2011, the Company employed approximately 6,000 employees, but approximately 95% of these employees were hired on a temporary seasonal basis. During the off-season, however, the number of employees is reduced significantly, and is comprised of approximately 315 full-time employees, principally at its corporate headquarters in Parsippany, New Jersey and its technology facility in Sarasota, Florida. The Company generally operates at a loss during the period from May 1st through December 31st, during which time the Company incurs costs associated with preparing for the upcoming tax season.

9.     For fiscal year 2011, the Company estimates that it will generate total revenue of approximately $214.4 million and EBITDA, adjusted for non-recurring items and costs associated with its balance sheet restructuring, of approximately $48.3 million. As of April 30, 2010, which was the end of Jackson Hewitt's 2010 fiscal year, the Company had generated total revenue of approximately $213.8 million and EBITDA of approximately $46.8 million. It had a net loss of approximately $272 million in 2010, largely on account of a goodwill impairment charge of approximately $274 million. At that time, the Debtors had total assets of approximately $346.4 million, and total liabilities of approximately $372 million, in each case as determined in accordance with generally accepted accounting principles.

**B.     The Debtors' Corporate and Capital Structure.**

10.     Jackson Hewitt, the ultimate parent of the Jackson Hewitt family of companies, is a publicly-held Delaware corporation.  It was incorporated on February 20, 2004, and was formed in connection with Jackson Hewitt's June 2004 initial public offering, which occurred when Cendant Corporation, now known as Avis Budget Group, Inc., divested 100% of its ownership interest in Jackson Hewitt.  Since its initial public offering, Jackson Hewitt's stock was traded on the New York Stock Exchange.  On May 6, 2011, however, Jackson Hewitt's stock was delisted.  The stock is now quoted on the OTCQB Marketplace which is operated by OTC Markets Group Inc.

11.     A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as Exhibit A.  There are five direct and indirect subsidiaries of Jackson Hewitt: Jackson Hewitt Inc., Jackson Hewitt Technology Services LLC, Jackson Hewitt Corporate Services Inc, Tax Services of America, Inc. and Hewfant Inc.  While the corporate family is comprised of six separate entities, they collectively operate a unitary business enterprise.  For instance, Jackson Hewitt Technology Services LLC supports the technology needs of all franchised and company-owned locations, and Tax Services of America, Inc. owns and operates the company-owned locations.

12.     The Debtors are parties to that certain Amended and Restated Credit Agreement, dated as of October 6, 2006, as amended (the "Credit Agreement").  As of the Petition Date, the Debtors were obligated on (a) approximately $214.4 million principal amount of term loans under the Credit Agreement, (b) approximately $141 million principal amount of outstanding revolver loans under the Credit Agreement (including capitalized PIK interest, but excluding earned but unpaid cash interest), and (c)

approximately $1.9 million under related hedge agreements, for a total of approximately $357 million. On May 27, 2011, a $30 million amortization payment is due under the Credit Agreement. The balance of the Debtors' obligations under the Credit Agreement is scheduled to mature a few months from now, on October 6, 2011.

13.     The obligations under the Credit Agreement are secured by a first priority lien on substantially all of the Debtors' assets. The total enterprise value of the Company is estimated in a range between $200 million and $250 million with a midpoint of $225 million. The lenders have an unsecured deficiency claim of approximately $172 million, which makes them the Debtors' largest unsecured creditors: the Debtors have no other funded debt obligations, and as of the Petition Date, the Debtors were obligated on a relatively small amount of outstanding trade debt.

**C.     Events Leading to the Filing of the Chapter 11 Cases.**

14.     The Debtors sought chapter 11 protection because they can no longer sustain the amount of their debt obligations under the Credit Agreement. The Debtors incurred these debt obligations at a time when their EBITDA was significantly higher than it is now. Specifically, the Debtors' 2009 EBITDA was approximately $75 million, but it dropped to $46.8 million in 2010 and is estimated to be $48.3 million for 2011. The Debtors' declining EBITDA has been driven by several factors, including a several-year decline in the number of tax returns prepared year-over-year and overall operating performance. While the Debtors reversed this trend for the 2011 tax season, the increase in returns over the 2010 tax season was relatively modest. These factors have driven the Debtors' enterprise value down significantly, such that there is insufficient value to pay in full the lenders under the Credit Agreement.

15.     Moreover, in preparing their go-forward business plan and projections, the Debtors have assumed significantly lower revenues on account of financial products, including no revenues at all on account of RALs. During the last two tax seasons, most lenders who historically provided RALs have exited the business. During the 2011 tax season, H&R Block, the largest paid tax return preparer in the United States, did not provide RALs to its customers. Jackson Hewitt had only one source of RAL products in 2011, and it is doubtful whether that source will provide RALs in 2012.

16.     Accordingly, given significantly lower historical and projected EBITDA levels and hence, an enterprise value that is significantly less than the amount of the debt under the Credit Agreement, and also given the maturity of the Credit Agreement in October of this year, the Company determined that it was in the best interests of its stakeholders to work with the lenders on a consensual restructuring, which is embodied in the Plan (as defined below).

17.     The Plan provides for a balance sheet restructuring whereby (i) the Debtors' outstanding obligations under the Credit Agreement will be forgiven in exchange for each lender receiving (a) its pro rata share of 100% of the new common stock issued by reorganized Jackson Hewitt, subject to dilution on account of a management incentive plan, (b) its pro rata share of a new term loan facility in the amount of $100 million, and (c) the opportunity to participate pro rata in a new revolving credit facility in the amount of $115 million, and (ii) all existing, outstanding shares of Jackson Hewitt stock and all rights and options to acquire Jackson Hewitt stock, will be cancelled.

18. The Plan also provides that the Debtors will (a) reject certain unfavorable executory contracts and unexpired leases and (b) assume all of their franchise agreements with their franchisees. Holders of general unsecured claims, including the lenders, as holders of deficiency claims under the Credit Agreement, will receive no recovery.

19. The foregoing plan is reflected in the Debtors' Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (the "Plan") and the related Disclosure Statement concerning the Plan (the "Disclosure Statement") filed concurrently with the Debtors' petitions. On May 23, 2011, the Debtors commenced solicitation of votes on the Plan from the lenders under the Credit Agreement. No other classes of creditors or stockholders were solicited, as each such class is either being paid in full or receiving no recovery and hence, is deemed either to accept or reject the Plan, respectively. The Debtors received overwhelming acceptances to the Plan from the lenders holding outstanding obligations under the Credit Agreement.

**D. Objectives Of The Chapter 11 Filing.**

20. The Debtors commenced these chapter 11 cases to implement the Plan as quickly as possible. While there is no value for the Debtors' existing stockholders or impaired creditors other than the lenders under the Credit Agreement, the Debtors strongly believe that the Plan is in the collective best interests of all their stakeholders, including their franchisees, and should be approved. The Plan, if confirmed, will end a prolonged period of uncertainty regarding the Debtors' future prospects by appropriately right-sizing their balance sheet. While RALs may not be part of the Debtors' long-term future, the core tax preparation business remains. Demand will continue for these

services. In 2010, more than 139 million tax returns were filed in the United States –
historically, 60% or more of all such tax returns have been prepared with the assistance of
a paid tax return preparer.

21.    It is imperative that the Debtors exit chapter 11 quickly. While the
2011 tax season has just concluded, preparations for the 2012 tax season must commence
immediately. However, these preparations will be negatively affected the longer the
Debtors are in chapter 11. Indeed, the Company has aggressive plans for expansion in
anticipation of the 2012 tax season, which it must begin to implement now. Confirmation
of the Plan will bring closure to the uncertainty that has plagued them for the last several
years, thereby allowing the Debtors to move forward towards the 2012 tax season and
beyond.

## I.    FIRST DAY MOTIONS AND ORDERS.

22.    In furtherance of these objectives, the Debtors expect to file a
number of first day motions and applications (the "First Day Motions") and proposed
orders, each as listed on the attached <u>Exhibit B</u>, and respectfully request that the Court
consider entering the proposed orders granting such First Day Motions. I have reviewed
each of the First Day Motions and Orders (including the exhibits thereto) and the facts set
forth therein are true and correct to the best of my knowledge, information and belief.
Moreover, I believe that the relief sought in each of the First Day Motions and Orders
(a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with
minimum interruption or disruption to their businesses or loss of productivity or value
and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

**A.      Administrative Pleadings (Items 1 and 2).**

23.      The Debtors have filed three "administrative" pleadings that seek to jointly administer the Debtors' chapter 11 cases for procedural purposes only and to retain The Garden City Group, Inc. ("GCG") as noticing and balloting agent; as noted in Items 1 and 2 on Exhibit B hereto.  The Debtors' attorneys have explained to me the customary practice in this regard in other chapter 11 business reorganization cases and the rationale for these pleadings.

24.      The Debtors are requesting that their chapter 11 cases be jointly administered only for procedural purposes.  As set forth above, Jackson Hewitt is the direct or indirect parent of each of the other Debtors.  I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the United States Trustee in supervising these bankruptcy cases.  Accordingly, the joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

25.      The Debtors also seek authority to retain GCG as noticing and balloting agent in their chapter 11 cases.  I understand that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

Accordingly, I believe that the most effective and efficient manner by which to give notice and provide solicitation services in these cases is to engage GCG, an independent third party with significant experience in this role, to act as an agent of the Court. In addition, the Debtors seek authority to retain GCG to design and implement an appropriate publication noticing program. Such relief is prudent in order to provide any unknown litigation claimants, particularly those whose claims relate to RALs, with notice of the bankruptcy and to give the Debtors the benefit of a discharge and injunction with respect to any such unknown litigation claims.

**B.      Motions to Continue Certain Banking and Business Practices (Item 3).**

26.      The Debtors have filed a motion to continue their ordinary course banking practices. In that regard, I understand that the Debtors maintain approximately twenty-eight (28) bank accounts out of which they manage cash receipts and disbursements (the "Bank Accounts"). I believe that all of the Bank Accounts are in financially stable banking institutions, and, with the exception of four (4) investment accounts, are fully insured by the Federal Deposit Insurance Corporation ("FDIC") (up to an applicable limit per Debtor per financial institution) and make up an established cash management system that the Debtors need to maintain, in my opinion, in order to ensure smooth collections and disbursements in the ordinary course.

27.      In my opinion, the cash management procedures utilized by the Debtors constitute ordinary, usual and essential business practices and are similar to those used by other major corporate enterprises. The Debtors' cash management system is highly automated. This allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as

creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. I believe that the Debtors will continue to maintain detailed records reflecting all transfers of funds.

28. Requiring the Debtors to alter their banking and business practices, including their use of numerous business forms (including, without limitation, letterhead, purchase orders, invoices, contracts and checks) would, I believe, cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to reorganize and pursue other alternatives to maximize the value of their estates. Moreover, such actions would be expensive, unnecessary and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. Consequently, I believe that maintenance of the existing cash management system and other banking and business practices, as requested in certain of the First Day Motions, during these chapter 11 cases is in the best interests of all creditors and other parties in interest.

## C.    Waiver of Investment and Deposit Requirements (Item 4).

29. The Debtors have filed a motion seeking a waiver of investment and deposit requirements under Bankruptcy Code section 345. As stated above, the Debtors believe that all of their Bank Accounts are with financially stable banking institutions with FDIC insurance (up to an applicable limit per Debtor per financial institution), except with respect to four (4) investment accounts, only one of which is actually used by the Debtors and, only then, for the limited purpose of overnight investment of cash held in the Debtors' central concentration account during the day.

30.     I believe that the Debtors' cash investment practices substantially conform with the approved investment and deposit practices identified in Bankruptcy Code section 345, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money.  Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform with the approved practices identified in Bankruptcy Code section 345, the Debtors seek to have such requirements waived so as to allow the applicable banking institutions to accept and hold the Debtors' funds consistent with prepetition practices.

**D.     Payment of Employee and Payroll Obligations and Certain Taxes (Item 5).**

31.     The Debtors have also filed a motion to continue certain prepetition wages, compensation and employee benefits.  From May 1, 2010 to April 30, 2011, the Debtors employed approximately 6,000 employees, but the actual number of employees on the Debtors' payroll during that period at any one time varied.  Approximately 95% of these employees are hired on a temporary seasonal basis, and the Debtors workforce peaks during the tax season  Temporary seasonal hiring begins in September and the vast majority of seasonal employees are let go by the end of April the following year.  On a year-round basis, the Debtors employ approximately 330 full-time, part-time and non-seasonal temporary employees, the vast majority of whom are compensated on a salaried basis.

32.     Specifically, the motion seeks authorization to pay prepetition wages, salaries, incentive awards, reimbursements, and other compensation, to continue the maintenance of employee benefit programs in the ordinary course of business, and to direct all banks to honor prepetition checks for payment of prepetition employee

obligations. These obligations include, among other things, a series of individual incentive plans and a general corporate incentive plan, all of which have been maintained by the Debtors historically, from year to year, and all of which are based on the achievement of individual and Company objectives. Because the information required to determine whether or not certain of these performance objectives have been satisfied has not been finalized as of the Petition Date, the Debtors can only estimate what their prepetition obligations to participants in the incentive plans actually are. I understand that the Plan provides for the assumption of these incentive plans, but, out of an abundance of caution, the Debtors are still seeking authority to make payments as and when they come due in the ordinary course of business, except payments under the corporate incentive plan to the six employees who are "insiders" within the meaning of Bankruptcy Code section 101(31).

33. As of the Petition Date, the Debtors estimate that approximately $133,000 in incentive awards is owed to approximately twenty-six (26) non-executive employees participating in four (4) individual incentive plans. The payments will range from approximately $2,220 to $9,175, with the average payment being approximately $5,100, but no participant is entitled to any amount that is greater than $11,725. These incentive awards were earned as a direct and proportionate result of the achievement of specific and measurable performance objectives associated with each individual participant's specific job responsibilities and areas of oversight.

34. The corporate incentive plan affords incentive-based compensation to 295 employees, virtually every member of the Debtors' workforce at their corporate offices. Awards are calculated based on the achievement of individual performance

objectives and the Debtors' overall EBITDA growth, but no final determinations are made unless and until the Debtors satisfy a pre-determined threshold for improved year-over-year EBITDA performance. Thus, although the corporate incentive plan was approved during 2010, the Debtors do not intend for it to become effective until June 2011 at the earliest because the Debtors will not be able to finally calculate their EBITDA for the just-completed fiscal year until then. Nonetheless, the Debtors estimate that EBITDA for fiscal year 2011 will be $48.5 million, which is $2.1 million higher than it was for the prior fiscal year. If this estimate is correct, the Debtors will have satisfied the EBITDA threshold of 4.3% year-over-year growth required to fund the corporate incentive plan at its lowest level.

35.     Ideally, the Debtors will have confirmed their Plan and emerged before any payments could be finally determined and paid; however, in the event such amounts would become payable in the ordinary course pre-emergence, the Debtors estimate that they would owe approximately $900,000. While the average corporate incentive plan participant would receive approximately $2,830, a total of 260 out of the 295 participants would receive $5,000 or less.[2]

36.     I believe that without payment of these employee obligations, including the incentive awards, in the ordinary course, the Debtors' businesses and operations will be detrimentally impacted through the reduction in employee morale and

---

[2]     Approximately 75 participants would receive incentive payments of under $1,000 each; approximately 90 participants would receive between $1,000 and $2,000 each; approximately 60 participants would receive between $2,000 and $3,000 each. A total of seven participants, all of whom are or might be considered insiders, would be entitled to payments over $11,000, with such amounts ranging from a low of $11,257 to a high of $75,000.

the potential loss of key employees during a critical time for the Debtors and their businesses.

37.     I estimate that there are presently no non-"insider" employees who are owed in excess of $11,725 for prepetition wages, salaries or commissions. Thus, I believe that the overwhelming majority of all of the Debtors' employees may have a priority claim with respect to all of their accrued but unpaid prepetition wages or salaries, a claim which I am told is granted priority over other claims pursuant to the Bankruptcy Code. Moreover, I understand that failure to maintain workers' compensation insurance in the various states in which the Debtors do business could result in administrative or legal proceedings against the Debtors and their officers and directors.

38.     I believe the Debtors must continue to pay the outstanding amounts owed as of the date of this Declaration for accrued and unpaid wages, salaries and incentive awards, including amounts that the Debtors are required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes. I believe that if such payments are not made, employees will terminate their employment with the Debtors, at a time when the need for a well-motivated workforce is most critical, and cause significant disruption to operations.

**E.      Utilities (Item 6).**

39.     The Debtors have filed a motion to pay all undisputed prepetition and postpetition obligations owed to utility companies, to provide utility companies with adequate assurance of payment and to establish procedures for resolving objections to the proposed adequate assurance. In connection with the operation of their businesses, the

Debtors receive electricity, natural gas, water, telephone services and other similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").

40.     The services provided by the Utility Companies are crucial to the Debtors' ongoing operations and the success of the Debtors' chapter 11 cases.  If the Utility Services were interrupted, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts.  I believe that the procedures that the Debtors have proposed for the Utility Companies adequately protect such Utility Companies' rights that I understand are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses and operations depend.  Additionally, I believe that all prepetition and postpetition obligations owed to the Utility Companies will be paid in a timely manner and should be allowed to use funds from the Cash Collateral Account to satisfy such obligations.

**F.     Motions for Payment of Other Critical Business Expenditures.**

41.     The Debtors have also filed a number of motions seeking authority to make critical business expenditures.

Tax and Fees and Surety Bond Obligations (Item 7)

42.     The Debtors seek authority to pay, in the ordinary course of business, any prepetition tax and regulatory fee obligations, including, sales, use and excise taxes; payroll taxes; income or gross receipts taxes; franchise taxes; real and personal property taxes; withholding taxes; maintenance and renewal obligations for

licenses to operate tax schools; business license, qualification to do business or other business and occupation taxes or fees; fees associated with maintaining incorporation status and foreign qualifications in the jurisdictions in which the Debtors do business; any other types of taxes, regulatory fees or charges; and any penalty, interest or similar charges (collectively, the "Taxes and Fees") owing to certain federal, state and local governmental units.

43.     It is my understanding that as of the Petition Date, the Debtors were, for the most part, current in the payment of assessed and undisputed Taxes and Fees.  However, certain Taxes and Fees attributable to 2010 and to the prepetition portion of the 2011 tax year will not be due until the applicable monthly, quarterly, or annual payment dates.  I believe the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the value of the Debtors' estates and facilitate the Debtors' ability to successfully reorganize.

44.     Additionally, the Debtors request authority to honor prepetition obligations due under any surety bonds outstanding as of the Petition Date and, if necessary, to post collateral as would be required to maintain and secure such continuing obligations and to issue new surety bonds (collectively, the "Surety Bond Obligations").  In the ordinary course of business, the Debtors are required to provide surety bonds, as financial assurances to third parties, to secure the Debtors' payment or performance of certain obligations.  Such obligations include obligations owed to municipalities, obligations associated with training programs, and franchise obligations and loan programs.  I understand that the Surety Bond Obligations are also necessary to comply

with the regulatory requirements of various jurisdictions. As of the Petition Date, the aggregate amount of the Debtors' surety bonds was $670,000.

45. If any surety bonds lapse without renewal, such lapse could cause the Debtors to violate the applicable laws requiring them to maintain surety bonds, which I believe could cause disruption to the Debtors operations to the detriment of all parties in interest. It is my opinion that avoiding such disruption is essential to the success and viability of the Debtors' businesses and in the best interests of the Debtors, their estates, their creditors and other parties in interest.

Franchisee and Customer Obligations (Item 8)

46. I believe that the success and viability of the Debtors' businesses, and ultimately the Debtors' ability to successfully reorganize, are totally dependent upon the satisfaction and loyalty of their customers and franchisees. Prior to the Petition Date, in the ordinary course of business, the Debtors engaged in certain activities to develop and sustain a positive reputation and relationship with their customers and franchisees. I believe that the Debtors' programs aimed at customer satisfaction, including the guarantee programs and the prepaid debit card program (collectively, the "Customer Programs") and the Debtors' programs aimed at franchisee satisfaction, including the regional marketing corporate matching program, the electronic filing fee rebate program and the return growth and financial product incentive programs (collectively, the "Franchisee Programs" and together with the Customer Programs, the "Programs") are critical, and any delay in honoring the Debtors' obligations thereunder will severely and irreparably harm customer and franchisee relations. Among other things, I believe that

any failure to honor any claims of customers or franchisees may well drive away valuable customers and franchisees, thereby harming the Debtors' efforts to reorganize.

47.     Accordingly, honoring prepetition customer and franchisee obligations under the Programs, and continuing the Programs on a postpetition basis, is in the best interests of the Debtors, their estates and their creditors.  I believe, therefore, that the Debtors should be permitted to pay prepetition and postpetition claims in connection with such obligations in the ordinary course of business.

Insurance Policies (Item 9)

48.     In connection with the operation of their businesses, the Debtors maintain various insurance policies, including policies for coverage for, among other things, property damage, general liability, automobile, directors and officers liability, workers' compensation, professional liability, crime, fiduciary, employment practices, special risk, excess punitive damages, and umbrella and excess umbrella liability (the "Insurance Policies").  I believe that maintenance of insurance coverage under the various Insurance Policies is essential to the operation of the Debtors' businesses and I am told is required under the United States Trustee for the District of Delaware Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees for Chapter 11 Cases (Jan. 26, 2009) (the "Operating Guidelines"), the laws of the various states in which the Debtors operate and the Debtors' various agreements.

49.     The Debtors seek to continue to maintain their existing Insurance Policies, and to renew, revise, extend, supplement, change or enter into new insurance coverage as needed in their business judgment.  I believe that payment of any Insurance Policy premiums relating to prepetition insurance coverage is necessary to continued

coverage under such policies and to maintain good relationships with the Debtors' insurers. For the policy period 2010-2011, the total annual premiums under the Insurance Policies equaled approximately $2.99 million. Furthermore, it is my opinion that authorizing the Debtors, in their business judgment, to renew, revise, extend, supplement, change or enter into new insurance coverage as needed is necessary to the continued operation of the Debtors' businesses.

50.     I also believe that it is in the best interests of the Debtors, their estates, their creditors and other parties in interest for the Debtors to continue their business relationship with their consultant, Marsh, Inc. (the "Insurance Consultant"), and to continue to pay the Insurance Consultant's fees. It is my belief that the employment of the Insurance Consultant has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize considerable savings in the procurement of such Insurance Policies. I believe that it is in the best interests of the Debtors to continue their business relationship with the Insurance Consultant.

**G.     Approval of Access to Cash Collateral (Item 10).**

51.     The Debtors have also sought authority to use cash collateral. For the reasons set forth below, I believe that the Court's approval of this motion is absolutely critical.

52.     Substantially all of the Debtors' cash constitutes cash collateral (the "Cash Collateral") of the lenders under the Credit Agreement. Specifically, under the terms of the Credit Agreement, the Debtors are required to deposit excess cash over $5 million into the "Cash Collateral Account" held by Wells Fargo Bank, N.A., as collateral

for obligations arising under the Credit Agreement. The Debtors, therefore, have limited access to immediately available funds.

53. Without immediate authority to use the Cash Collateral, it is my understanding that the Debtors would have no cash to sustain their businesses and would be forced to immediately cease operating as a going concern to the detriment of all stakeholders.

54. Accordingly, I believe the Debtors have an immediate need to use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses and the completion of the restructuring process. The Debtors' access to Cash Collateral is necessary in order to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses and thus preserve and maintain the going concern value of the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders.

**H.  Motion to Schedule Combined Hearing, Approve  Notice, Establish Objection Procedures and Waive the Meeting of Creditors (Item 11).**

55. Additionally, the Debtors are requesting that the Court approve an order (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and the confirmation of the Plan, (b) approving the form and manner of notice of the combined hearing and the commencement of these chapter 11 cases, (c) approving procedures for objecting to the adequacy of the Disclosure Statement and confirmation of the Plan, and (d) waiving the meeting of creditors.

56. The Debtors are requesting that the Court set a Combined Hearing date in early July 2011. It is my understanding the lenders support this schedule, and that date will provide creditors ample time to file objections, if there indeed should be any.

57.     Furthermore, the Debtors request that the Court fix a time and procedures for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan.  I believe approving the objection procedures as fully described in the motion and setting the objection deadline for no later than 4:00 p.m. (prevailing Eastern Time) on June 22, 2011 (which is 28 days after the anticipated hearing date on the First Day Motions) will minimize disruption to the Debtors' business, and is in the best interests of all parties involved in these chapter 11 cases.

58.     The Debtors also request a waiver of the requirement to hold a meeting of creditors.  I believe that cause exists to waive the meeting of creditors.  It is my understanding that the Disclosure Statement contains much of the type of information that would typically be discussed at a meeting of the creditors.  As the Debtors intend to proceed expeditiously through these chapter 11 proceedings, the Debtors request that the Court direct the United States Trustee not to convene a creditors' meeting if the Plan is confided within sixty (60) days from the Petition Date.

59.     The Debtors also seek approval of the form and manner of the combined notice in these chapter 11 cases.  In particular, the Debtors seek authorization to send a combined notice only to those holders of claims and interests identified as of the record date, the attorneys general of all fifty states and the individual named plaintiffs and their counsel in the pending RAL-related cases.

60.     Jackson Hewitt does not itself make RALs.  Rather, Jackson Hewitt makes available to any customer who wishes to apply for a RAL an application to a third party financial institution who, in turn, makes an independent determination whether the customer qualifies for a RAL.  Jackson Hewitt contracts with this third party

to assist it in gathering financial information in connection with the RAL application. Jackson Hewitt does not believe that it has any liability to any customers on account of RALs.

61. Moreover, as further described herein, there is no value for unsecured creditors under the Debtors' Plan, including any RAL-related claimant, as the estimated value of the reorganized enterprise is tens of millions of dollars less than the face amount of the Debtors' obligations to their lenders, which obligations are secured by liens on all the Debtors' assets.

Overview of RAL-Related Claims

62. Millions of the Debtors' customers have obtained RALs over the years. It is my understanding that none of them had ever alleged any violation of consumer credit laws in connection with their RALs until, in 2005, a complaint was filed in California against the Debtors seeking damages for, among other things, the Debtors' alleged violation of the state's credit services organization act. This suit was filed after the California attorney general had made these and other claims.

63. As it has been explained to me, although not entirely uniform, most state credit services organization acts, including the act in California, require businesses who assist consumers in obtaining credit to register with the state and to afford consumers a three or five-day window to cancel a credit contract. It is my understanding that Jackson Hewitt is not and has never been registered as a credit services organization in any state, and has never believed that it was required to do so. Nonetheless, in order to avoid prolonged litigation, Jackson Hewitt settled the California matters.

64.    However, four attorneys, including one attorney who had filed the California action, thereafter filed seven similar actions in other states. All purported to be brought as class actions, though none of them has ever been certified. The Debtors settled two actions via token payments to the plaintiffs and their attorneys. Three of the other cases have been dismissed in whole or in part. And two cases remain pending at the pre-trial stage. Except with respect to the California action, which was settled four years ago, I am aware of no state attorney general or any other government agency that has filed suit against the Debtors asserting that RALs violate state laws.

65.    It is important to note that none of the plaintiffs or their attorneys have been able to credibly articulate how the Debtors' customers have suffered any actual damages. In particular, I have been told that the plaintiffs' attorneys have never suggested that their purported clients' RAL transactions would have changed in the slightest had the Debtors been registered as a credit services organization.

66.    Based upon the foregoing history, the Debtors do not believe that they have any liability on account of RALs. However, the handful of suits that have been brought have been very costly to defend, even though most of them have been dismissed or settled with small, nuisance payments. The Debtors estimate that they have thus far incurred fees of between $6 million and $7 million since the first suit was filed in 2005. The Debtors suspect that the same plaintiffs' attorneys will continue to file suits across the country in an effort to recoup their investment in their earlier, failed litigations.

Overview of Proposed Publication Notice

67.    I believe that as part of the Debtors' goal to obtain a fresh start, the Debtors need to bring an end to this costly campaign, and need to ensure that the

reorganized enterprise will be free from the threat of additional claims being brought after its emergence from chapter 11. As described to me, in order to obtain this discharge, and in order to provide any person who believes he or she has a RAL-related claim the opportunity to appear and be heard, the Debtors propose to provide direct mail notice to all named plaintiffs and/or their counsel in the pending lawsuits. Moreover, the Debtors will provide direct mail notice to the attorney general of every state in the country.

68.     As I understand it, this proposed expanded notice publication involves publishing the combined notice in The Wall Street Journal, USA Today, and the 50 largest regional newspapers throughout the United States, which together have a collective circulation of approximately 16 million. Over the course of a two-week period, the Debtors will also publish a notice on the Quadrant One network, which is comprised of over 350 local newspaper and television websites; on two additional national online networks, 24/7 Real Media, Inc. and Microsoft Media Network, which together provide an opportunity for the notice to appear on over 2,300 web properties; as well as on eight major websites such as CNN and Yahoo. I have been told that the proposed website program will afford 125 million opportunities to be viewed.

69.     As described to me, the website notices will contain a link which will take viewers to the press release issued in connection with the Debtors' bankruptcy, and a copy of the combined notice. These notices will advise customers of the pendency of the bankruptcy; the fact that Jackson Hewitt intends to continue in the business of providing tax returns; the time, date, and place of the proposed confirmation hearing; and the fact that the Plan, if confirmed, will discharge any and all RAL and other litigation

claims, without any recovery.  The cost of the proposed notice program is approximately $800,000.

70.     I believe that potential RAL-related litigation claimants qualify as "unknown" creditors because their interests are conjectural and their addresses can only be discovered upon investigation and do not in the due course of business come to the knowledge of the Debtors.  While the tax returns the Debtors have prepared for their customers have addresses that could, in theory, be used to send direct mail notice, the Debtors know from experience with their customers that a very large number of these addresses are bad.  In particular, prior to each tax season, the Debtors mail reminders to past years' customers that the Debtors can assist them with their tax preparation needs.  However, the Debtors typically receive back hundreds of thousands of such mailings, with no forwarding address indicated.  It is my understanding that the reason is that the Debtors' relatively low-income customer base (average annual income of $30,000) is very transient, i.e., they move often.

71.     I believe the cost of "scrubbing" mailing lists and trying to find such customers would be astronomical.  In addition, the Debtors have estimated that the cost of mailing the proposed notice to millions of customers and maintaining an 800 number to respond to the onslaught of inquiries would be over $5 million, at the very least.  This amount is more than all the Debtors' trade debt combined.  Indeed, the out-of-pocket costs of trying to find customer addresses and mailing millions of notices would pale in comparison to the potential cost to the Debtors' franchise of sending notices directly to their customers -- notices that would undoubtedly prompt inquiries about the meaning of the notices and uncertainty about the Debtors' survival.  While this concern

may be true of almost all debtors seeking to reorganize, a debtor's franchise value should not be jeopardized by requiring such notice where, as here, the theoretical claims have such a dubious history.

I swear under penalty of perjury that the foregoing is true and correct.

*Remainder of Page Left Intentionally Blank*

Dated: May 24, 2011

JACKSON HEWITT TAX SERVICE INC.
(on behalf of itself and the other Debtors)


*/s/ Daniel P. O'Brien*
Name: Daniel P. O'Brien
Title: Executive Vice President, Chief
        Financial Officer and Treasurer

**EXHIBIT A**

**Corporate Organization Chart**



# EXHIBIT B

## List of First Day Motions

1) Debtors' Motion for Order Directing Joint Administration Under Fed. R. Bankr. P. 1015(b) and Del. Bankr. L.R. 1015-1 and Waiving Requirements of Fed. R. Bankr. P. 2002(n)

2) Debtor's Application for Order Under 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) Authorizing the Employment and Retention of The Garden City Group, Inc. as Noticing and Balloting Agent *Nunc Pro Tunc* to the Petition Date

3) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a) and 363, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (I) Authorizing Maintenance of Existing Bank Accounts, (II) Authorizing Use of Existing Business Forms and (III) Authorizing Use of Existing Cash Management System

4) Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105 and 345 and Del. Bankr. L.R. 2015-2(b) Waiving Investment and Deposit Requirements

5) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to Pay Prepetition Wages, Other Compensation and Employee Benefits

6) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363 and 366 and Fed. R. Bankr. P. 6003 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and (IV) Authorizing Debtors to Pay Prepetition Obligations to Utility Companies in the Ordinary Course of Business

7) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363, 506(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing, but not Directing, Debtors to (I) Pay Certain Prepetition Taxes and Regulatory Fees and (II) Honor Surety Bond Obligations and Continue to Pay All Obligations Arising Thereunder

8) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363, 558, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing the Debtors to Honor Existing Customer and Franchisee Programs and Obligations in the Ordinary Course of Business

9) Debtors' Motion for Order Under 11 U.S.C. §§ 105, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors (I) to Maintain Existing Insurance Policies and to Pay All Insurance Obligations Arising Thereunder and (II) to Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies

10) Debtors' Motion for Interim and Final Stipulated Orders Under 11 U.S.C. §§ 361, 363 and 507(b), Fed. R. Bankr. P. 4001(b) and Del. Bankr. L.R. 4001-2 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief

11) Debtors' Motion Under 11 U.S.C. §§ 102, 105, 341, 1125, 1126 and 1128, Fed. R. Bankr. P. 2002, 3017, 3018 and 3020 and Del. Bankr. L.R. 3017-1 (I) for Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form and Manner of Notice of Combined Hearing and Commencement of the Chapter 11 Cases, (C) Establishing Procedures for Objecting to Disclosure Statement and Plan and (D) Waiving Requirement for Meeting of Creditors and (II) for Order (A) Approving Prepetition Solicitation Procedures, (B) Approving Adequacy of Disclosure Statement and (C) Confirming Plan of Reorganization