Jackson Hewitt Tax Service Inc. and subsidiaries (collectively, the "Debtors") are sending you this disclosure statement (the "Disclosure Statement") because you may be a creditor entitled to vote on the Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (the "Plan"). This solicitation (the "Solicitation") of votes is being conducted to obtain sufficient acceptances of the Plan *prior to* the filing of voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtors intend to file voluntary cases under chapter 11 of the Bankruptcy Code to implement the Plan. Because no chapter 11 cases have yet been commenced, this Disclosure Statement has not been approved by any Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. Following the commencement of their chapter 11 cases, the Debtors expect to seek promptly an order of the Bankruptcy Court (1) approving (a) this Disclosure Statement as having contained "adequate information" as defined by section 1125(a) of the Bankruptcy Code and (b) the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (2) confirming the Plan described herein.

# DISCLOSURE STATEMENT

## DATED MAY 23, 2011

### PREPETITION SOLICITATION OF VOTES
### WITH RESPECT TO JOINT PREPACKAGED PLAN OF REORGANIZATION

OF

# JACKSON HEWITT TAX SERVICE INC. AND SUBSIDIARIES

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date are not the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Debtors are relying on section 4(2) of the Securities Act and similar provisions of state securities law, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.

Each holder of a Secured Senior Credit Facility Claim (as defined in the Plan) or authorized signatory for the beneficial owner of a Secured Senior Credit Facility Claim will be required to certify on its Ballot whether such holder or beneficial owner is an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell, or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement and the information set forth herein are confidential. This Disclosure Statement contains material non-public information concerning the Debtors, their subsidiaries, and their respective securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is

obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate any confidential information to any person, under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any such confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 1:00 P.M. PREVAILING EASTERN TIME ON MAY 24, 2011, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE"). THE RECORD DATE FOR DETERMINING WHETHER A HOLDER OF A SECURED SENIOR CREDIT FACILITY CLAIM IS ENTITLED TO VOTE ON THE PLAN IS MAY 23, 2011 (THE "VOTING RECORD DATE").**

---

**THE DEBTORS ARE FURNISHING THIS DISCLOSURE STATEMENT TO EACH HOLDER OF A SECURED SENIOR CREDIT FACILITY CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN. USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS, THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO OTHERS (OTHER THAN THOSE ADVISORS OF ANY RECIPIENT OF THIS DISCLOSURE STATEMENT WHO MAY REVIEW THE INFORMATION CONTAINED HEREIN TO ASSIST SUCH RECIPIENT IN ITS EVALUATION OF THE PLAN).**

---

Skadden, Arps, Slate, Meagher & Flom LLP

Four Times Square
New York, New York 10036
(212) 735-3000
Mark A. McDermott
J. Gregory Milmoe

One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Mark S. Chehi  (I.D. No. 2855)

Counsel for Jackson Hewitt Tax Service Inc. and Subsidiaries

# INTRODUCTION AND DISCLAIMER

Jackson Hewitt Tax Service Inc. ("Jackson Hewitt"), Jackson Hewitt Inc., Jackson Hewitt Technology Services LLC, Jackson Hewitt Corporate Services Inc., Tax Services of America, Inc., and Hewfant Inc. (collectively, the "Debtors" or the "Company") submit this Disclosure Statement to certain holders of claims in connection with the solicitation of acceptances of the proposed Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries, dated as of May 23, 2011, a copy of which is annexed hereto as Appendix A.[1] In particular, the Company is soliciting such acceptances from holders of secured obligations under that certain Amended and Restated Credit Agreement, dated as of October 6, 2006, as amended, by and among the Company; the lenders from time to time party thereto as lenders and various hedge counterparties (collectively, the "Lenders"); and Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association, as administrative agent (the "Administrative Agent") (the "Existing Credit Agreement").

THE TABLE SET FORTH BELOW SUMMARIZES THE CLASSIFICATION AND TREATMENT OF ALL PREPETITION CLAIMS AGAINST AND INTERESTS IN THE DEBTORS. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE APPENDICES AND EXHIBITS THERETO IN THEIR ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, EACH CLASS CONSISTS OF SUB-CLASSES FOR EACH DEBTOR, AND EACH SUB-CLASS SHALL AND SHALL BE DEEMED TO BE A SEPARATE CLASS FOR ALL PURPOSES UNDER THE BANKRUPTCY CODE. A SCHEDULE OF THE SUB-CLASSES IS SET FORTH IN EXHIBIT D TO THE PLAN.

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
| --- | --- |
| **Administrative Claims** | An Administrative Claim is a claim for costs and expenses of administration of the chapter 11 cases. All Allowed Administrative Claims will be paid in full in cash on the Effective Date of the Plan. However, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the chapter 11 cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or customary payment terms.<br><br>**Estimated Recovery: 100%** |

---

[1] All capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| **Priority Tax Claims** | A Priority Tax Claim is a claim of a governmental unit for taxes accorded priority in right of payment under section 507(a)(8) of the Bankruptcy Code. The Debtors anticipate receiving authority, upon commencement of the chapter 11 cases, to pay all such Claims in the ordinary course, without interruption. To the extent any such Claim is not so paid, then on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its claim Reinstated, which means that such holder's legal, equitable and contractual rights with respect to its Priority Tax Claim will be left unaltered and paid in the ordinary course, unless such holder and the Debtors agree to different treatment.<br><br>**Estimated Recovery: 100%** |
| **Class 1 – Other Priority Claims** | An Other Priority Claim is a Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including claims for wages, salaries, or commissions earned within 180 days before the petition date, subject to limitations set forth in the Bankruptcy Code. The Debtors anticipate receiving authority, upon commencement of the chapter 11 cases, to pay all known Other Priority Claims, including all employee-related obligations, in the ordinary course, without interruption. To the extent any such Claim is not so paid, then as soon as reasonably practicable after the Effective Date, each holder of an Allowed Other Priority Claim will be paid in full in cash.<br><br>**Estimated Recovery: 100%** |
| **Class 2 – Other Secured Claims** | An Other Secured Claim is any claim that is secured by a lien on the Debtors' property, or that is subject to setoff, other than a Secured Senior Credit Facility Claim. On, or as soon as reasonably practicable after, the Effective Date, each Allowed Other Secured Claim shall be Reinstated, which means that its legal, equitable and contractual rights with respect to its Other Secured Claim will be left unaltered.<br><br>**Estimated Recovery: 100%** |
| **Class 3 – Secured Senior Credit Facility Claims (Estimated Amount of Senior Credit Facility Claims: $357 million)** | A Senior Credit Facility Claim is a claim outstanding under the Existing Credit Agreement or held by a Lender or any hedge party under any related hedge agreement. The Senior Credit Facility Claims are secured by liens on all the Debtors' assets. As described below, the estimated mid-point value of the reorganized Debtors is approximately $225 million. Because this amount is less than the full face amount of such Claims, such Claims are deemed bifurcated into a secured claim, equal to the value of the Debtors, and an unsecured deficiency claim. The secured claim is included in Class 3 as a Secured Senior Credit Facility Claim. On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Secured Senior Credit Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, its pro rata share of (a) a new term loan facility (in the aggregate amount of $100 |

| Description And Amount<br>Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | million) and (b) 100% of the new common stock of reorganized Jackson Hewitt (subject to dilution on account of a management incentive plan to be implemented by the new board of reorganized Jackson Hewitt). Holders of Secured Senior Credit Facility Claims will also be given the opportunity to participate in their pro rata share of a new $115 million revolving credit facility as described below. Those who participate will receive their pro rata share of cash on the Company's balance sheet in excess of $5 million. The unsecured deficiency claims of the holders of Senior Credit Facility Claims are classified with General Unsecured Claims below. The Lenders shall have the right, amongst themselves, to sell, trade or otherwise convey their specific allocations of new common stock and new term loans, before or after the Effective Date, and certain of such Lenders have already done so. Accordingly, actual percentage recoveries for any particular Lender may differ from the estimate below.<br><br>**Estimated Recovery: 51.8%** |
| **Class 4 – General Unsecured Claims Estimated Amount (other than the Lenders' deficiency claims): $3.5 million** | A General Unsecured Claim means any claim other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Secured Senior Credit Facility Claim, a Subordinated 510(b) Claim, or an Intercompany Claim. Such claims include deficiency claims of the Lenders in the estimated amount of approximately $172 million; trade claims; lease rejection claims; and disputed litigation claims. The holders of General Unsecured Claims will receive no recovery under the Plan.<br><br>**Estimated Recovery: 0%** |
| **Class 5 – Subordinated 510(b) Claims** | A Subordinated 510(b) Claim is a claim arising from the purchase or sale, or the rescission of the purchase or sale, of equity securities or debt securities of Jackson Hewitt, and related claims. The holders of Subordinated 510(b) Claims will receive no recovery under the Plan.<br><br>**Estimated Recovery: 0%** |
| **Class 6 – Interests in Jackson Hewitt** | An Interest in Jackson Hewitt is any equity security in Jackson Hewitt, including but not limited to stock, warrants and options. On the Effective Date, all Interests in Jackson Hewitt will be cancelled without further action by the Debtors or Reorganized Debtors. The holders of Interests in Jackson Hewitt will not receive or retain any property under the Plan.<br><br>**Estimated Recovery: 0%** |
| **Class 7 – Intercompany Claims** | An Intercompany Claim is a claim of a Debtor against another Debtor. On or prior to the Effective Date, (i) the Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part; (ii) the Intercompany Claim held by Jackson Hewitt Corporate Services Inc. |

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | against Jackson Hewitt Inc. shall be Reinstated; and (iii) the Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc. shall be Reinstated.<br><br>**Estimated Recovery: 0%** |
| **Class 8 – Intercompany Interests** | An Intercompany Interest is an Interest in a Debtor held by another Debtor. On the Effective Date, all Allowed Intercompany Interests will be Reinstated.<br><br>**Estimated Recovery: 0%** |

**THE DEBTORS HAVE NOT COMMENCED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.** BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. NONETHELESS, IF CHAPTER 11 CASES ARE SUBSEQUENTLY COMMENCED, THE DEBTORS INTEND TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT COMPLIED WITH SECTION 1126(b) OF THE BANKRUPTCY CODE.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED. THE DEBTORS CURRENTLY INTEND TO SEEK TO EFFECTUATE THE PLAN PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN **SECTION IV — "SUMMARY OF THE PLAN OF REORGANIZATION."** IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTORS WILL HAVE TO CONSIDER ALL OF THEIR OPTIONS AS DEBTORS IN BANKRUPTCY.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES ATTACHED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN. IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE COMPANY'S HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTORS' CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THE DEBTORS' CHAPTER 11 CASES, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE COMPANY OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE COMPANY OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF SECURED SENIOR CREDIT FACILITY CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING **SECTION V — "RISK FACTORS TO BE CONSIDERED,"** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

EXCEPT WITH RESPECT TO THE "FINANCIAL PROJECTIONS" ATTACHED HERETO AS APPENDIX C AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN (INCLUDING WITH RESPECT TO THE PLEADINGS THE DEBTORS EXPECT TO FILE IN THE CHAPTER 11 CASES), THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS. UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS:** This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* **Section V — "Risk Factors To Be Considered."** When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or persons acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

INTRODUCTION AND DISCLAIMER ............................................................................................ i
I.     OVERVIEW OF THE COMPANY ......................................................................................... 1
    A.    Corporate Structure ................................................................................................... 1
    B.    Business Operations .................................................................................................. 1
    C.    Capital Structure ....................................................................................................... 2
    D.    Events Leading to the Company's Need to Restructure ............................................ 3
    E.    The Proposed Restructuring Plan .............................................................................. 3
    F.    Objectives of the Chapter 11 Filing ......................................................................... 3
II.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ..................................................... 4
    A.    Notice to the Lenders ................................................................................................ 4
    B.    Solicitation Package .................................................................................................. 4
    C.    Voting Procedures and Voting Deadline ................................................................... 4
    D.    Revocation; Waivers of Defects; Irregularities ........................................................ 5
    E.    Confirmation Hearing and Deadline for Objections to Confirmation ....................... 5
III.   THE ANTICIPATED CHAPTER 11 CASES ........................................................................ 6
    A.    Motions to be Filed on the Petition Date .................................................................. 6
        1.    Motion to Approve Combined Disclosure Statement and Confirmation Hearing ............ 6
        2.    Motion to Use Cash Collateral ..................................................................... 6
        3.    Motion to Continue Using Existing Cash Management Systems .................... 6
        4.    Motion to Waive Investment and Deposit Requirements............................... 7
        5.    Motion for Authority to Pay Prepetition Employee Compensation and Associated Benefits ....................................................................................... 7
        6.    Franchisee/Customer Motion ....................................................................... 7
        7.    Motion to Pay Taxes/Regulatory Expenses................................................... 7
        8.    Motion to Maintain Insurance Policies ......................................................... 7
        9.    Adequate Assurance of Utilities ................................................................... 7
        10.   Motion to Reject Unexpired Leases of Nonresidential Real Property ............ 8
        11.   Other "First Day" Motions ........................................................................... 8
    B.    Anticipated Timetable for the Chapter 11 Cases ....................................................... 8
IV.   SUMMARY OF THE PLAN OF REORGANIZATION ........................................................ 8
    A.    Overview of Chapter 11 ............................................................................................ 9
    B.    Classification and Settlement and Treatment of Claims and Interests........................ 9
        1.    Treatment Of Unclassified Claims .............................................................. 10
        2.    Classification And Treatment Of Claims And Interests................................ 10
        3.    Acceptance Or Rejection Of The Plan ......................................................... 12
        4.    Means For Implementation Of The Plan ...................................................... 13
    C.    Provisions Governing Distributions ........................................................................ 15
        1.    Allowed Claims .......................................................................................... 15
        2.    Distributions For Claims Allowed As Of The Effective Date....................... 15
        3.    Fractional Shares ........................................................................................ 16
        4.    Interest And Penalties On Claims................................................................. 16
        5.    Means Of Cash Payment.............................................................................. 16
        6.    Withholding And Reporting Requirements/Allocations ............................... 16
        7.    Preservation Of Rights ................................................................................ 16
    D.    Treatment Of Executory Contracts And Unexpired Leases ..................................... 17
        1.    Assumption Of Executory Contracts And Unexpired Leases ...................... 17
        2.    Compensation And Benefit Programs .......................................................... 17
        3.    D&O Liability Insurance Policies ................................................................ 17
        4.    Indemnification ........................................................................................... 18
    E.    Confirmation And Consummation Of The Plan....................................................... 18
        1.    Condition To Confirmation ......................................................................... 18
        2.    Conditions To Effective Date....................................................................... 18
        3.    Waiver Of Conditions ................................................................................. 19
    F.    Effect Of Plan Confirmation ................................................................................... 19

|  |  | 1. | Binding Effect | 19 |
|  |  | 2. | Revesting Of Assets | 19 |
|  |  | 3. | Compromise And Settlement Of Claims And Interests | 19 |
|  |  | 4. | Releases And Related Matters | 20 |
|  |  | 5. | Discharge Of The Debtors | 20 |
|  |  | 6. | Injunction | 21 |
|  |  | 7. | Exculpation And Limitation Of Liability | 21 |
|  |  | 8. | Term Of Bankruptcy Injunction Or Stays | 21 |
|  |  | 9. | Post-Effective Date Retention Of Professionals | 21 |
|  | G. | Miscellaneous Provisions | | 21 |
|  |  | 1. | Payment Of Statutory Fees | 21 |
|  |  | 2. | Amendment Or Modification Of The Plan | 22 |
|  |  | 3. | Severability Of Plan Provisions | 22 |
|  |  | 4. | Successors And Assigns | 22 |
|  |  | 5. | Revocation, Withdrawal, Or Non-Consummation | 22 |
|  |  | 6. | Governing Law | 22 |
| V. | RISK FACTORS TO BE CONSIDERED | | | 23 |
|  | A. | Failure to Confirm the Plan | | 23 |
|  | B. | Potential Adverse Effects of Chapter 11 | | 23 |
|  | C. | Failure to Obtain a Discharge of Unknown Litigation Claims | | 23 |
|  | D. | Business Risks | | 24 |
|  |  | 1. | No Public Market for Securities | 24 |
|  |  | 2. | Majority Shareholder Control | 24 |
|  |  | 3. | Inherent Uncertainty of Debtors' Financial Projections | 24 |
|  |  | 4. | Lack of Audited and Recent Financial Reports | 25 |
|  |  | 5. | Inability to Execute Strategic Plan and Reverse Declining Profitability | 25 |
|  |  | 6. | Distribution System | 25 |
|  |  | 7. | Regulation of Financial Products | 25 |
|  |  | 8. | Failure to Comply with Regulatory Requirements | 26 |
|  |  | 9. | Failure to Grow Franchise System | 26 |
|  |  | 10. | Disruption in Retail Relationships | 26 |
|  |  | 11. | Dependence on Key Personnel | 27 |
|  |  | 12. | Success Tied to Operations of Franchisees | 27 |
|  |  | 13. | Litigation | 27 |
|  |  | 14. | Seasonal Nature of Business | 27 |
|  |  | 15. | Competition | 28 |
|  |  | 16. | Goodwill Impairment Charges | 28 |
|  |  | 17. | Credit Markets | 28 |
|  | E. | Methods of Solicitation | | 28 |
|  | F. | Classification and Treatment of Claims and Interests | | 29 |
| VI. | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | | | 30 |
|  | A. | Issuance and Resale of Plan Securities Under the Plan | | 30 |
|  |  | 1. | Exemption from Registration | 30 |
|  |  | 2. | Resales of Plan Securities; Definition of Underwriter | 30 |
| VII. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | | 31 |
|  | A. | Certain U.S. Federal Income Tax Consequences to the Debtors | | 32 |
|  |  | 1. | Cancellation of Indebtedness Income | 32 |
|  |  | 2. | Net Operating Losses – Section 382 | 33 |
|  | B. | Certain U.S. Federal Income Tax Consequences to Holders of Class 3 Secured Senior Credit Facility Claims | | 33 |
|  |  | 1. | General U.S. Federal Income Tax Consequences to Holders | 33 |
|  |  | 2. | Accrued Interest | 35 |
|  |  | 3. | Market Discount | 35 |
|  |  | 4. | Backup Withholding and Information Reporting | 35 |
|  | C. | Importance of Obtaining Professional Tax Assistance | | 36 |

VIII. FEASIBILITY, VALUATION, BEST INTERESTS OF CREDITORS AND CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES ................................................................. 36
    A. Feasibility of the Plan .................................................................................................. 36
    B. Valuation ..................................................................................................................... 37
    C. Best Interests Test ....................................................................................................... 37
    D. Confirmation Without Acceptance of All Impaired Classes ....................................... 38
IX. CONCLUSION AND RECOMMENDATION ....................................................................... 40

**APPENDICES**

APPENDIX A        Joint Prepackaged Plan of Reorganization

APPENDIX B        Liquidation Analysis

APPENDIX C        Financial Projections

APPENDIX D        Valuation Analysis

APPENDIX E        Plan Support Agreement

# I.  OVERVIEW OF THE COMPANY

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

## A.  Corporate Structure

Jackson Hewitt Tax Service Inc. ("Jackson Hewitt"), the ultimate parent of the Jackson Hewitt family of companies, is a publicly-held Delaware corporation.  It was incorporated on February 20, 2004, and was formed in connection with Jackson Hewitt's June 2004 initial public offering, which occurred when Cendant Corporation, now known as Avis Budget Group, Inc., divested 100% of its ownership interest in Jackson Hewitt. Since its initial public offering, Jackson Hewitt's stock was traded on the New York Stock Exchange.  On May 6, 2011, however, Jackson Hewitt's stock was delisted.  The stock is now quoted on the OTCQB Marketplace which is operated by OTC Markets Group Inc.

There are five direct and indirect subsidiaries of Jackson Hewitt: Jackson Hewitt Inc., Jackson Hewitt Technology Services LLC, Jackson Hewitt Corporate Services Inc, Tax Services of America, Inc. and Hewfant Inc.  While the corporate family is comprised of six separate entities, they collectively operate a unitary business enterprise.  For instance, Jackson Hewitt Technology Services LLC supports the technology needs of all franchised and company-owned locations (discussed further below), and Tax Services of America, Inc. owns and operates the company-owned locations.  The Company's executive offices are located at 3 Sylvan Way, Parsippany, New Jersey 07054.  The Company's telephone number is (973) 630-1040.  The Company's internet address is www.jacksonhewitt.com.

## B.  Business Operations

The Company provides computerized preparation services for federal, state and local individual income tax returns in the United States through a nationwide network of franchised and company-owned offices operating under the brand name Jackson Hewitt Tax Service.  The market for paid tax preparation services is highly fragmented, with tens of thousands of paid tax return preparers throughout the country.  The Company is the second largest paid tax return preparer in the United States, having prepared approximately 2.6 million tax returns for the 2011 tax season, which is between 3% and 4% of the total market for paid tax return preparation services.

The core of the Company's business is its franchise network.  As of the date hereof, the Company had approximately 700 franchisees who collectively operated a total of 4,846 offices.  In 2011, the franchisees prepared approximately 84% of the total number of tax returns prepared by the Company.  The franchise business generates revenue for the Company from royalties, marketing and advertising fees, and other revenue.  In 2010, this revenue constituted approximately 44% of the Company's total revenue.

The Company also operates approximately 1,110 company-owned offices.  These company-owned offices recognize service revenues primarily from the preparation of tax returns.  In 2010, revenue from company-owned offices constituted approximately 34% of the Company's total revenue.  The balance of the Company's 2010 revenues, which comprised approximately 22% of total revenue in 2010, was derived principally from the sale, by third-party financial institutions, of financial products, including, in particular, assisted refunds ("ARs") and refund anticipation loans ("RALs") in Jackson Hewitt Tax Service locations.

ARs enable customers to pay for tax return preparation fees and other charges out of their tax refunds, so that no out-of-pocket payment is required at the time of tax preparation. Pursuant to this arrangement, the bank establishes a temporary bank account to enable a more accelerated receipt of tax refund amounts than receiving a check in the mail from the Internal Revenue Service ("IRS"). A RAL is a short-term consumer loan made by a third-party financial institution to a customer in anticipation of a refund being paid by the IRS. The customer receives the loan amount within 24 hours of filing his or her tax return, and the loan is repaid when the IRS funds the tax refund. The RAL is secured by the customer's anticipated tax refund.

Another critically important and highly successful aspect of the Company's business is its relationship with Wal-Mart. In 2010, the Company entered into an arrangement with Wal-Mart which granted the Company the exclusive right to provide tax preparation services within Wal-Mart stores during the 2010 and 2011 tax seasons. This led to a significant increase in the number of Company locations. In 2011, the Company, through its franchisees and company-owned stores, operated tax preparation kiosks in over 2,000 Wal-Mart stores. Approximately 24% of the tax returns prepared by the Company in 2011 were generated in Wal-Mart stores.

The Company's business is highly seasonal resulting in substantially all of the Company's revenues and cash flow being generated during the period from January 1st through April 30th of each year, and the Company's workforce also peaks during this period. From May 1, 2010 to April 30, 2011, the Company employed approximately 6,000 employees, but approximately 95% of these employees were hired on a temporary seasonal basis. During the off-season, however, the number of employees is reduced significantly, and is comprised of approximately 315 full-time employees, principally at its corporate headquarters in Parsippany, New Jersey and its technology facility in Sarasota, Florida. The Company generally operates at a loss during the period from May 1st through December 31st, during which time the Company incurs costs associated with preparing for the upcoming tax season.

For fiscal year 2011, the Company estimates that it will generate total revenue of approximately $214.4 million and EBITDA, adjusted for non-recurring items and costs associated with its balance sheet restructuring, of approximately $48.3 million. As of April 30, 2010, which was the end of the Company's 2010 fiscal year, the Company had generated total revenue of approximately $213.8 million and EBITDA of approximately $46.8 million. It had a net loss of approximately $272 million in 2010, largely on account of a goodwill impairment charge of approximately $274 million. At that time, the Debtors had total assets of approximately $346.4 million, and total liabilities of approximately $372 million, in each case as determined in accordance with generally accepted accounting principles.

## C.      Capital Structure

Jackson Hewitt and its subsidiaries are parties to the Existing Credit Agreement. As of the date hereof, the Company was obligated on (i) approximately $214.4 million principal amount of term loans under the Existing Credit Agreement, (ii) approximately $141 million principal amount of outstanding revolver loans under the Existing Credit Agreement (including capitalized PIK interest, but excluding earned but unpaid cash interest), and (iii) approximately $1.9 million under related hedge agreements, for a total of approximately $357 million. On May 27, 2011, a $30 million amortization payment is due under the Existing Credit Agreement. The balance of the Debtors' obligations under the Existing Credit Agreement is scheduled to mature a few months from now, on October 6, 2011.

The obligations under the Existing Credit Agreement are secured by a first priority lien on substantially all of the Company's assets. The total enterprise value of the Company is estimated in a range between $200 million and $250 million with a mid-point of $225 million. The Lenders have an unsecured deficiency claim of approximately $172 million, which makes them the Debtors' largest unsecured creditors: the Company has no other funded debt obligations, and as of the date hereof, the Company was obligated on a relatively small amount of outstanding trade debt.

D.  **Events Leading to the Company's Need to Restructure**

The Debtors need to restructure their affairs because they can no longer sustain the amount of their debt obligations under the Existing Credit Agreement. The Debtors incurred these debt obligations at a time when their EBITDA was significantly higher than it is now. Specifically, the Debtors' 2009 EBITDA was approximately $75 million, but it dropped to $46.8 million in 2010 and is estimated to be $48.3 million for 2011. The Debtors' declining EBITDA has been driven by several factors, including a several-year decline in the number of tax returns prepared year-over-year and overall operating performance. While the Debtors reversed this trend for the 2011 tax season, the increase in returns over the 2010 tax season was relatively modest. These factors have driven the Debtors' enterprise value down significantly, such that there is insufficient value to pay in full the Lenders under the Existing Credit Agreement.

Moreover, in preparing their go-forward business plan and projections, the Debtors have assumed significantly lower revenues on account of financial products, including no revenues at all on account of RALs. During the last two tax seasons, most lenders who historically provided RALs have exited the business. During the 2011 tax season, H&R Block, the largest paid tax return preparer in the United States, did not provide RALs to its customers. Jackson Hewitt had only one source of RAL products in 2011, and it is doubtful whether that source will provide RALs in 2012.

Accordingly, given significantly lower historical and projected EBITDA levels and hence, an enterprise value that is significantly less than the amount of the debt under the Existing Credit Agreement, and also given the maturity of the Existing Credit Agreement in October of this year, the Company determined that it was in the best interests of its stakeholders to work with the Lenders on a consensual restructuring, which is embodied in the Plan.

E.  **The Proposed Restructuring Plan**

As a general matter, the Plan provides for a balance sheet restructuring whereby (i) the Debtors' outstanding obligations under the Existing Credit Agreement will be forgiven in exchange for each Lender receiving (a) its pro rata share of 100% of the new common stock issued by reorganized Jackson Hewitt, subject to dilution on account of a management incentive plan, (b) its pro rata share of a new term loan facility in the amount of $100 million, and (c) the opportunity to participate pro rata in a new revolving credit facility in the amount of $115 million, and (ii) all existing, outstanding shares of Jackson Hewitt stock and all rights and options to acquire Jackson Hewitt stock, will be cancelled. The terms of the new term loan facility are described in <u>Exhibit A</u> to the Plan and the terms of the New Revolving Credit Facility are described in <u>Exhibit B</u> to the Plan.

The Plan also provides that the Debtors will (a) reject certain unfavorable executory contracts and unexpired leases and (b) assume all of their franchise agreements with their franchisees. Holders of general unsecured claims, including the Lenders, as holders of deficiency claims under the Existing Credit Agreement, will receive no recovery. In addition, on the Effective Date of the Plan, the Debtors and the Lenders will enter into a shareholders' agreement. The material terms and conditions of the shareholders' agreement are set forth in the term sheet attached to the Plan as <u>Exhibit C</u>.

F.  **Objectives of the Chapter 11 Filing**

In connection with the solicitation of votes on the Plan, the Debtors and certain Lenders entered into a plan support agreement pursuant to which the Lenders agreed to support the Plan. Accordingly, assuming the Debtors receive requisite votes accepting the Plan, the Debtors intend to commence chapter 11 cases to implement the Plan as quickly as possible. A copy of the plan support agreement, without exhibits, is attached hereto as <u>Appendix E</u>.

While there is no value for the Debtors' existing stockholders or impaired creditors other than the Lenders, the Debtors strongly believe that the Plan is in the collective best interests of all their stakeholders, including their franchisees, and should be approved. The Plan, if confirmed, will end a prolonged period of uncertainty regarding the Debtors' future prospects by appropriately right-sizing their balance sheet. While RALs may not be part of the Debtors' long-term future, the core tax preparation business remains. Demand will continue for these services. In 2010, more than 139 million tax returns were filed in the United States – historically, 60% or more of all such tax returns have been prepared with the assistance of a paid tax return preparer.

It is imperative that the Debtors exit chapter 11 quickly. While the 2011 tax season has just concluded, preparations for the 2012 tax season must commence immediately. However, these preparations will be negatively affected the longer the Debtors are in chapter 11. Indeed, the Company has aggressive plans for expansion in anticipation of the 2012 tax season, which it must begin to implement now. Confirmation of the Plan will bring closure to the uncertainty that has plagued them for the last several years, thereby allowing the Debtors to move forward towards the 2012 tax season and beyond.

## II.  PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.  Notice to the Lenders

This Disclosure Statement is being transmitted to the Lenders, who are the holders of Class 3 Secured Senior Credit Facility Claims. They are the only creditors entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan. With the exception of Class 4 General Unsecured Claims, Class 5 Subordinated 510(b) Claims and Class 6 Interests in Jackson Hewitt, all other Classes are Unimpaired under the Plan and the holders of Claims and Interests in such classes are deemed to have accepted the Plan.

### B.  Solicitation Package

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Lenders, the Debtors also will send copies of the Plan (attached hereto as Appendix A) and a Ballot to be used by holders of Claims in such Class to vote to accept or reject the Plan.

### C.  Voting Procedures and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return your Ballot to the Garden City Group, Inc. (the "Voting Agent") either by fax to the fax number set forth below; email, to the email address set forth below; or by hand delivery during customary business hours, or overnight courier to the address set forth below, so that it is received by the Voting Deadline.

THE VOTING DEADLINE IS 1:00 P.M. PREVAILING EASTERN TIME ON MAY 24, 2011, UNLESS EXTENDED BY THE DEBTORS. THE VOTING RECORD DATE FOR DETERMINING WHETHER A HOLDER OF A SECURED SENIOR CREDIT FACILITY CLAIM IS ENTITLED TO VOTE ON THE PLAN IS MAY 23, 2011. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT AT THE ADDRESS, FAX NUMBER OR EMAIL ADDRESS SET FORTH BELOW.

The Garden City Group, Inc.
Attn: JHT Ballot Processing
1985 Marcus Avenue, Suite 200
Lake Success, NY 11042
(888) 476-7162
JHTSolicitation@gcginc.com

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received or the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact the Voting Agent as follows:

By Email: JHTSolicitation@gcginc.com
By Phone: (631) 470-1889 (Patrick Leathem)
(631) 470-1866 (Craig Johnson)
(631) 470-6834 (Jeff Stein)

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline or the Bankruptcy Court orders otherwise, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan. In the event of a dispute with respect to any Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

## D.     Revocation; Waivers of Defects; Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding. Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtors' written consent or an order of the Bankruptcy Court. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.

The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions therein) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## E.     Confirmation Hearing and Deadline for Objections to Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. If and when the Debtors file petitions for relief under chapter 11 of the Bankruptcy Code, they will request that the Bankruptcy Court schedule a Confirmation Hearing to consider the adequacy of this Disclosure Statement and to confirm the Plan. Notice of the Confirmation Hearing will be provided to holders of Claims and Interests or their representatives (the "Confirmation Hearing Notice") pursuant to an order of the Bankruptcy Court. Objections to Confirmation must be filed with the Bankruptcy Court by the date designated in

the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, SUCH OBJECTION TO CONFIRMATION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING.

## III. THE ANTICIPATED CHAPTER 11 CASES

If the Debtors receive the requisite acceptances in response to the Solicitation occurring pursuant to this Disclosure Statement, the Debtors intend promptly to commence the Chapter 11 Cases. From and after the Petition Date, the Debtors intend to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors do not expect the Chapter 11 Cases to be protracted. To ease their transition into Chapter 11 and to expedite their emergence from Chapter 11, the Debtors intend to seek from the Bankruptcy Court, among other things, the relief detailed below on the Petition Date. If granted, this relief will facilitate the administration of the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. The Debtors may also seek various other forms of administrative and other relief in the early stages of the Chapter 11 Cases.

## A. Motions to be Filed on the Petition Date

### 1. *Motion to Approve Combined Disclosure Statement and Confirmation Hearing*

The Debtors expect to seek an order (i) scheduling a combined Confirmation Hearing and hearing on the adequacy of this Disclosure Statement on the earliest date which is convenient for the Bankruptcy Court (the "Combined Hearing"); (ii) approving the objection deadline and procedures with respect to the Combined Hearing; and (iii) approving the form and manner of notice of the Combined Hearing and the commencement of the Debtors' chapter 11 cases, including a publication notice program to provide notice to unknown creditors. At the Combined Hearing, the Debtors will seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128, and 1129 of the Bankruptcy Code. At that time, the Debtors also expect to request the Bankruptcy Court to approve the prepetition solicitation of votes on the Plan.

### 2. *Motion to Use Cash Collateral*

The Debtors expect to seek authority to use their cash collateral in order to continue their business operations. The Debtors expect to seek authorization to use only such amounts of cash collateral as are necessary or appropriate to continue to operate their businesses in the ordinary course and to avoid any immediate and irreparable harm to their businesses. In exchange for the use of such cash collateral, the Debtors will offer to the Lenders and the Administrative Agent adequate protection in the form of, *inter alia*, replacement liens, superpriority claims and payment of the fees and expenses of the Lenders.

### 3. *Motion to Continue Using Existing Cash Management Systems*

Because the Debtors expect the Chapter 11 Cases to be pending for approximately 45 days, and because of the administrative hardship that any operating changes would impose, the Debtors expect to seek authority to continue using their existing cash management system, bank accounts, and business forms. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be impeded to the detriment of the Debtors' Estates and their creditors.

4. *Motion to Waive Investment and Deposit Requirements*

The Debtors will seek to waive the investment and deposit requirements imposed by Bankruptcy Code section 345, to the extent that their investment and deposit practices do not conform to such requirements, so as to allow the applicable banking institutions to accept and hold the Debtors' funds consistent with prepetition practices. This relief will enable the Debtors to maintain their centralized cash management system which is inextricably intertwined with their prepetition investment and deposit practices.

5. *Motion for Authority to Pay Prepetition Employee Compensation and Associated Benefits*

The Debtors have a valuable asset in their work force and believe that any delay in paying prepetition compensation or benefits to their employees would destroy their relationships with such employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. Accordingly, the Debtors expect to seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date, and, through a separate interim motion, authority to continue to pay compensation and benefits which were accrued but unpaid as of the Petition Date during the period between the Petition Date and the hearing on the "first day" motions.

6. *Franchisee/Customer Motion*

In order to maintain the loyalty of their franchisees and customers, the Debtors will seek authority to continue to perform their prepetition and postpetition obligations arising under their franchisee and customer programs. The franchisee programs include, but are not limited to, the regional marketing corporate matching program, the electronic filing fee rebate program and the royalty growth incentive program and the customer programs include, but are not limited to, various guarantee programs. This relief will enable the Debtors to maintain relationships with their franchisees and customers during the pendency of the Chapter 11 Cases, which will, in turn, preserve the value of the Debtors' businesses.

7. *Motion to Pay Taxes/Regulatory Expenses*

The Debtors expect to seek authority to pay prepetition sales taxes, use taxes, and property taxes regardless of when incurred, to the appropriate taxing, licensing and other governmental authorities, and to continue to honor related obligations under surety contracts and to post additional collateral as requested in the ordinary course of the Debtors' businesses and consistent with their past practices.

8. *Motion to Maintain Insurance Policies*

In connection with the operation of their business, the Debtors maintain various insurance policies. Maintenance of insurance is essential to the continued operation of the Debtors' business, and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases and the laws of the various states in which the Debtors operate. Accordingly, the Debtors will request authority to continue to honor obligations under and related to their insurance policies, and to renew, revise, extend, supplement, change or obtain new insurance coverage, as needed in their business judgment.

9. *Adequate Assurance of Utilities*

In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telephone and other similar services from many different utility

companies. Historically, the Debtors have paid these utility companies timely. The Debtors expect to move the Bankruptcy Court on the Petition Date to enter an order approving, as adequate assurance of payment for the utility companies, a cash deposit of $200,000 in the aggregate into a newly created, interest-bearing, segregated account. The amount of the deposit equals the estimate aggregate cost for half of one month of utility services, calculated based on the cost of utility services in May 2010. Further, the motion will request an order prohibiting the utility companies from altering, refusing, or discontinuing services. The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization. The Debtors will also seek authority to continue to pay the prepetition and postpetition claims of the utility companies as they become due in the ordinary course of business.

10. *Motion to Reject Unexpired Leases of Nonresidential Real Property*

The Debtors will seek authority to reject certain unexpired leases of nonresidential real property governing premises at which the Debtors no longer conduct business as of the Petition Date and to abandon any equipment, furniture, fixtures, and/or any other personal property located at any of the premises in order to avoid incurring unnecessary costs for facilities that provide no tangible benefit to the Debtors' estates. This relief will relieve the Debtors from their obligations to pay rent, as well as certain other costs including, but not limited to, taxes, insurance, utilities, maintenance and operating expenses associated with the leases, and save the Debtors' bankruptcy estates considerable administrative costs.

11. *Other "First Day" Motions*

Upon the commencement of the Chapter 11 Cases, the Debtors also intend to seek court approval to provide for, among other things:

- the extension of the deadlines to file schedules and statements, and ultimate waiver if the Plan is effectuated;

- joint administration of the Debtors' Chapter 11 Cases; and

- retention of professionals.

## B. Anticipated Timetable for the Chapter 11 Cases

The Debtors anticipate that the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan will occur within 30 to 45 days after the Petition Date. There can be no assurance, however, that the Bankruptcy Court will permit the chapter 11 cases to proceed as expeditiously as anticipated. Assuming that the Plan is confirmed at that hearing, the Plan provides that the Effective Date will be the first business day on which all conditions to the Plan's effectiveness (as set forth in Article VIII of the Plan) have been satisfied or waived. *See* **Section IV.E.1 — "Summary Of The Plan Of Reorganization – Confirmation And Consummation Of The Plan – Condition To Confirmation."** Based upon information currently available, the Debtors believe that the Effective Date could occur shortly after the Confirmation Date. There can be no assurance, however, that this projected timetable can be achieved.

## IV. SUMMARY OF THE PLAN OF REORGANIZATION

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete

statements of such terms and provisions. The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors and their Estates, the Reorganized Debtors, and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and its interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes that plan binding upon the debtor and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) holds a claim or interest that is impaired under the plan; (ii) has voted to accept or reject the plan; or (iii) receives or retains any property under the plan.

## B.    Classification and Settlement and Treatment of Claims and Interests

The Plan, though proposed jointly, constitutes separate plans proposed by each of the Debtors. Therefore, except as expressly specified in the Plan, the classifications set forth below shall be deemed to apply separately with respect to each plan proposed by each Debtor.

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that holders of Claims and Interests will receive types of consideration based on the different rights of the holders of Claims or Interests in each Class. Except as otherwise provided in the Plan, each Class consists of sub-Classes for each Debtor, and each sub-Class shall and shall be deemed to be a separate Class for all purposes under the Bankruptcy Code. A schedule of the sub-Classes is set forth in Exhibit D to the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Each reference to "Class" or "Classes" shall include all sub-Classes of the respective Class or Classes, as applicable.

Moreover, the Plan implements a compromise and settlement with respect to the Senior Credit Facility Claims, Intercompany Claims, and Intercompany Interests. Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute Bankruptcy Court approval of, such settlement. In particular, the Lenders' Senior Credit Facility Claims are secured by liens on all the Debtors' assets, including all Cash, the Cash Collateral Account, Intercompany Claims, and Intercompany Interests. However, the estimated value of the Debtors is significantly less than the face amount of the Senior Credit Facility Claims. While there is, therefore, no value available for holders of Intercompany Claims and Intercompany Interests, the Lenders nonetheless have agreed to the treatments specified

below for such Claims and Interests in order to preserve the Debtors' historical corporate structure and intercompany relationships.

1.      *Treatment Of Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

(a)      Administrative Claims.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (x) any Professional Fee Claim shall not be paid except in accordance with an order of the Bankruptcy Court permitting such payment, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors.

(b)      Priority Tax Claims.  The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan.  Unless the holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have such Claim Reinstated.

2.      *Classification And Treatment Of Claims And Interests*

(a)      Summary Of Classes

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 ................. | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 ................. | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 ................. | Secured Senior Credit Facility Claims | Impaired | Yes |
| Class 4 ................. | General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 5 ................. | Subordinated 510(b) Claims | Impaired | No (deemed to reject) |
| Class 6 ................. | Interests in Jackson Hewitt | Impaired | No (deemed to reject) |
| Class 7 ................. | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 8 ................. | Intercompany Interests | Unimpaired | No (deemed to accept) |

(b)     Treatment Of Classes

(i)     **Class 1 – Other Priority Claims.**  Class 1 consists of separate sub-Classes for all Other Priority Claims that may exist against each Debtor, respectively.  On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each holder of an Allowed Class 1 Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, cash equal to the unpaid portion of such Allowed Other Priority Claim.

(ii)     **Class 2 – Other Secured Claims.**  Class 2 consists of separate sub-Classes for all Other Secured Claims that may exist against each Debtor, respectively.  On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Class 2 Other Secured Claim shall be Reinstated.

(iii)     **Class 3 – Secured Senior Credit Facility Claims.**  Class 3 consists of separate sub-Classes for all Secured Senior Credit Facility Claims against each Debtor, respectively.  The Senior Credit Facility Claims are Allowed Claims, for all purposes, in the amount of no less than $357 million and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.  On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Secured Senior Credit Facility Claim, (i) its pro rata share of the New Term Loan Facility; (ii) its pro rata share of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan; and (iii) an opportunity elect to participate pro rata in the New Revolving Credit Facility (and receive the associated pro rata distribution of Cash, as set forth in Section 5.3 of the Plan if such holder elects to so participate).

(iv)     **Class 4 – General Unsecured Claims.**  Class 4 consists of separate sub-Classes for all General Unsecured Claims that may exist against each Debtor, respectively.  The holders of Class 4 General Unsecured Claims shall not receive or retain any property under the Plan on account of such Class 4 General Unsecured Claims.

(v)     **Class 5 – Subordinated 510(b) Claims.**  Class 5 consists of all Subordinated 510(b) Claims.  This Class is applicable only to the Chapter 11 Case of Jackson Hewitt.  The holders of Class 5 Subordinated 510(b) Claims shall not receive or retain any property under the Plan on account of such Class 5 Subordinated 510(b) Claims.

(vi)     **Class 6 – Interests in Jackson Hewitt.**  Class 6 consists of all Interests in Jackson Hewitt.  This Class is applicable only to the Chapter 11 Case of Jackson Hewitt.  On the Effective Date, all Class 6 Interests in Jackson Hewitt shall be cancelled without further action by the Debtors or Reorganized Debtors.  The holders of Class 6 Interests in Jackson Hewitt shall not receive or retain any property under the Plan on account of such Class 6 Interests in Jackson Hewitt.

(vii)     **Class 7 – Intercompany Claims.**  Class 7 consists of three sub-Classes each consisting of the following Claims, respectively:  (i) the Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt; (ii) the Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc.; and (iii) the Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc.  On or prior to the Effective Date, (i) the Allowed Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part; (ii) the Allowed Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc. shall be Reinstated;

and (iii) the Allowed Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc. shall be Reinstated.

        (viii)    **Class 8 – Intercompany Interests.** Class 8 consists of five sub-Classes each consisting of the following Intercompany Interests, respectively: (i) Jackson Hewitt's Intercompany Interests in Jackson Hewitt Inc.; (ii) Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Technology Services LLC; (iii) Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Corporate Services Inc.; (iv) Jackson Hewitt Inc.'s Intercompany Interests in Tax Services of America, Inc.; and (v) Jackson Hewitt Inc.'s Intercompany Interests in Hewfant Inc. On the Effective Date, the Allowed Class 8 Intercompany Interests shall be Reinstated and the legal, equitable, and contractual rights to which the holders of such Allowed Class 8 Intercompany Interests are entitled shall remain unaltered.

        (c)    **Alternative Treatment.** Notwithstanding any provision herein to the contrary, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors or the Reorganized Debtors may agree in writing.

        (d)    **Special Provision Regarding Unimpaired Claims.** Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

        (e)    **Procedures For Resolving Disputed, Contingent, And Unliquidated Claims.** The Debtors and the Reorganized Debtors may contest the amount and validity of any disputed, contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

       3.    *Acceptance Or Rejection Of The Plan*

        (a)    **Acceptance By Class Entitled To Vote.** Class 3, which is the only Impaired Class of Claims of the Debtors that is entitled to receive or retain property or any interest in property under the Plan, is entitled to vote to accept or reject the Plan. Class 3 shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

        (b)    **Presumed Acceptance Of The Plan.** Classes 1, 2, 7, and 8 are Unimpaired. Therefore, such Classes are deemed to have accepted the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

        (c)    **Presumed Rejection Of The Plan.** Classes 4, 5, and 6 are Impaired. Therefore, such Classes are deemed to have rejected the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

        (d)    **Elimination Of Classes.** To the extent applicable, any Class (including, for the avoidance of doubt, any sub-Class) that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (i) voting to accept or reject the Plan and (ii) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

(e)     Cramdown.  The Debtors shall request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

4.      *Means For Implementation Of The Plan*

(a)     Continued Legal Existence.  Except as otherwise provided in the Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a corporation, limited liability company or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to such Debtor's certificate or articles of incorporation and by-laws or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

(b)     Sources Of Cash For Distribution.  All cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from (i) existing cash balances, including balances in the Cash Collateral Account, (ii) the operations of the Debtors or Reorganized Debtors and (iii) the New Revolving Credit Facility.

(c)     New Revolving Credit Facility.  All Lenders will be given the opportunity to participate in the New Revolving Credit Facility on a pro rata basis based upon the amount of their Secured Senior Credit Facility Claims.  To the extent the New Revolving Credit Facility is not fully subscribed, subscribing Lenders will "flex" their pro rata share thereof by 10% (by way of example, a 15% Lender would flex to 16.5%).  To the extent the New Revolving Credit Facility remains not fully subscribed after such "flex", subscribing Lenders electing to do so may, but shall not be obligated to, further subscribe on a pro rata basis.  In exchange for providing the New Revolving Credit Facility, such Lenders will receive (on a pro rata basis based upon their participation in the New Revolving Credit Facility) the Cash on the Reorganized Debtors' balance sheet (including any Cash in the Cash Collateral Account) in excess of $5 million as of the Effective Date.  On the Effective Date, the New Revolving Credit Facility will be deemed drawn in an amount (the "Initial Draw") that shall be the lesser of (i) the actual amount of Cash collateral used by the Debtors between April 30, 2011 and the Effective Date (the "Actual Draw") and (ii) an amount based upon the Debtors' projected revolver draw (the "Projected Draw") as set forth on the Projected Draw Schedule attached to the Plan as Exhibit A, provided that during the period between the Petition Date and the Effective Date, all expenses of the Debtors and their estates, other than those related to professional fees, shall be in amounts consistent with the Debtors' ordinary course of operations and the cash budget approved pursuant to the terms of any cash collateral order.  If the Initial Draw is deemed to be the Projected Draw and the Effective Date falls between two dates shown on the Projected Draw Schedule, the amount of the Initial Draw shall be prorated based upon the number of days between such Effective Date and the scheduled dates such Effective Date falls between.

(d)     Approval And Authorization For The New Term Loan Facility And New Revolving Credit Facility.  Confirmation shall be deemed approval of the New Term Loan Facility and the New Revolving Credit Facility and authorization for the Reorganized Debtors to enter into the New Term Loan Facility and the New Revolving Credit Facility and execute such documents as may be required to effectuate the treatment afforded to the Lenders pursuant to the New Term Loan Facility and the New Revolving Credit Facility.

(e)     Issuance of New Common Stock.  On the Effective Date, Reorganized Jackson Hewitt shall issue shares of New Common Stock for distribution to holders of Allowed Secured Senior Credit Facility Claims.  All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non assessable.  The New Common Stock issued to the holders of Allowed Secured Senior Credit Facility Claims shall be subject to dilution by the Management Incentive Plan.

(f)     Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of the New Common Stock to holders of Allowed Secured Senior Credit Facility Claims shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

(g)     Shareholders' Agreement For New Common Stock.  On the Effective Date, Reorganized Jackson Hewitt and the Lenders shall be deemed to have executed and delivered the Shareholders' Agreement.  Each holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall be deemed bound by the Shareholders' Agreement as of the Effective Date without the need for execution or delivery by such holder.

(h)     Management Incentive Plan.  The New Board will implement the Management Incentive Plan.

(i)     New Board Of Reorganized Jackson Hewitt.  The New Board of Reorganized Jackson Hewitt shall be comprised of five (5) directors elected by a majority of the shareholders.  The identity of the members of the New Board will be identified in the Plan Supplement or in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing.

(j)     Corporate Action.  Each of the matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

(k)     Preservation Of Causes Of Action.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions, except that the Debtors waive all Avoidance Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Retained Action in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of the Plan.

(l)     Effectuating Documents; Further Transactions.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

(m)     Exemption From Certain Transfer Taxes And Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform

Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(n)     Further Authorization.  The Debtors and the Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

(o)     Dissolution Of Creditors' Committee.  A Creditors' Committee, if appointed, shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Creditors' Committee, if appointed, shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (a) all Professional Fee Claims and (b) any appeals of the Confirmation Order.

(p)     Cancellation Of Existing Securities And Agreements.  Except as provided in the Plan or in the Confirmation Order, on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Senior Credit Facility Claims and Interests in Jackson Hewitt shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.  The holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan and the Confirmation Order.

## C.     Provisions Governing Distributions

### 1.     *Allowed Claims*

Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to holders of Allowed Claims.  A holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such holder's Disputed Claim becomes an Allowed Claim.

### 2.     *Distributions For Claims Allowed As Of The Effective Date*

Except as otherwise provided under the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

3.      *Fractional Shares*

No fractional shares of New Common Stock will be issued or distributed under the Plan. The actual distribution of shares of New Common Stock will be rounded to the next higher or lower whole number as follows: (a) fractions less than one-half (½) shall be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total number of shares of New Common Stock to be distributed herein will be adjusted as necessary to account for such rounding. No consideration will be provided to holders of Secured Senior Credit Facility Claims in lieu of fractional shares that are rounded down.

4.      *Interest And Penalties On Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims and Other Priority Claims, and no holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

5.      *Means Of Cash Payment*

Payments of cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Reorganized Debtor. Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

6.      *Withholding And Reporting Requirements/Allocations*

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Each Holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall be treated as receiving, for U.S. federal income tax purposes, in full satisfaction and discharge of its Claim (i) its pro rata share of the New Term Loan Facility, (ii) its pro rata share of the New Common Stock, and (iii) to the extent that such Holder participates in the New Revolving Credit Facility, its share of the cash on the Reorganized Debtors' balance sheet (including any Cash in the Cash Collateral Account) in excess of $5 million as of the Effective Date, and the Initial Draw under the New Revolving Credit Facility. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

7.      *Preservation Of Rights*

The Reorganized Debtors shall retain all rights arising under section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, including, but not limited to, the right to set off against any Claim, the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the

Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder; *provided*, *further*, that the holder of any Claim must assert any right to setoff prior to the Effective Date or such right shall be deemed waived on the Effective Date.

## D.   Treatment Of Executory Contracts And Unexpired Leases

### 1.   *Assumption Of Executory Contracts And Unexpired Leases*

Except as otherwise provided in the Plan, on the Effective Date, all executory contracts and unexpired leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (a) has previously been rejected by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to reject filed on or before the Effective Date; (c) is identified as an executory contract or unexpired lease to be rejected pursuant to the Plan Supplement before the Effective Date; or (d) expired or terminated pursuant to its own terms.  An executory contract or unexpired lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors had properly provided for the cure of any defaults that might have existed, (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases and (c) the requirements for assumption of any executory contract or unexpired lease to be assumed had been satisfied.  Except as otherwise provided in the following sentence, all cure payments under any Assumed Contract shall be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a final order resolving such dispute.

### 2.   *Compensation And Benefit Programs*

All of the Debtors' programs, plans, agreements and arrangements relating to employee compensation and benefits, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are (other than any executory contract rejected pursuant to Section 7.1 of the Plan), executory contracts that are assumed under Section 7.1 of the Plan, and the Debtors' and Reorganized Debtors' obligations under such programs, plans, agreements and arrangements will survive Confirmation of the Plan and will be fulfilled in the ordinary course of business.

### 3.   *D&O Liability Insurance Policies*

As of the Effective Date, the D&O Liability Insurance Policies shall be treated as if they were executory contracts that are assumed under the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of claim need be filed.

4.       *Indemnification*

Except as otherwise specifically limited in the Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of the Debtors' present and former directors, officers, employees, agents, representatives, attorneys, accountants, financial advisors, investment bankers and consultants (the "Covered Persons") pursuant to the Debtors' or Reorganized Debtors' certificates of incorporation, by-laws, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty or intentional tort, shall be treated as if they were executory contracts that are assumed under the Plan and shall survive the Effective Date and remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

**E.       Confirmation And Consummation Of The Plan**

1.       *Condition To Confirmation*

Confirmation of the Plan is conditioned upon the Confirmation Order being reasonably acceptable in form and substance to the Debtors and the Participating Lenders.

2.       *Conditions To Effective Date*

The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors and the Participating Lenders in accordance with the terms hereof:

(a)       The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Participating Lenders, shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the New Term Loan Facility and the New Revolving Credit Facility and other agreements or documents created in connection with the Plan.

(b)       All documents related to, provided for therein, or contemplated by the New Term Loan Facility and the New Revolving Credit Facility shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

(c)       All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(d)       All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

(e)       The payment in full of all fees and expenses of the Administrative Agent and Bayside and their respective professionals (as set forth in Section 4(b) of the Plan Support Agreement.)

(f)        The payment in full of all fees and expenses of the arranger under the New Term Loan Facility and the New Revolving Credit Facility.

### 3.    *Waiver Of Conditions*

Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Debtors and the Participating Lenders, without any notice to parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## F.    **Effect Of Plan Confirmation**

### 1.    *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all present and former holders of Claims and Interests, and their respective successors and assigns, including but not limited to the Reorganized Debtors.

### 2.    *Revesting Of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, liens, charges, encumbrances, rights and Interests of creditors and equity security holders. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### 3.    *Compromise And Settlement Of Claims And Interests*

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. Without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against or Interests in them and Causes of Action against other Persons.

4. *Releases And Related Matters*

    (a)    **Releases by the Debtors**

**As of the Effective Date, for good and valuable consideration provided by each of the Releasees, including, but not limited to, (i) the discharge of debt; (ii) the obligations of the Releasees to provide the support necessary for consummation of the Plan; and (iii) the services of the Releasees in facilitating the expeditious implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, each of the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed to forever release, waive and discharge the Participating Lenders and each of the Participating Lenders' and the Debtors' respective current and former members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, subsidiaries, affiliates and representatives (in each case only in their capacity as such), and their respective properties from any and all Causes of Action, whether known or unknown, arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, and further including those in any way related to the Chapter 11 Cases, the Disclosure Statement or the Plan to the fullest extent of the law; *provided*, *however*, that the foregoing shall not operate to waive or release any Releasee from any Causes of Action arising under the New Term Loan Facility or the New Revolving Credit Facility.**

    (b)    **Releases by the Lenders**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Participating Lender shall be deemed to have fully discharged and released the Releasees and their respective property from any and all Causes of Action, whether known or unknown, arising from or related in any way to the Debtors, including, without limitation, those in any way related to the Chapter 11 Cases, the Disclosure Statement or the Plan; *provided*, *however*, that the foregoing shall not operate to waive or release any Releasee from any Causes of Action arising under the New Term Loan Facility or the New Revolving Credit Facility or any Causes of Action by any Participating Lender that provides cash management services to a Releasee to the extent such Causes of Action are for usual and customary cash management fees and charges.**

5. *Discharge Of The Debtors*

    (a)    Upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan.

    (b)    As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities

against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

6.      *Injunction*

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability that is released or discharged under Article IX of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective Affiliates or their property on account of any such released or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

7.      *Exculpation And Limitation Of Liability*

None of the Releasees shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Releasee that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided further*, that each Releasee shall be entitled to reasonably rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

8.      *Term Of Bankruptcy Injunction Or Stays*

Except as provided otherwise in the Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

9.      *Post-Effective Date Retention Of Professionals*

Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors will employ and pay professionals in the ordinary course of business.

## G.      Miscellaneous Provisions

1.      *Payment Of Statutory Fees*

All fees payable pursuant to section 1930 of Title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

2.      *Amendment Or Modification Of The Plan*


Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan, *provided, however,* that the Participating Lenders approve of such alteration, amendment or modification.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.


3.      *Severability Of Plan Provisions*


If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.


4.      *Successors And Assigns*


The Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.


5.      *Revocation, Withdrawal, Or Non-Consummation*


The Debtors reserve the right, to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.


6.      *Governing Law*


Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of New York without giving effect to the principles of conflicts of law of such jurisdiction.

# V. RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan. This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

## A. Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidations. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtors during the Chapter 11 Cases. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Furthermore, although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to such timing. In addition, the Debtors could experience material adverse changes in their liquidity as a result of such delay.

## B. Potential Adverse Effects of Chapter 11

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement of the Chapter 11 Cases could materially adversely affect the relationship among the Debtors and their franchisees, customers, employees, vendors and service providers.

## C. Failure to Obtain a Discharge of Unknown Litigation Claims

The Plan will discharge Claims, including, without limitation, any known or unknown litigation Claims arising, or that might arise, from the sale of RALs by third-party financial institutions to the Debtors' customers, through the chapter 11 cases. The Debtors intend to serve notice of the commencement of the cases, the date, time and place of the combined hearing on approval of this disclosure statement and confirmation of the Plan, and the procedures for objecting to the adequacy of this disclosure statement and confirmation of the Plan on all known litigation claimants, and to publish notice of the same information in an effort to provide notice to all unknown litigation claimants. The Debtors believe that these procedures will provide sufficient notice to all parties in interest, whether known or unknown, in the Debtors' chapter 11 cases. However, there is no assurance that the Debtors' proposed notice program, which seeks to bind unknown litigation claimants to the discharge, will be approved by the Bankruptcy Court. In the event that the Bankruptcy Court does not approve such notice program, unknown litigation claimants may not be subject to the discharge and may bring suits against the Company in the future. While the Company believes it has meritorious defenses to possible litigation involving RALs and other possible litigation Claims, the Company cannot ensure that the outcome of such possible future legal proceedings and litigation will not have a material adverse effect on the Company and its results of operations.

**D.** **Business Risks**

      1. *No Public Market for Securities*

The New Common Stock to be issued pursuant to the Plan will not be registered under the Securities Act. Accordingly, the New Common Stock may only be offered or sold pursuant to an exemption from the registration requirements of the Securities Act or pursuant to an effective registration statement. The Company cannot assure you that an active trading market for the New Common Stock will develop, in which case, you may not be able to resell your New Common Stock at its fair market value or at all. Future trading prices of the New Common Stock will depend on many factors, including, among other things, prevailing interest rates, the Company's operating results and the market for similar securities. Because the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock and the inherent risks related to the Reorganized Debtors' ability to successfully implement their business plan, there can be no assurances of the actual recoveries to holders of Allowed Secured Senior Credit Facility Claims.

      2. *Majority Shareholder Control*

Upon emergence, Bayside Capital, Inc and certain of its affiliates ("Bayside") may own a significant majority of the New Common Stock. Pursuant to the Shareholders' Agreement, Bayside will exercise substantial influence over the New Board of Jackson Hewitt and there can be no assurance that Bayside will exercise their control in the best interests of the minority shareholders. This concentration of ownership could delay, defer or prevent a change of control of Reorganized Jackson Hewitt or impede a merger, takeover or other business combination that may be otherwise favorable to Reorganized Jackson Hewitt or to eligible holders who receive New Common Stock pursuant to the Plan.

      3. *Inherent Uncertainty of Debtors' Financial Projections*

The Financial Projections attached hereto as <u>Appendix C</u> include projections covering the Reorganized Company's operations through 2013. These projections are based on assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Reorganized Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

The business plan was developed by the Company with the assistance of its advisors. There can be no assurances that the Company's business plan will not change, perhaps materially, as a result of decisions management and the new Board of Directors make after fully evaluating the strategic direction of the Company and its business plan. Any deviations from the Company's existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

4. *Lack of Audited and Recent Financial Reports*

Attached to the Company's most recent 10-K is the Company's audited financial statement for the fiscal year ended April, 2010. This is the last period for which an audited financial statement is available. Attached to the Company's most recent 10-Q is the Company's unaudited financial statement for the period ended January, 2011. As of the date hereof, the Company has not prepared financial statements for fiscal periods after January 2011. The information to be contained in these reports is not available at this time and there can be no assurance that such information would not have been material to your decision whether to vote to accept or reject the Plan.

5. *Inability to Execute Strategic Plan and Reverse Declining Profitability*

The key driver of the Company's business is the number of tax returns prepared by its network. From 2008 to 2010, the number of tax returns prepared by the Company declined as compared to the prior fiscal year and the Company's profitability had declined in each of such fiscal years accordingly. In fiscal year 2011, the number of tax returns prepared by the Company increased slightly over 2010. The factors contributing to the decline in fiscal 2010 include the loss of 50% of the Company's RAL program as compared to the prior tax season, a continuing soft economy and related high unemployment, and increased competition, both from other electronic return originators as well as from online tax services. If the Company is not able to execute on its strategic plan to attract and retain customers and increase the number of tax returns prepared by its system, the Company's revenues and profits will likely continue to decline. The failure to reverse the decreasing number of tax returns being prepared by the Company and the associated decline in profitability will also likely discourage franchisees from expanding their business within the Jackson Hewitt network or may discourage franchisees from renewing their franchise agreements with the Company and discourage new franchisees from entering the Jackson Hewitt network, each of which could have a material adverse effect on the Company's business, financial condition and results of operations.

6. *Distribution System*

Building a stronger distribution system is necessary to drive the growth of the Company's business by maximizing the performance of the locations that the Company already possesses and expanding the Company's existing network. As previously discussed, the Company entered into an agreement with Wal-Mart pursuant to which the Company was granted the exclusive right to provide tax preparation services within Wal-Mart stores through the 2011 tax season. This arrangement afforded the Company the opportunity to add a significant number of new, incremental Wal-Mart locations to its distribution network for the 2010 and 2011 tax seasons. If the Company's agreement with Wal-Mart is not extended beyond the 2011 tax season, or is otherwise terminated, the Company's distribution network would be negatively impacted which could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company's strategy for selling new territories and expanding its alliance and partnership activities may not succeed, causing the Company's revenues or profitability to decline.

7. *Regulation of Financial Products*

From time to time, government officials at the federal and state levels introduce and enact legislation and regulations proposing to regulate or prevent financial institutions from offering RALs and other financial products. Certain of the proposed legislation and regulations could, if adopted, increase costs or decrease revenues to the Company, its franchisees and the financial institutions that provide the Company's financial products, or could negatively impact or eliminate the ability of financial institutions to provide RALs and other financial products through tax return preparation offices, which could have a material adverse effect on the Company's business, financial condition and results of operations. As noted above, based on recent developments, the Company assumes that it will not have a source of RAL products beginning in 2012.

8. *Failure to Comply with Regulatory Requirements*

The Company's tax return preparation business, including its franchise operations and financial institutions' ability to offer RALs and other financial products, are subject to extensive regulation and oversight in the United States by the IRS, the FTC and by federal and state regulatory and law enforcement agencies. If governmental agencies having jurisdiction over the Company's operations were to conclude that the Company's business practices, the practices of its franchisees, or those of the financial institutions that provide financial products violate applicable laws, the Company could become subject to sanctions which could have a material adverse effect on the Company's business, financial condition and results of operations. These sanctions may include, without limitation: (a) civil monetary damages and penalties; (b) criminal penalties; and (c) injunctions or other restrictions on the manner in which the Company conducts its business.

In addition, the financial institutions that provide financial products to the Company's customers are also subject to significant regulation and oversight by federal and state regulators, including banking regulators. The failure of these financial institutions to comply with the regulatory requirements of federal and state government regulatory bodies, including banking and consumer protection laws, could affect their ability to continue to provide financial products to the Company's customers, which could have a material adverse effect on the Company's business, financial condition and results of operations. The Company's customers' inability to obtain financial products through the Company's tax return preparation offices could cause the demand for the Company's tax return preparation services to be reduced, causing the Company's revenues or profitability to decline. The Company also may be required to change business practices which could alter the way financial products are offered which could cause the Company's revenues or profitability to decline.

9. *Failure to Grow Franchise System*

The success and growth of the Company's franchise system depends on maintaining a satisfactory working relationship with existing franchisees and attracting new franchisees to the Jackson Hewitt network. Poor performance and the more difficult financial position that results from such poor performance, the Company's inability to provide financial products, and lawsuits and other disputes with its franchisees, could discourage the Company's franchisees from expanding their business within the Jackson Hewitt network or from renewing their existing franchise agreements or lead to negative publicity which could discourage new franchisees from entering the Jackson Hewitt network, and could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, poor performance could result in an increase in franchisee attrition. The failure to grow the Jackson Hewitt network or a loss of a significant number of franchisees could have a material adverse effect on the Company's business, financial condition and results of operations.

10. *Disruption in Retail Relationships*

The failure to successfully execute the Company's operating plan under its agreement with Wal-Mart, the termination of the agreement or the inability to extend the agreement on terms satisfactory to the Company could have a material adverse effect on the Company's business, financial condition and results of operations. The Company also has offices in other retail-partner locations, typically retail stores and shopping malls. In the event the Company is unable to negotiate favorable agreements with these or comparable retail stores or shopping malls or a significant number of these retail stores or shopping malls close, especially immediately prior to or during the tax season, or the Company's operators are unsuccessful in opening these locations, it could cause the Company's revenues or profitability to decline.

11. *Dependence on Key Personnel*

The Company's continued success depends largely on the efforts and abilities of its executive officers and other key employees. Competition for executive, managerial and skilled personnel in the tax service industry remains intense. The Company may experience increased compensation costs in order to attract and retain executives, managers and other skilled employees. The Company may not be able to retain existing management, fill new positions or vacancies or attract or retain the management and personnel necessary to operate its business effectively. Although efforts have been made to retain key personnel, including the implementation, after the Effective Date, of a management incentive plan by the New Board, the Company may not be able to continue to retain key personnel or otherwise attract new personnel, which would cause the Company's business to suffer.

12. *Success Tied to Operations of Franchisees*

The Company's success depends on its franchisees and the manner in which they operate and develop their offices. However, the Company's ability to control the operations of its franchisees is limited because their businesses are independently owned and operated. Franchisees retain control over the employment and management of all personnel, including the large number of seasonal employees required during the tax season. Although the Company can exercise control over its franchisees and their operations to a certain extent under the terms of its franchise agreements to, among other things, maintain signage and equipment, standardize operating procedures, approve suppliers, distributors and products, protect the goodwill of intellectual property and require compliance with law and compliance standards, the quality of their operations may be diminished by any number of factors beyond the Company's control. Consequently, the franchisees may not operate their offices in a manner consistent with the Company's philosophy and standards or may not increase the level of revenues generated compared to prior tax seasons. While the Company ultimately can take action to terminate franchisees that do not comply with the standards contained in the franchise agreements, and even though the Company has implemented thorough compliance and monitoring functions, the Company may not be able to identify problems and take action quickly enough and, as a result, the Company's image and reputation may suffer, causing revenues or profitability to decline.

13. *Litigation*

The Company is, from time to time, subject to various asserted or unasserted legal proceedings and claims. Any such claims, regardless of merit, could be time-consuming and expensive to defend and could divert management's attention and resources. While management believes the Company has adequate insurance coverage and accrues loss contingencies for all known matters that are probable and can be reasonably estimated, the Company cannot ensure that the outcome of all current or future litigation will not have a material adverse effect on the Company and its results of operations.

14. *Seasonal Nature of Business*

As described above, the Company's business is highly seasonal. The Company generates substantially all of its revenues during the period from January 1 through April 30. The concentration of revenue-generating activity during this relatively short period presents a number of operational challenges for the Company and its franchisees, including: (a) cash and resource management during the first eight months of the fiscal year, when the Company generally operates at a loss and incurs fixed costs and costs of preparing for the upcoming tax season; (b) flexible staffing, because the number of employees at the Company's network offices during the peak of the tax season is exponentially higher than at any other time; (c) accurate forecasting of revenues and expenses; and (d) ensuring optimal uninterrupted operations during tax season. If the Company were unable to meet these challenges or were to experience significant business interruptions during the tax season, which may be caused by labor shortages, systems failures, work stoppages, adverse weather, computer viruses, computer hackers, health

epidemics or other events, many of which are beyond the Company's control, the Company could experience a loss of business, which could have a material adverse effect on its business, financial condition and results of operations.

15. *Competition*

The paid tax return preparation market is highly competitive. The Company competes with tens of thousands of paid tax return preparers, including H&R Block, which is the largest paid tax return preparation service company, Liberty Tax Service, local and regional tax return preparation companies and regional and national accounting firms and financial service institutions that prepare tax returns as part of their businesses. The Company also faces increased competitive challenges from the online and software self preparer market, including the Free File Alliance, a consortium of the IRS and online preparation services that provides free online tax return preparation, and from volunteer organizations that prepare tax returns at no cost for low-income taxpayers. Certain states may also pass legislation to provide free online tax return preparation and filing from time to time. The availability of these alternatives may reduce demand for the Company's products and limit the amount of fees that the Company can charge. The Company also competes for the sale of tax return preparation franchises with H&R Block, Liberty Tax Service, and other regional franchisors. Inability to continue to sell franchises would have a material adverse effect on the Company's financial condition.

16. *Goodwill Impairment Charges*

The Company evaluates the carrying value of goodwill and other intangible assets for recoverability at least annually in its fourth fiscal quarter. The Company updates the test between annual periods when an event occurs or if circumstances change that would more likely than not reduce the fair value of its franchises or company-owned offices below their carrying value. Due to the loss of approximately 50% of the Company's RAL program in the third quarter of fiscal 2010, the Company concluded that a goodwill triggering event had occurred and recorded a pre-tax goodwill impairment charge of $274.1 million. If the Company continues to experience further declines in its results from these and other factors, it may incur impairment charges related to the remaining value of goodwill and other intangibles and to such amounts arising out of future acquisitions. Any additional impairment of the value of goodwill and other intangible assets could have a significant negative impact on the Company's future operating results.

17. *Credit Markets*

The credit markets have been experiencing unprecedented volatility and disruption causing many lenders and institutional investors to cease providing funding to even the most credit worthy borrowers or to other financial institutions. This continued turmoil could limit the Company's ability to access the capital markets and other sources of funding. The cost and availability of funds has also adversely impacted franchisees' ability to grow and operate their businesses, which could continue to cause the Company's revenues or profitability to decline. In addition, continued disruptions in the credit markets could adversely affect the Company's ability to sell territories to new or existing franchisees, causing the Company's revenues or profitability to decline.

E. **Methods of Solicitation**

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan (i) if the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) if there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of "adequate information" (as defined by section 1125(a) of the Bankruptcy Code). In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the

commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Debtors believe that its Solicitation of votes to accept or reject the Plan from the holders of Secured Senior Credit Facility Claims is proper under applicable nonbankruptcy law, rules, and regulations, if any, and that the Disclosure Statement contains "adequate information" as defined by section 1125(a) of the Bankruptcy Code. The Debtors also believe that they are not required to solicit any other class under the Bankruptcy Code or applicable nonbankruptcy law, rules, or regulations. The Debtors cannot be certain, however, that the Solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If the Bankruptcy Court determines that the Solicitation did not comply with the requirements of section 1126(b) of the Bankruptcy Code, the Debtors may seek to resolicit acceptances, and, in that event, confirmation of the Plan could be delayed and possibly jeopardized.

## F.     Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against and Interests in the Debtors. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors currently anticipate that they would seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any creditor pursuant to the Solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.

There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification without requiring the Debtors to resolicit votes. Except to the extent that modification of classification requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Class 3 Secured Senior Credit Facility Claims pursuant to the Solicitation will constitute a consent to the Plan's treatment of such Claim regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that, under the Bankruptcy Rules, the Debtors would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of Class 3 Claims.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that they have complied with this requirement. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan or the Debtors could be required to modify the Plan.

# VI.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

## A.  Issuance and Resale of Plan Securities Under the Plan

### 1.  *Exemption from Registration*

The Plan provides for the Debtors to issue New Common Stock (the "Plan Securities") to holders of Class 3 Secured Senior Credit Facility Claims.  The Debtors believe that the Plan Securities constitutes "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.  Accordingly, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

### 2.  *Resales of Plan Securities; Definition of Underwriter*

If the holder of the Plan Securities is an underwriter, the Plan Securities will be "restricted securities" and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## VII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain holders of Secured Senior Credit Facility Claims that are entitled to vote to accept or reject the Plan. This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein. No opinion of counsel has been obtained as to any of the tax consequences of the Plan and no ruling will be sought from the IRS with respect to any statement or conclusion in this summary. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any creditor or equity interest-holder and there can be no assurance that the IRS would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Non-U.S. Holders (as defined below) and all aspects of U.S. federal income taxation applicable to special classes of taxpayers (including, without limitation, banks and certain other financial institutions, insurance companies, tax-exempt organizations,

governmental entities, partnerships or other pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currencies, employees of the Debtors, and persons who received their claims pursuant to the exercise of an employee stock option or otherwise as compensation). This summary assumes that holders of Claims hold their Claims as capital assets for U.S. federal income tax purposes and will hold any New Common Stock and their interest in the New Term Loan Facility and New Revolving Credit Facility as a capital asset for U.S. federal income tax purposes. Furthermore, the following discussion does not address U.S. federal taxes other than income taxes. Holders of Claims should consult their tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including U.S. federal, state, local and foreign tax consequences.

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a Claim that is neither a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) nor (1) an individual that is a citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (ii) such trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, CREDITORS AND INTEREST-HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) CREDITORS AND INTEREST-HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## A.    Certain U.S. Federal Income Tax Consequences to the Debtors

### 1.    *Cancellation of Indebtedness Income*

In general, the discharge of a debt obligation in exchange for cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the Debtor. However, COD income is not taxable to the Debtor if the debt discharge occurs in a Title 11 bankruptcy case. Rather, under the Tax Code, such COD income instead should reduce certain of the Debtors' tax attributes, generally in the following order: (a) net operating losses and net operating loss carryforwards (collectively, "NOLs"); (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A Debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries). Where the Debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that certain tax attributes of the

consolidated subsidiaries of the Debtor and other members of the group be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that is generated between the date of discharge and the end of the Debtors' tax year and/or may be carried back to prior years). Any excess COD income remaining after the required reduction of tax attributes is generally not subject to U.S. federal income tax and generally has no other current U.S. federal income tax impact.

The Debtors do not expect to have a substantial amount of NOLs or other tax attributes listed above, except for tax basis in their assets, after the tax for the year that includes the Effective Date is determined. The Debtors expect to realize a substantial amount of COD income as a result of the discharge of obligations pursuant to the Plan, which, under the attribute reduction rules described above, is generally expected to result in a reduction of certain of such attributes, including tax basis in their assets.

2.    *Net Operating Losses – Section 382*

The Debtors anticipate that they will experience an "ownership change" (within the meaning of Section 382 of the Tax Code) on the Effective Date as a result of the issuance of the New Common Stock to holders of Secured Senior Credit Facility Claims pursuant to the Plan. As a result, the Debtors' ability to use any pre-Effective Date NOLs and certain other tax attributes in any post-Effective Date taxable year (and in the portion of the current taxable year beginning after the Effective Date) may be subject to limitations. Section 382 of the Tax Code may also limit the Debtors' ability to use certain "net unrealized built-in losses" to offset future taxable income realized within five years of the Effective Date. It is possible that the basis reduction described above under "Cancellation of Indebtedness Income" may reduce the amount of "net unrealized built-in losses" otherwise subject to such limitations. In addition, the Debtors' NOLs would be subject to further limitations if the Debtors experience additional future ownership changes and could potentially be reduced to zero if they do not continue their business enterprise for at least two years following the Effective Date.

**B.    Certain U.S. Federal Income Tax Consequences to Holders of Class 3 Secured Senior Credit Facility Claims**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Class 3 Secured Senior Credit Facility Claims (referred to as "holders" for purposes of the discussion under the heading "*Certain U.S. Federal Income Tax Consequences to Holders of Class 3 Secured Senior Credit Facility Claims*") are not entirely clear. The discussion below describes possible U.S. federal income tax consequences of the transactions contemplated by the Plan to holders, however, no assurance can be given as to the treatment of such transactions by the IRS or as to whether such treatment will be sustained by a court. If required under the Tax Code, the Company will notify the holders as to any position the Company is required to take regarding the transactions contemplated by the Plan. Each holder should consult its tax advisor regarding the tax consequences to it of the transactions contemplated by the Plan and information that may be relevant to its particular situation and circumstances.

1.    *General U.S. Federal Income Tax Consequences to Holders*

Pursuant to the Plan, in full satisfaction and discharge of its Claim, each holder will receive (i) its pro rata share of the New Term Loan Facility, (ii) its pro rata share of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan, and (iii) an opportunity to participate pro rata in the New Revolving Credit Facility. Holders that participate in the New Revolving Credit Facility will receive (on a pro rata basis based upon their participation in the New Revolving Credit Facility) the cash on the Reorganized Debtors' balance sheet in excess of $5 million as of the Effective Date. In addition, on the Effective Date, the New Revolving Credit Facility will be deemed drawn in an amount equal to the Initial Draw and each holder that participates in the New Revolving Credit Facility will receive a pro rata share of such Initial Draw.

The Plan treats each holder as receiving, for U.S. federal income tax purposes, in full satisfaction and discharge of its Claim (i) its pro rata share of the New Term Loan Facility, (ii) its pro rata share of the New Common Stock, and (iii) to the extent that the holder participates in the New Revolving Credit Facility, its share of the cash on the Reorganized Debtors' balance sheet in excess of $5 million as of the Effective Date, and the Initial Draw under the New Revolving Credit Facility. The IRS could take the position, however, that the holders or the Debtors should be treated for U.S. federal income tax purposes in some manner other than that set forth in the Plan.

A published IRS ruling and an IRS private letter ruling issued in reliance on such published ruling with respect to similar transactions to those contemplated by the Plan indicate that the holders may be treated for U.S. federal income tax purposes as exchanging their Claims with JHI for JHI common stock deemed to be issued to such holders, the New Term Loan Facility, the Initial Draw under the New Revolving Credit Facility and cash (the "JHI Exchange"), followed by an exchange by the holders with Jackson Hewitt of the JHI common stock deemed received in satisfaction of their Claims for New Common Stock (the "Stock Exchange"). The U.S. federal income tax consequences of such treatment will depend, in part, on whether the holders' Claims, the obligations under the New Term Loan Facility, and the Initial Draw under the New Revolving Credit Facility constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. It is unclear whether holders' Claims, the obligations under the New Term Loan Facility, or the Initial Draw under the New Revolving Credit Facility constitute "securities" for U.S. federal income tax purposes and each holder should consult its tax advisor regarding the treatment of such obligations as "securities".

Subject to the discussion below regarding accrued interest, to the extent that a holder's Claim is a "security" for U.S. federal income tax purposes, and the treatment under the IRS rulings described above otherwise applies, the JHI Exchange should be treated as a "recapitalization" and the Stock Exchange should be treated as a tax-free reorganization. In such case, a holder generally should recognize capital gain (but not loss), subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized in the JHI Exchange (as described in the following paragraph) or (ii) the amount of cash and fair market value of any obligation treated as received in the JHI Exchange that does not constitute a "security". A holder's tax basis in its New Common Stock and obligations constituting "securities" should be equal to the tax basis of the Claim surrendered in exchange therefor, increased by the amount of any gain recognized and decreased by the amount of cash and the fair market value of any obligation not constituting a "security" treated as received in the JHI Exchange (with such tax basis allocated between the New Common Stock and such obligations in proportion to their respective fair market values), and a holder's holding period for its New Common Stock and obligations constituting "securities" generally should include its holding period for such Claim. A holder's tax basis in any obligation not constituting a "security" deemed received in the JHI Exchange should equal its fair market value on the Effective Date, and a holder's holding period for such obligation should begin on the day following the Effective Date.

Subject to the discussion below regarding accrued interest, to the extent that the JHI Exchange is not treated as a "recapitalization" and the transactions contemplated by the Plan are otherwise taxable to a holder, such holder should recognize gain or loss equal to the difference between (a) the sum of the fair market value of New Common Stock on the Effective Date, the issue price of New Term Loan Facility and the Initial Draw under the New Revolving Credit Facility (which generally should equal their stated principal amount if neither such obligation nor the Claim surrendered in exchange therefor is considered "publicly traded" under applicable Treasury regulations), and cash received pursuant to the Plan and (b) the holder's adjusted tax basis in the Claim surrendered

pursuant to the Plan. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the holder's holding period for the surrendered Claim exceeded one year. A holder's tax basis in the New Common Stock should equal its fair market value on the Effective Date. A holder's tax basis in the New Term Loan Facility and the Initial Draw under the New Revolving Credit Facility should equal their issue price. A holder's holding period for the New Common Stock, New Term Loan Facility and the Initial Draw under the New Revolving Credit Facility should begin on the day following the Effective Date.

The tax consequences described above are not exclusive and holders may be treated for U.S. federal income tax purposes in some manner other than that set forth herein. Each holder should consult its tax advisor regarding the tax consequences to it of the transactions contemplated by the Plan.

2.      *Accrued Interest*

Pursuant to the Plan, the Debtors will allocate for tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest. Relevant authority indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization should be binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. To the extent that any consideration is allocated to accrued but unpaid interest, holders of Claims for accrued interest which previously have not included such accrued interest in taxable income should be required to recognize ordinary income equal to the amount of cash or the fair market value of any other property received with respect to such Claims for accrued interest. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

3.      *Market Discount*

The market discount provisions of the Tax Code may apply to holders. In general, a debt obligation, other than a debt obligation with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated principal amount exceeds the adjusted tax basis of the obligation in the holder's hands immediately after its acquisition by more than a statutory *de minimis* amount. Gain recognized by a holder with respect to a "market discount bond" should generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's period of ownership, unless the holder elected to include accrued market discount in taxable income currently. If the JHI Exchange is treated as a "recapitalization" and the Stock Exchange is treated as a tax-free reorganization with respect to a holder, any accrued market discount on the exchanged Claim in excess of the gain recognized in the JHI Exchange should generally carry over to the New Common Stock and obligations treated as "securities" received by such holder.

4.      *Backup Withholding and Information Reporting*

Certain payments are generally subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and such holder may obtain a refund of any

excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

## C.     Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR HOLDER'S PARTICULAR CIRCUMSTANCES.   ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.     FEASIBILITY, VALUATION, BEST INTERESTS OF CREDITORS AND CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES

## A.     Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.   For purposes of showing that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.   To support their belief in the feasibility of the Plan, the Debtors prepared the financial projections (the "Financial Projections") set forth as Appendix C of the Disclosure Statement.   The Financial Projections show that the Reorganized Debtors should have sufficient cash to make payments required under the Plan.   Accordingly, the Debtors believe the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. ACCORDINGLY, READERS OF THIS DISCLOSURE STATEMENT ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS, AND SHOULD CAREFULLY REVIEW **SECTION V — "RISK FACTORS TO BE CONSIDERED"** HEREIN.   THE FINANCIAL PROJECTIONS SHOULD NOT BE RELIED UPON AS NECESSARILY INDICATIVE OF FUTURE, ACTUAL RECOVERIES.

Holders of Claims against and Interests in the Debtors are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.   Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

In addition to the assumptions footnoted in the Financial Projections themselves, the Financial Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors.   Although considered reasonable by the Debtors as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## B. Valuation

Moelis, the Debtors' financial advisor, has determined the estimated range of the reorganization value of the Reorganized Debtors, excluding cash on hand, to be approximately $200 million to $250 million (with a mid-point estimate of approximately $225 million) as of an assumed Effective Date of June 30, 2011. This estimate is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the business plan and the Financial Projections, access to adequate exit financing, market conditions through the period covered by the Financial Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein. The valuation is supported by the analysis (the "Valuation Analysis") attached hereto as Appendix D, and will be further supported by the Debtors' presentation at the Confirmation Hearing.

The aggregate amount of Senior Credit Facility Claims is approximately $357 million. As noted above, in satisfaction of the Secured Senior Credit Facility Claims, each Lender will receive its pro rata share of the New Common Stock and the New Term Loan. The Plan consideration, which includes the value of the New Common Stock and the New Term Loan, is not sufficient to satisfy the Lenders' Senior Credit Facility Claims in full. Specifically, based upon the mid-point of the Valuation, the Lenders will receive an estimated 51.8% recovery, and will, in turn, have deficiency claims in an aggregate amount of $172 million. The Lenders' deficiency claims are General Unsecured Claims. In addition, the Debtors estimate approximately $3.5 million in other known General Unsecured Claims. Accordingly, the Lenders are the Debtors' largest unsecured creditors.

## C. Best Interests Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that, with respect to each Impaired Class of Claims and Interests, that each holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is known as the "best interests of creditors" test.

To calculate the probable distribution to holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if their chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their chapter 11 cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the chapter 11 cases. The liquidation itself would trigger certain tax and other priority claims that otherwise would be due in the ordinary course of business. Those priority claims would be paid

in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of most, if not all, of the Debtors' executory contracts and unexpired leases, thereby creating a significant increase in general unsecured claims.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. As described in more detail in the Liquidation Analysis, attached hereto as <u>Appendix B</u>, the holders of Claims and Interests of each of (i) Impaired Classes 4, 5, and 6 will receive the same distribution under the Plan as in a liquidation (i.e., zero) and (ii) Impaired Class 3 will receive more under the Plan than in a liquidation: in the event of a liquidation of the Debtors, the proceeds available for holders of Class 3 Claims would range from approximately $65 million to $80 million, with a recovery of only 18% to 23% for holders of such Claims. In contrast, under the Plan, holders of Allowed Class 3 Claims will receive an estimated 51.6% recovery based upon the mid-point of the Valuation. Therefore, holders of Impaired Claims and Interests will receive substantially more (as to Class 3) or the same (as to Classes 4, 5, and 6) under the Plan than in a liquidation.

**The Plan leaves Class 1 Other Priority Claims, Class 2 Other Secured Claims, Class 7 Intercompany Claims and Class 8 Intercompany Interests Unimpaired, so the best interest test is satisfied with respect to these Classes.**

Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

## D.     Confirmation Without Acceptance of All Impaired Classes

Classes 4, 5, and 6 will receive no recovery under the Plan and are deemed to have rejected the Plan. In view of the deemed rejection by such Classes, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan over the objection of an impaired rejecting class, if, among other things, at least one Impaired Class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and if the plan does not "discriminate unfairly" against and is "fair and equitable" to each impaired rejecting class.

In general, a plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated substantially equivalent with respect to other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. All of the Class 4 General Unsecured Claims, Class 5 Subordinated 510(b) Claims, and Class 6 Interests in Jackson Hewitt are placed into their individual classes and given the same respective treatment – zero recovery. The Claims and Interests in theses Classes are likewise properly subordinated to all other Claims of any nature, and are legally distinct. Accordingly, the Plan does not discriminate unfairly against holders of Claims and Interests in Classes 4, 5, and 6.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of equity interests that rejects a plan if

the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

The Plan is fair and equitable with respect to Classes 4, 5, and 6. First, there are no holders of any Claims against or Interests in the Debtors junior to the Claims and Interests in Classes 4, 5, and 6 who will receive or retain any property under the Plan on account of such junior claim or interest. Second, pursuant to the Plan, no holders of Claims against or Interests in the Debtors senior to Classes 4, 5, and 6 are receiving more than full payment on account of such Claims against or Interests in the Debtors. Thus, the Debtors submit that the Plan is structured such that it does not "discriminate unfairly" and is "fair and equitable" to each impaired rejecting class.

## IX.     CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any other alternative under the circumstances. Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and lower recovery to the holders of Secured Senior Credit Facility Claims. Consequently, the Debtors urge all holders of Secured Senior Credit Facility Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before 1:00 P.M., Prevailing Eastern Time, on May 24, 2011 by the Voting Agent.

Dated:    May 23, 2011

JACKSON HEWITT TAX SERVICE INC.
  (for itself and on behalf of the other Debtors)

By:  /s/ Daniel P. O'Brien
       Name:   Daniel P. O'Brien
       Title:     Executive Vice President, Chief
                 Financial Officer and Treasurer

Mark A. McDermott
J. Gregory Milmoe
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Email: Mark.McDermott@skadden.com
Email: Gregory.Milmoe@skadden.com

Mark S. Chehi (I.D. No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Email: Mark.Chehi@skadden.com

Counsel for Jackson Hewitt Tax Service Inc. and Subsidiaries

APPENDIX A

JOINT PREPACKAGED PLAN OF REORGANIZATION
OF JACKSON HEWITT TAX SERVICE INC. AND SUBSIDIARIES

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - x
| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JACKSON HEWITT TAX SERVICE INC., et al., | : | Case No. 11-[_____] (___) |
| | : | |
| Debtors.[1] | : | Joint Administration Pending |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## JOINT PREPACKAGED PLAN OF REORGANIZATION OF JACKSON HEWITT TAX SERVICE INC. AND SUBSIDIARIES

Mark A. McDermott
J. Gregory Milmoe
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Email: Mark.McDermott@skadden.com
Email: Gregory.Milmoe@skadden.com

Mark S. Chehi (I.D. No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Email: Mark.Chehi@skadden.com

Attorneys for Jackson Hewitt Tax Service Inc. and Subsidiaries

Dated: May 23, 2011

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Jackson Hewitt Tax Service Inc. (9692), Jackson Hewitt Inc. (9705), Jackson Hewitt Technology Services LLC (2409), Tax Services of America, Inc. (7427), Jackson Hewitt Corporate Services Inc. (2415), and Hewfant Inc. (0545). The address for each of the Debtors, with the exception of Jackson Hewitt Technology Services LLC, is 3 Sylvan Way, Parsippany, NJ 07054. The address for Jackson Hewitt Technology Services LLC is 501 N. Cattlemen Rd., Sarasota, FL 34232.

# TABLE OF CONTENTS

Page

**INTRODUCTION** .................................................................................................................... 1

# ARTICLE I

# DEFINED TERMS AND RULES OF INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Administrative Agent ........................................................................... | 1 |
| 1.2 | Administrative Claim ............................................................................ | 1 |
| 1.3 | Affiliate.................................................................................................. | 1 |
| 1.4 | Allowed ................................................................................................. | 1 |
| 1.5 | "Allowed ... Claim" .............................................................................. | 2 |
| 1.6 | Avoidance Action .................................................................................. | 2 |
| 1.7 | Bankruptcy Code................................................................................... | 2 |
| 1.8 | Bankruptcy Court .................................................................................. | 2 |
| 1.9 | Bankruptcy Rules .................................................................................. | 2 |
| 1.10 | Bayside .................................................................................................. | 2 |
| 1.11 | Business Day ......................................................................................... | 2 |
| 1.12 | Cash....................................................................................................... | 2 |
| 1.13 | Cash Collateral Account........................................................................ | 2 |
| 1.14 | Cause of Action..................................................................................... | 2 |
| 1.15 | Chapter 11 Case(s) ................................................................................ | 3 |
| 1.16 | Claim ..................................................................................................... | 3 |
| 1.17 | Class ...................................................................................................... | 3 |
| 1.18 | Confirmation.......................................................................................... | 3 |
| 1.19 | Confirmation Date................................................................................. | 3 |
| 1.20 | Confirmation Hearing ........................................................................... | 3 |
| 1.21 | Confirmation Order................................................................................ | 3 |
| 1.22 | Creditors' Committee ............................................................................ | 3 |
| 1.23 | Debtor has the meaning set forth in the Introduction........................... | 3 |
| 1.24 | D&O Liability Insurance Policies.......................................................... | 3 |
| 1.25 | Disclosure Statement............................................................................. | 3 |
| 1.26 | Disputed Claim ...................................................................................... | 3 |
| 1.27 | Effective Date ....................................................................................... | 4 |
| 1.28 | Entity ..................................................................................................... | 4 |
| 1.29 | Estate(s)................................................................................................. | 4 |
| 1.30 | Executory Contract................................................................................ | 4 |
| 1.31 | Exhibit ................................................................................................... | 4 |
| 1.32 | Existing Credit Agreement .................................................................... | 4 |
| 1.33 | Final Order............................................................................................. | 4 |
| 1.34 | General Unsecured Claim....................................................................... | 4 |
| 1.35 | Holder.................................................................................................... | 5 |

| 1.36 | Impaired | 5 |
|------|----------|---|
| 1.37 | Intercompany Claim | 5 |
| 1.38 | Intercompany Interest | 5 |
| 1.39 | Interest | 5 |
| 1.40 | Jackson Hewitt | 5 |
| 1.41 | Lenders | 5 |
| 1.42 | Lien | 5 |
| 1.43 | Management Incentive Plan | 5 |
| 1.44 | New Board | 5 |
| 1.45 | New Common Stock | 5 |
| 1.46 | New Revolving Credit Facility | 5 |
| 1.47 | New Term Loan Facility | 6 |
| 1.48 | Other Priority Claim | 6 |
| 1.49 | Other Secured Claim | 6 |
| 1.50 | Participating Lenders | 6 |
| 1.51 | Person | 6 |
| 1.52 | Petition Date | 6 |
| 1.53 | Plan | 6 |
| 1.54 | Plan Supplement | 6 |
| 1.55 | Priority Tax Claim | 6 |
| 1.56 | Professional | 6 |
| 1.57 | Professional Fee Claim | 6 |
| 1.58 | Reinstated | 7 |
| 1.59 | Releasees | 7 |
| 1.60 | Reorganized Debtors | 7 |
| 1.61 | Reorganized Jackson Hewitt | 7 |
| 1.62 | Requisite Participating Lenders | 7 |
| 1.63 | Retained Actions | 7 |
| 1.64 | Secured Claim | 8 |
| 1.65 | Senior Credit Facility Claims | 8 |
| 1.66 | Secured Senior Credit Facility Claims | 8 |
| 1.67 | Shareholders' Agreement | 8 |
| 1.68 | Subordinated 510(b) Claim | 8 |
| 1.69 | Unclassified Claims | 8 |
| 1.70 | Unexpired Lease | 8 |
| 1.71 | Unimpaired | 8 |

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

| 2.1 | Administrative Claims | 9 |
|-----|----------------------|---|
| 2.2 | Priority Tax Claims | 10 |

# ARTICLE III

# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| 3.1 | Separate Plans | 10 |
| 3.2 | Classification And Settlement | 10 |
| 3.3 | Treatment Of Classes | 11 |
| 3.4 | Alternative Treatment | 14 |
| 3.5 | Special Provision Regarding Unimpaired Claims | 14 |
| 3.6 | Procedures For Resolving Disputed, Contingent, And Unliquidated Claims | 14 |

# ARTICLE IV

# ACCEPTANCE OR REJECTION OF THIS PLAN

| | | |
|---|---|---|
| 4.1 | Acceptance By Class Entitled To Vote | 14 |
| 4.2 | Presumed Acceptance Of The Plan | 15 |
| 4.3 | Presumed Rejection Of The Plan | 15 |
| 4.4 | Elimination Of Classes | 15 |
| 4.5 | Cramdown | 15 |

# ARTICLE V

# MEANS FOR IMPLEMENTATION OF THIS PLAN

| | | |
|---|---|---|
| 5.1 | Continued Legal Existence | 15 |
| 5.2 | Sources Of Cash For Distribution | 15 |
| 5.3 | New Revolving Credit Facility | 15 |
| 5.4 | Approval And Authorization For The New Term Loan Facility And New Revolving Credit Facility | 16 |
| 5.5 | Issuance Of New Common Stock | 16 |
| 5.6 | Section 1145 Exemption | 16 |
| 5.7 | Shareholders' Agreement For New Common Stock | 16 |
| 5.8 | Management Incentive Plan | 17 |
| 5.9 | New Board Of Reorganized Jackson Hewitt | 17 |
| 5.10 | Corporate Action | 17 |
| 5.11 | Preservation Of Causes Of Action | 17 |
| 5.12 | Effectuating Documents; Further Transactions | 17 |
| 5.13 | Exemption From Certain Transfer Taxes And Recording Fees | 18 |
| 5.14 | Further Authorization | 18 |
| 5.15 | Dissolution Of Creditors' Committee | 18 |
| 5.16 | Cancellation Of Existing Securities And Agreements | 18 |

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

| | | |
|---|---|---|
| 6.1 | Allowed Claims | 19 |
| 6.2 | Distributions For Claims Allowed As Of The Effective Date | 19 |
| 6.3 | Fractional Shares | 19 |
| 6.4 | Interest And Penalties On Claims | 19 |
| 6.5 | Means Of Cash Payment | 19 |
| 6.6 | Withholding And Reporting Requirements/Allocations | 19 |
| 6.7 | Preservation Of Rights | 20 |

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

| | | |
|---|---|---|
| 7.1 | Assumption Of Executory Contracts And Unexpired Leases | 20 |
| 7.2 | Compensation And Benefit Programs | 21 |
| 7.3 | D&O Liability Insurance Policies | 21 |
| 7.4 | Indemnification | 21 |

# ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

| | | |
|---|---|---|
| 8.1 | Condition To Confirmation | 22 |
| 8.2 | Conditions To Effective Date | 22 |
| 8.3 | Waiver Of Conditions | 22 |

# ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

| | | |
|---|---|---|
| 9.1 | Binding Effect | 23 |
| 9.2 | Revesting Of Assets | 23 |
| 9.3 | Compromise And Settlement Of Claims, Interests And Controversies | 23 |
| 9.4 | Releases And Related Matters | 23 |
| 9.5 | Discharge Of The Debtors | 24 |
| 9.6 | Injunction | 25 |
| 9.7 | Exculpation And Limitation Of Liability | 25 |
| 9.8 | Term Of Bankruptcy Injunction Or Stays | 25 |
| 9.9 | Post-Effective Date Retention Of Professionals | 26 |

**ARTICLE X**

**RETENTION OF JURISDICTION**

**ARTICLE XI**

**MISCELLANEOUS PROVISIONS**

| | | |
|---|---|---|
| 11.1 | Payment Of Statutory Fees | 27 |
| 11.2 | Amendment Or Modification Of This Plan | 27 |
| 11.3 | Severability Of Plan Provisions | 28 |
| 11.4 | Successors And Assigns | 28 |
| 11.5 | Revocation, Withdrawal, Or Non-Consummation | 28 |
| 11.6 | Notice | 28 |
| 11.7 | Governing Law | 29 |
| 11.8 | Exhibits | 29 |
| 11.9 | Filing Of Additional Documents | 29 |
| 11.10 | Conflicts | 29 |

## EXHIBITS

EXHIBIT A          NEW REVOLVING CREDIT FACILITY TERM SHEET AND PROJECTED DRAW SCHEDULE

EXHIBIT B          NEW TERM LOAN FACILITY TERM SHEET

EXHIBIT C          SHAREHOLDERS' AGREEMENT TERM SHEET

EXHIBIT D          SCHEDULE OF SUB-CLASSES

# INTRODUCTION

Jackson Hewitt Tax Service Inc. ("Jackson Hewitt") and subsidiaries (collectively, the "Debtors") propose the following joint prepackaged plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

# ARTICLE I

# DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms*. As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1     ***Administrative Agent*** means Wells Fargo Bank, N.A., the Administrative Agent under the Existing Credit Agreement, and any successor thereto.

1.2     ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date and through the Effective Date, of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for goods, services, leased equipment and leased premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under Chapter 123 of Title 28 of the United States Code; and (d) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court.

1.3     ***Affiliate*** means, with respect to any Person, "affiliate" as defined in section 101(2) of the Bankruptcy Code as if such Person were a Debtor.

1.4     ***Allowed*** means, with respect to (a) any Claim, such Claim or any portion thereof that has been allowed (i) by a Final Order of the Bankruptcy Court, (ii) pursuant to the terms of this Plan, or (iii) by agreement between the Holder of such Claim and the Debtors or Reorganized Debtors; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim," the Debtors do not waive their rights to contest the amount and validity of any disputed, contingent or

unliquidated Claim in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and (b) any Interest, an Interest that is allowed (i) pursuant to the Plan or, (ii) by agreement between the Holder of such Interest and the Debtors or Reorganized Debtors.

1.5    *"Allowed ... Claim"* means an Allowed Claim of the particular type or Class described.

1.6    *Avoidance Action* means any claim or Cause of Action of an Estate arising out of or maintainable pursuant to sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.7    *Bankruptcy Code* means Title 11 of the United States Code, as now in effect or hereafter amended, to the extent such amendments apply to the Chapter 11 Cases.

1.8    *Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware, or any other court with jurisdiction over the Chapter 11 Cases.

1.9    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.10    *Bayside* means, collectively, the affiliates of Bayside Capital, Inc. that are Lenders.

1.11    *Business Day* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.12    *Cash* means legal tender of the United States of America and equivalents thereof.

1.13    *Cash Collateral Account* means that certain 2011 Cash Collateral Account (as defined in the Existing Credit Agreement) maintained by the Debtors, into which Cash in excess of the Maximum Cash Amount (as defined in the Existing Credit Agreement) is deposited, as required under the Existing Credit Agreement.

1.14    *Cause of Action* means any action, proceeding, agreement, Claim, cause of action, controversy, demand, debt, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, recoupment, crossclaim, counterclaim, third-party claim, indemnity claim, contribution claim or any other claim known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether pending in litigation or otherwise, in contract or in tort, in law or in equity or pursuant to any other theory of law, based in whole or in part upon any act or omission or other event occurring prior to the

Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

       **1.15**    ***Chapter 11 Case(s)*** means (a) when used with reference to a particular Debtor, the case under Chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

       **1.16**    ***Claim*** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

       **1.17**    ***Class*** means a category of Claims or Interests, as described in Article III hereof.

       **1.18**    ***Confirmation*** means the confirmation of this Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

       **1.19**    ***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

       **1.20**    ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

       **1.21**    ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

       **1.22**    ***Creditors' Committee*** means the statutory committee of unsecured creditors, if any, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

       **1.23**    ***Debtor*** has the meaning set forth in the Introduction.

       **1.24**    ***D&O Liability Insurance Policies*** means all insurance policies for directors' and officers' liability maintained by the Debtors, including any directors' and officers' "tail policy."

       **1.25**    ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, as amended, modified or supplemented from time to time, and distributed contemporaneously herewith in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code and Bankruptcy Rule 3017.

       **1.26**    ***Disputed Claim*** means (a) any Claim as to which the Debtors have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtors, the Reorganized Debtors, or other party in interest in accordance with applicable law, which

objection has not been withdrawn or determined by a Final Order, (b) if there are schedules, any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.27    *Effective Date* means the Business Day this Plan becomes effective as provided in Article VIII hereof.

1.28    *Entity* means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.29    *Estate(s)* means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

1.30    *Executory Contract* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.31    *Exhibit* means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

1.32    *Existing Credit Agreement* means that certain Amended and Restated Credit Agreement dated as of October 6, 2006, as amended, by and among Jackson Hewitt Tax Service Inc., Jackson Hewitt Inc., Tax Services of America, Inc. and Hewfant Inc. as borrowers; the lenders from time to time party thereto as lenders; Jackson Hewitt Technology Services LLC and Jackson Hewitt Corporate Services Inc. as guarantors; and Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association, as administrative agent.

1.33    *Final Order* means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

1.34    *General Unsecured Claim* means any Claim against any Debtor other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Secured Senior Credit Facility Claim, a Subordinated 510(b) Claim, or an Intercompany Claim.

**1.35** *Holder* means a holder of a Claim or Interest, as applicable.

**1.36** *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.37** *Intercompany Claim* means any and all Claims of a Debtor against another Debtor.

**1.38** *Intercompany Interest* means an Interest in a Debtor held by another Debtor.

**1.39** *Interest* means any equity security, including a limited liability company membership interest, in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors, together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

**1.40** *Jackson Hewitt* has the meaning set forth in the Introduction.

**1.41** *Lenders* means all lenders party to the Existing Credit Agreement as of the Effective Date and any Hedge Party under any Hedge Agreement (as each such term is defined in the Existing Credit Agreement).

**1.42** *Lien* shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation.

**1.43** *Management Incentive Plan* means a post-Effective Date management incentive plan for management, selected employees and directors of the Reorganized Debtors, providing for incentive compensation consisting of (i) 5% of the number of shares of New Common Stock (on a fully diluted basis) in the form of restricted shares and (ii) 5% of the number of shares of New Common Stock (on a fully diluted basis) in the form of non-qualified stock options, which will (a) be allocated by the New Board, (b) be struck at the per-share value of the New Common Stock as set forth in the Confirmation Order, (c) vest over a 3-year timeframe (subject to certain performance thresholds) and (d) dilute Lender participation in the New Common Stock on a pro rata basis.

**1.44** *New Board* means the initial board of directors of Reorganized Jackson Hewitt appointed as of the Effective Date.

**1.45** *New Common Stock* means common shares in the capital of Reorganized Jackson Hewitt, par value $0.01 per share, to be authorized pursuant to the Plan.

**1.46** *New Revolving Credit Facility* means the Reorganized Debtors' new secured revolving credit facility in an aggregate committed amount of $115 million,

which shall have terms substantially as set forth in the term sheet attached hereto as Exhibit A.

**1.47** *New Term Loan Facility* means the Reorganized Debtors' new secured term loan facility in an amount of no more than $100 million, which shall have terms substantially as set forth in the term sheet attached hereto as Exhibit B.

**1.48** *Other Priority Claim* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or Priority Tax Claim.

**1.49** *Other Secured Claim* means any Secured Claim, other than a Secured Senior Credit Facility Claim.

**1.50** *Participating Lenders* means the Lenders that vote in favor of the Plan.

**1.51** *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

**1.52** *Petition Date* means, with respect to a Debtor, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.53** *Plan* means this Chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, supplemented, or modified from time to time.

**1.54** *Plan Supplement* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Debtors no later than ten (10) Business Days prior to the hearing at which the Bankruptcy Court considers whether to confirm the Plan, as may thereafter be altered, amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**1.55** *Priority Tax Claim* means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**1.56** *Professional* means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328 or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.57** *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

**1.58**    *Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve reinstatement.

**1.59**    *Releasees* means the Debtors, the Reorganized Debtors, the Participating Lenders, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives.

**1.60**    *Reorganized Debtors* means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**1.61**    *Reorganized Jackson Hewitt* means Jackson Hewitt or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

**1.62**    *Requisite Participating Lenders* means the Holders of at least two thirds in dollar amount and more than one half in number of the aggregate amount of outstanding Claims under the Existing Credit Agreement.

**1.63**    *Retained Actions* means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, (a) claims and Causes of Action brought prior to the Effective Date, (b) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (c) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, (d) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, (e) all Avoidance Actions, and (f) any such claims, Causes of Action, rights

of action, suits or proceedings listed in the Disclosure Statement or any schedules filed by the Debtors in this cases, if any; *provided, however*, that Retained Actions shall not include those claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article IX herein.

**1.64** *Secured Claim* means a Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

**1.65** *Senior Credit Facility Claims* means all Claims outstanding under the Existing Credit Agreement, plus all amounts owed to any Hedge Party under any Hedge Agreement (as each such term is defined in the Existing Credit Agreement).

**1.66** *Secured Senior Credit Facility Claims* means Senior Credit Facility Claims in an amount equal to the value of the Liens securing such Claims.

**1.67** *Shareholders' Agreement* means (a) the shareholders' agreement, with respect to the New Common Stock, contemplated by the term sheet attached hereto as Exhibit C and (b) the final form of the shareholders' agreement as and when filed with the Bankruptcy Court.

**1.68** *Subordinated 510(b) Claim* means any Claim subordinated pursuant to Bankruptcy Code section 510(b), which shall include (a) any Claim arising from the rescission of a purchase or sale of (i) Interests in Jackson Hewitt or (ii) debt securities of Jackson Hewitt, (b) any Claim for damages arising from the purchase or sale of (i) any Interests in Jackson Hewitt or (ii) debt securities of Jackson Hewitt, or (c) any Claim for reimbursement, contribution or indemnification on account of any such Claim.

**1.69** *Unclassified Claims* means Administrative Claims and Priority Tax Claims.

**1.70** *Unexpired Lease* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.71** *Unimpaired* means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*Rules Of Interpretation And Computation Of Time.* For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in

such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits*.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or after the Petition Date, but in any event, no later than ten (10) Business Days prior to the hearing at which the Bankruptcy Court considers whether to confirm the Plan.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (a) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (b) on the Bankruptcy Court's website at http://www.deb.uscourts.gov (registration required) or (c) at our noticing agent's website at http://www.jacksonhewittcaseinfo.com. The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

**2.1** *Administrative Claims*.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (x) any Professional Fee Claim shall not be paid except in

accordance with an order of the Bankruptcy Court permitting such payment, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors.

**2.2** *Priority Tax Claims*. The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by the Plan. Unless the Holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Priority Tax Claim shall have such Claim Reinstated.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**3.1** *Separate Plans*. This Plan, though proposed jointly, constitutes separate plans proposed by each of the Debtors. Therefore, except as expressly specified herein, the classifications set forth below shall be deemed to apply separately with respect to each plan proposed by each Debtor.

**3.2** *Classification And Settlement*. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. Except as otherwise provided in the Plan, each Class consists of sub-Classes for each Debtor, and each sub-Class shall and shall be deemed to be a separate Class for all purposes under the Bankruptcy Code. A schedule of the sub-Classes is set forth in Exhibit D to the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Each reference to "Class" or "Classes" shall include all sub-Classes of the respective Class or Classes, as applicable.

Moreover, the Plan implements a compromise and settlement with respect to the Senior Credit Facility Claims, Intercompany Claims, and Intercompany Interests. Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute Bankruptcy Court approval of, such settlement.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 ............. | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 ............. | Other Secured Claims | Unimpaired | No (deemed to accept) |

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 3 ............. | Secured Senior Credit Facility Claims | Impaired | Yes |
| Class 4 ............. | General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 5 ............. | Subordinated 510(b) Claims | Impaired | No (deemed to reject) |
| Class 6 ............. | Interests in Jackson Hewitt | Impaired | No (deemed to reject) |
| Class 7 ............. | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 8 ............. | Intercompany Interests | Unimpaired | No (deemed to accept) |

### 3.3 *Treatment Of Classes*.

**(a)** *Class 1 – Other Priority Claims*

(i) *Claims In Class:* Class 1 consists of separate sub-Classes for all Other Priority Claims that may exist against each Debtor, respectively.

(ii) *Treatment:* On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Class 1 Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

(iii) *Voting:* Class 1 is Unimpaired, and the Holders of Allowed Class 1 Other Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

**(b)** *Class 2 – Other Secured Claims*

(i) *Claims In Class:* Class 2 consists of separate sub-Classes for all Other Secured Claims that may exist against each Debtor, respectively.

(ii) *Treatment:* On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim shall be Reinstated.

(iii) *Voting:* Class 2 is Unimpaired, and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

**(c)** *Class 3 – Secured Senior Credit Facility Claims*

(i) *Claims In Class:* Class 3 consists of separate sub-Classes for all Secured Senior Credit Facility Claims against each Debtor, respectively. The Senior Credit Facility Claims are Allowed Claims, for all purposes, in the amount of no less than $357 million and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(ii) *Treatment:* On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Secured Senior Credit Facility Claim, (i) its pro rata share of the New Term Loan Facility, (ii) its pro rata share of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan, and (iii) an opportunity to elect to participate pro rata in the New Revolving Credit Facility (and receive the associated pro rata distribution of Cash, as set forth in Section 5.3 if such holder elects to so participate).

(iii) *Voting:* Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Secured Senior Credit Facility Claim is entitled to vote to accept or reject this Plan.

**(d)** *Class 4 – General Unsecured Claims*

(i) *Claims In Class:* Class 4 consists of separate sub-Classes for all General Unsecured Claims that may exist against each Debtor, respectively.

(ii) *Treatment:* The Holders of Class 4 General Unsecured Claims shall not receive or retain any property under the Plan on account of such Class 4 General Unsecured Claims.

(iii) *Voting:* Class 4 is Impaired, and the Holders of Class 4 General Unsecured Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 4 General Unsecured Claims are not entitled to vote to accept or reject this Plan.

**(e)** *Class 5 – Subordinated 510(b) Claims*

(i) *Claims In Class:* Class 5 consists of all Subordinated 510(b) Claims. This Class is applicable only to the Chapter 11 Case of Jackson Hewitt.

(ii) *Treatment:* The Holders of Class 5 Subordinated 510(b) Claims shall not receive or retain any property under the Plan on account of such Class 5 Subordinated 510(b) Claims.

(iii)     *Voting:*  Class 5 is Impaired, and the Holders of Class 5 Subordinated 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Subordinated 510(b) Claims are not entitled to vote to accept or reject this Plan.

**(f)**     *Class 6 – Interests in Jackson Hewitt*

(i)     *Interests In Class:*  Class 6 consists of all Interests in Jackson Hewitt.  This Class is applicable only to the Chapter 11 Case of Jackson Hewitt.

(ii)     *Treatment:*  On the Effective Date, all Class 6 Interests in Jackson Hewitt shall be cancelled without further action by the Debtors or Reorganized Debtors.  The Holders of Class 6 Interests in Jackson Hewitt shall not receive or retain any property under the Plan on account of such Class 6 Interests in Jackson Hewitt.

(iii)     *Voting:*  Class 6 is Impaired, and the Holders of Class 6 Interests in Jackson Hewitt are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Interests in Jackson Hewitt are not entitled to vote to accept or reject this Plan.

**(g)**     *Class 7 – Intercompany Claims*

(i)     *Claims In Class:*  Class 7 consists of three sub-Classes each consisting of the following Claims, respectively:  (i) the Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt; (ii) the Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc.; and (iii) the Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc.

(ii)     *Treatment:*  On or prior to the Effective Date, (i) the Allowed Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part; (ii) the Allowed Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc. shall be Reinstated; and (iii) the Allowed Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc. shall be Reinstated.

(iii)     *Voting:*  Sub-Class 7 relating to the Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt is conclusively deemed to have rejected the Plan.  Sub-Classes 7 relating to the Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc., and the Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc., respectively, are conclusively deemed to have accepted the Plan.  Therefore, the Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject this Plan.

(h)   *Class 8 – Intercompany Interests*

(i)   *Interests In Class:*  Class 8 consists of five sub-Classes each consisting of the following Intercompany Interests, respectively:  (i) Jackson Hewitt's Intercompany Interests in Jackson Hewitt Inc.; (ii) Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Technology Services LLC; (iii) Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Corporate Services Inc.; (iv) Jackson Hewitt Inc.'s Intercompany Interests in Tax Services of America, Inc.; and (v) Jackson Hewitt Inc.'s Intercompany Interests in Hewfant Inc.

(ii)   *Treatment:*  On the Effective Date, the Allowed Class 8 Intercompany Interests shall be Reinstated and the legal, equitable, and contractual rights to which the Holders of such Allowed Class 8 Intercompany Interests are entitled shall remain unaltered so as to maintain the organizational structure of the Debtors as such structure existed on the Petition Date.

(iii)   *Voting:*  Class 8 is Unimpaired, and the Holders of Allowed Class 8 Intercompany Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 8 Intercompany Interests are not entitled to vote to accept or reject this Plan.

**3.4**   ***Alternative Treatment***.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors or the Reorganized Debtors may agree in writing.

**3.5**   ***Special Provision Regarding Unimpaired Claims***.  Except as otherwise provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

**3.6**   ***Procedures For Resolving Disputed, Contingent, And Unliquidated Claims***.  The Debtors and the Reorganized Debtors may contest the amount and validity of any disputed, contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THIS PLAN

**4.1**   ***Acceptance By Class Entitled To Vote***.  Class 3, which is the only Impaired Class of Claims of the Debtors that is entitled to receive or retain property or any interest in property under this Plan, is entitled to vote to accept or reject this Plan.  Class 3 shall have accepted this Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the

Class have voted to accept this Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

**4.2** ***Presumed Acceptance Of The Plan***. Classes 1, 2, 7, and 8 are Unimpaired. Therefore, such Classes are deemed to have accepted this Plan by operation of law and are not entitled to vote to accept or reject the Plan.

**4.3** ***Presumed Rejection Of The Plan***. Classes 4, 5, and 6 are Impaired. Therefore, such Classes are deemed to have rejected this Plan by operation of law and are not entitled to vote to accept or reject the Plan.

**4.4** ***Elimination Of Classes***. To the extent applicable, any Class (including, for the avoidance of doubt, any sub-Class) that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.5** ***Cramdown***. The Debtors shall request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

**5.1** ***Continued Legal Existence***. Except as otherwise provided in this Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a corporation, limited liability company or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to such Debtor's certificate or articles of incorporation and by-laws or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**5.2** ***Sources Of Cash For Distribution***. All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (a) existing Cash balances, including balances in the Cash Collateral Account, (b) the operations of the Debtors or Reorganized Debtors and (c) the New Revolving Credit Facility.

**5.3** ***New Revolving Credit Facility***. All Lenders will be given the opportunity to participate in the New Revolving Credit Facility on a pro rata basis based upon the amount of their Secured Senior Credit Facility Claims. To the extent the New Revolving Credit Facility is not fully subscribed, subscribing Lenders will "flex" their pro rata share thereof by 10% (by way of example, a 15% Lender would flex to 16.5%).

To the extent the New Revolving Credit Facility remains not fully subscribed after such "flex", subscribing Lenders electing to do so may, but shall not be obligated to, further subscribe on a pro rata basis. In exchange for providing the New Revolving Credit Facility, such Lenders will receive (on a pro rata basis based upon their participation in the New Revolving Credit Facility) the Cash on the Reorganized Debtors' balance sheet (including any Cash in the Cash Collateral Account) in excess of $5 million as of the Effective Date. On the Effective Date, the New Revolving Credit Facility will be drawn in an amount (the "Initial Draw") that shall be the lesser of (i) the actual amount of Cash collateral used by the Debtors between April 30, 2011 and the Effective Date (the "Actual Draw") and (ii) an amount based upon the Debtors' projected revolver draw (the "Projected Draw") as set forth on the Projected Draw Schedule contained in Exhibit A attached hereto, provided that during the period between the Petition Date and the Effective Date, all expenses of the Debtors and their estates, other than those related to professional fees, shall be in amounts consistent with the Debtors' ordinary course of operations and the cash budget approved pursuant to the terms of any cash collateral order. If the Initial Draw is deemed to be the Projected Draw and the Effective Date falls between two dates shown on the Projected Draw Schedule, the amount of the Initial Draw shall be prorated based upon the number of days between such Effective Date and the scheduled dates such Effective Date falls between.

**5.4**     ***Approval And Authorization For The New Term Loan Facility And New Revolving Credit Facility***.  Confirmation shall be deemed approval of the New Term Loan Facility and the New Revolving Credit Facility and authorization for the Reorganized Debtors to enter into the New Term Loan Facility and the New Revolving Credit Facility and execute such documents as may be required to effectuate the treatment afforded to the Lenders pursuant to the New Term Loan Facility and the New Revolving Credit Facility.

**5.5**     ***Issuance Of New Common Stock***.  On the Effective Date, Reorganized Jackson Hewitt shall issue shares of New Common Stock for distribution to Holders of Allowed Secured Senior Credit Facility Claims.  All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non assessable.  The New Common Stock issued to the Holders of Allowed Secured Senior Credit Facility Claims shall be subject to dilution by the Management Incentive Plan.

**5.6**     ***Section 1145 Exemption***.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of the New Common Stock to Holders of Allowed Secured Senior Credit Facility Claims shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

**5.7**     ***Shareholders' Agreement For New Common Stock***.  On the Effective Date, Reorganized Jackson Hewitt and the Lenders shall be deemed to have executed and delivered the Shareholders' Agreement.  Each Holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall be deemed bound by the Shareholders'

Agreement as of the Effective Date without the need for execution or delivery by such Holder.

**5.8** *Management Incentive Plan*. The New Board will implement the Management Incentive Plan.

**5.9** *New Board Of Reorganized Jackson Hewitt*. The New Board of Reorganized Jackson Hewitt shall be comprised of five (5) directors elected by a majority of the shareholders. The identity of the members of the New Board will be identified in the Plan Supplement or in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing.

**5.10** *Corporate Action*. Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

**5.11** *Preservation Of Causes Of Action*. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions, except that the Debtors hereby waive all Avoidance Actions. After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action. The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of this Plan.

**5.12** *Effectuating Documents; Further Transactions*. Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

**5.13**  *Exemption From Certain Transfer Taxes And Recording Fees*.
Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a
Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any
agreement regarding the transfer of title to or ownership of any of the Debtors' real or
personal property will not be subject to any document recording tax, stamp tax,
conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate
transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee,
or other similar tax or governmental assessment, and the Confirmation Order will direct
the appropriate state or local governmental officials or agents to forego the collection of
any such tax or governmental assessment and to accept for filing and recordation any of
the foregoing instruments or other documents without the payment of any such tax or
governmental assessment.

**5.14**  *Further Authorization*.  The Debtors and the Reorganized Debtors
shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem
necessary to carry out the intentions and purposes, and to give full effect to the provisions,
of this Plan.

**5.15**  *Dissolution Of Creditors' Committee*.  A Creditors' Committee, if
appointed, shall continue in existence until the Effective Date to exercise those powers
and perform those duties specified in section 1103 of the Bankruptcy Code and shall
perform such other duties as it may have been assigned by the Bankruptcy Court prior to
the Effective Date.  On the Effective Date, the Creditors' Committee, if appointed, shall
be dissolved and the Creditors' Committee's members shall be deemed released of all
their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or
this Plan and its implementation, and the retention or employment of the Creditors'
Committee's attorneys, accountants, professionals, and other agents shall terminate,
except with respect to (a) all Professional Fee Claims and (b) any appeals of the
Confirmation Order.

**5.16**  *Cancellation Of Existing Securities And Agreements*.  Except as
provided in this Plan or in the Confirmation Order, on the Effective Date, all notes, stock,
instruments, certificates, agreements, side letters, fee letters and other documents
evidencing or giving rise to Senior Credit Facility Claims and Interests in Jackson Hewitt
shall be cancelled, and the obligations of the Debtors thereunder or in any way related
thereto shall be fully released, terminated, extinguished and discharged, in each case
without further notice to or order of the Bankruptcy Court, act or action under applicable
law, regulation, order, or rule or any requirement of further action, vote, or other approval
or authorization by any Person.  The Holders of or parties to such notes, stock,
instruments, certificates, agreements, side letters, fee letters, and other documents shall
have no rights arising from or relating to such notes, stock, instruments, certificates,
agreements, side letters, fee letters, and other documents or the cancellation thereof,
except the rights provided pursuant to this Plan and the Confirmation Order.

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**6.1** *Allowed Claims*. Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims. A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

**6.2** *Distributions For Claims Allowed As Of The Effective Date*. Except as otherwise provided under this Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.3** *Fractional Shares*. No fractional shares of New Common Stock will be issued or distributed under this Plan. The actual distribution of shares of New Common Stock will be rounded to the next higher or lower whole number as follows: (a) fractions less than one-half (½) shall be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total number of shares of New Common Stock to be distributed herein will be adjusted as necessary to account for such rounding. No consideration will be provided to Holders of Secured Senior Credit Facility Claims in lieu of fractional shares that are rounded down.

**6.4** *Interest And Penalties On Claims*. Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims and Other Priority Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

**6.5** *Means Of Cash Payment*. Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Reorganized Debtor. Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.6** *Withholding And Reporting Requirements/Allocations*. In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall

comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Each Holder of an Allowed Class 3 Secured Senior Credit Facility Claim shall be treated as receiving, for U.S. federal income tax purposes, in full satisfaction and discharge of its Claim (i) its pro rata share of the New Term Loan Facility, (ii) its pro rata share of the New Common Stock, and (iii) to the extent that such Holder participates in the New Revolving Credit Facility, its share of the Cash on the Reorganized Debtors' balance sheet (including any Cash in the Cash Collateral Account) in excess of $5 million as of the Effective Date, and the Initial Draw under the New Revolving Credit Facility. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**6.7** ***Preservation Of Rights***. The Reorganized Debtors shall retain all rights arising under section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, including, but not limited to, the right to set off against any Claim, the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder; *provided*, *further*, that the Holder of any Claim must assert any right to setoff prior to the Effective Date or such right shall be deemed waived on the Effective Date.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**7.1** ***Assumption Of Executory Contracts And Unexpired Leases***. Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) has previously been rejected by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to reject filed on or before the Effective Date; (c) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date; or (d) expired or terminated pursuant to its own terms. An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors had properly provided for the cure of any defaults that might have existed, (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed had been satisfied. Except as otherwise provided in the following sentence, all cure payments under any Assumed Contract shall be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute.

**7.2** ***Compensation And Benefit Programs***. All of the Debtors' programs, plans, agreements and arrangements relating to employee compensation and benefits, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are (other than any Executory Contract rejected pursuant to Section 7.1), Executory Contracts that are assumed under Section 7.1 of this Plan, and the Debtors' and Reorganized Debtors' obligations under such programs, plans, agreements and arrangements will survive Confirmation of this Plan and will be fulfilled in the ordinary course of business.

**7.3** ***D&O Liability Insurance Policies***. As of the Effective Date, the D&O Liability Insurance Policies shall be treated as if they were Executory Contracts that are assumed under this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no proof of claim need be filed.

**7.4** ***Indemnification***. Except as otherwise specifically limited in this Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of the Debtors' present and former directors, officers, employees, agents, representatives, attorneys, accountants, financial advisors, investment bankers and consultants (the "Covered Persons") pursuant to the Debtors' or Reorganized Debtors' certificates of incorporation, by-laws, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, Causes of Action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, excluding claims resulting from gross negligence, willful misconduct, or intentional tort, shall be treated as if they were Executory Contracts that are assumed under this Plan and shall survive the Effective Date and remain unaffected thereby, and shall not be discharged, irrespective of whether such

defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

## ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

**8.1** *Condition To Confirmation*.  Confirmation of the Plan is conditioned upon the Confirmation Order being reasonably acceptable in form and substance to the Debtors and the Participating Lenders.

**8.2** *Conditions To Effective Date*.  The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors and the Participating Lenders in accordance with the terms hereof:

**(a)** The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Participating Lenders, shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the New Term Loan Facility and the New Revolving Credit Facility and other agreements or documents created in connection with this Plan.

**(b)** All documents related to, provided for therein, or contemplated by the New Term Loan Facility and the New Revolving Credit Facility shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

**(c)** All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

**(d)** All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

**(e)** The payment in full of all fees and expenses of the Administrative Agent and Bayside and their respective professionals (as set forth in Section 4(b) of the Plan Support Agreement.)

**(f)** The payment in full of all fees and expenses of the arranger under the New Term Loan Facility and the New Revolving Credit Facility.

**8.3** *Waiver Of Conditions*.  Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Debtors and the Participating Lenders, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date

may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

**9.1** *Binding Effect*. This Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all present and former Holders of Claims and Interests, and their respective successors and assigns, including but not limited to the Reorganized Debtors.

**9.2** *Revesting Of Assets*. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**9.3** *Compromise And Settlement Of Claims, Interests And Controversies*. In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. Without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against or Interests in them and Causes of Action against other Persons.

**9.4** *Releases And Related Matters*

(a) **Releases by the Debtors**

**As of the Effective Date, for good and valuable consideration provided by each of the Releasees, including, but not limited to, (i) the discharge of debt; (ii) the obligations of the Releasees to provide the support necessary for consummation of the Plan; and (iii) the services of the Releasees in facilitating the expeditious**

implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, each of the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed to forever release, waive and discharge the Participating Lenders and each of the Participating Lenders' and the Debtors' respective current and former members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, subsidiaries, affiliates, and representatives (in each case only in their capacity as such), and their respective properties from any and all Causes of Action, whether known or unknown, arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, and further including those in any way related to the Chapter 11 Cases, the Disclosure Statement or this Plan to the fullest extent of the law; *provided*, *however*, that the foregoing shall not operate to waive or release any Releasee from any Causes of Action arising under the New Term Loan Facility or the New Revolving Credit Facility.

(b)    Releases by the Lenders

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Participating Lender shall be deemed to have fully discharged and released the Releasees and their respective property from any and all Causes of Action, whether known or unknown, arising from or related in any way to the Debtors, including, without limitation, those in any way related to the Chapter 11 Cases, the Disclosure Statement or this Plan; *provided*, *however*, that the foregoing shall not operate to waive or release any Releasee from any Causes of Action arising under the New Term Loan Facility or the New Revolving Credit Facility or any Causes of Action by any Participating Lender that provides cash management services to a Releasee to the extent such Causes of Action are for usual and customary cash management fees and charges.
.

### 9.5    *Discharge Of The Debtors*

(a)    Upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted this Plan.

(b)    As of the Effective Date, except as provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors

or the Reorganized Debtors, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### 9.6    *Injunction*

Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability that is released or discharged under this Article IX are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective Affiliates or their property on account of any such released or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

### 9.7    *Exculpation And Limitation Of Liability*

**None of the Releasees shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Releasee that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided further*, that each Releasee shall be entitled to reasonably rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.**

### 9.8    *Term Of Bankruptcy Injunction Or Stays*.  Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

**9.9**     *Post-Effective Date Retention Of Professionals*.  Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors will employ and pay professionals in the ordinary course of business.

# ARTICLE X

# RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

**(a)**     Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

**(b)**     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

**(c)**     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

**(d)**     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

**(e)**     Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

**(f)**     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331,

503(b), and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses by the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

**(g)** Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

**(h)** Adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

**(i)** Hear and determine Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

**(j)** Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

**(k)** Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

**(l)** Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

**(m)** Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

**(n)** Enter an order closing the Chapter 11 Cases.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1** *Payment Of Statutory Fees*.  All fees payable pursuant to section 1930 of Title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**11.2** *Amendment Or Modification Of This Plan*.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan*, provided, however,* that the Participating Lenders approve of such alteration, amendment or modification.  A Holder of a Claim that has accepted this

Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**11.3** *Severability Of Plan Provisions*. If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.4** *Successors And Assigns*. This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**11.5** *Revocation, Withdrawal, Or Non-Consummation*.

The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

**11.6** *Notice*. All notices, requests, and demands to or upon the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

JACKSON HEWITT TAX SERVICE INC.
3 Sylvan Way
Parsippany, New Jersey 07054
Telephone: (973) 630-0707
Fax: (973) 630-0702
Att'n: Steven L. Barnett, Esq.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000
Att'n: J. Gregory Milmoe, Esq.
Att'n: Mark A. McDermott, Esq.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Fax: (302) 651-3001
Att'n: Mark S. Chehi, Esq.

Attorneys for Debtors and Debtors in Possession

**11.7** *Governing Law*. Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of New York without giving effect to the principles of conflicts of law of such jurisdiction.

**11.8** *Exhibits*. All Exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

**11.9** *Filing Of Additional Documents*. On or before substantial consummation of this Plan, the Debtors shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**11.10** *Conflicts*. In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

*Remainder of Page Left Intentionally Blank*

Dated: May 23, 2011
Parsippany, New Jersey

JACKSON HEWITT TAX SERVICE INC.
(on behalf of itself and the other Debtors)

By: _____
Name: Daniel P. O'Brien
Title: EVP & CFO

Mark A. McDermott
J. Gregory Milmoe
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Email: Mark.McDermott@skadden.com
Email: Gregory.Milmoe@skadden.com

Mark S. Chehi (I.D. No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Email: Mark.Chehi@skadden.com

Attorneys for Jackson Hewitt Tax Service
Inc. and Subsidiaries

EXHIBIT A

TO

JOINT PREPACKAGED PLAN OF REORGANIZATION
<u>OF JACKSON HEWITT TAX SERVICE INC. AND ITS AFFILIATES</u>

# NEW REVOLVING CREDIT FACILITY TERM SHEET

| | | | |
|---|---|---|---|
| **Administrative Agent:** | Third Party Agent to be agreed upon by Bayside and the Company | | |
| **Arranger:** | Wells Fargo Securities, LLC | | |
| **Annual Agent Fee:** | TBD | | |
| **Arranger Fee:** | $125,000 under the New Revolver; $250,000 total | | |
| **New Revolver:** | $115 million or such slightly lesser amount as deemed acceptable by the Administrative Agent and Bayside | | |
| | 1st lien on all assets | | |
| | Maturity date 8/1/15 | | |
| | Pricing: | | |
| | | **Cash Rate** | **Unused Fee** |
| | | L + 4.50% | .50% |
| | * Cash rate declines by 1.00% (i.e. to L+ 3.50%) if Covenant EBITDA for any audited period exceeds $50MM. Cash rate returns to L+4.50% if Covenant EBITDA for any audited period is less than or equal to $50MM. | | |
| | LIBOR Floor of 2.00% | | |
| | | | |
| **Financial Covenants Applicable to New Revolver:** | | **Minimum EBITDA** | **Maximum Average Total Leverage** |
| | Closing to 1st anniversary | $35 million | 4.25x |
| | 2nd full year | $37 million | 4.10x |
| | 3rd full year to maturity | $40 million | 3.80x |
| | | | |
| | | | |
| **Reporting Requirements:** | Reporting will be generally consistent with leveraged middle market credits. | | |
| **Control of Cash** | Cash subject to acceptable deposit account control agreements. The Company will covenant not to retain more than $15 million in cash at any time that there is an outstanding revolver balance. This covenant may not be modified without the consent of 90% of Lenders. | | |
| **Required Lenders:** | (a) For so long as Bayside holds twenty percent or more of the commitments under the New Revolver, Lenders holding two-thirds of the commitments under the New Revolver (or if the commitments under the New Revolver have expired or otherwise been terminated, the outstanding loans under the New Revolver); provided, however, that a majority of the non-Bayside Lenders may direct the Administrative Agent to declare an event of default and exercise rights and remedies thereafter; (b) Otherwise, Lenders holding a majority of the commitments under the New Revolver (or if the commitments under the New Revolver have expired or otherwise been terminated, the outstanding loans under the New Revolver). | | |
| **Other Terms** | Credit Agreement to include representations, warranties, affirmative covenants, negative covenants, events of default and other provisions generally consistent with leveraged middle market credits. | | |

## PROJECTED DRAW SCHEDULE

| Date of Emergence | 5/31 2011 | 6/30 2011 | 7/31 2011 | 8/31 2011 | 9/30 2011 | 10/31 2011 | 11/30 2011 | 12/31 2011 | 1/31 2012 | 2/29 2012 | 3/31 2012 | 4/30 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Initial Draw (in $ millions) | 15.5 | 24.5 | 33.6 | 43.3 | 50.0 | 59.8 | 71.0 | 83.5 | 93.3 | 18.9 | 0.0 | 0.0 |

EXHIBIT B

TO

JOINT PREPACKAGED PLAN OF REORGANIZATION
OF JACKSON HEWITT TAX SERVICE INC. AND ITS AFFILIATES

# NEW TERM LOAN FACILITY TERM SHEET

| | |
|---|---|
| **Administrative Agent:** | Third Party Agent to be agreed upon by Bayside and the Company |
| **Arranger:** | Wells Fargo Securities, LLC |
| **Annual Agent Fee:** | TBD |
| **Arranger Fee:** | $125,000 under the New Term Loan; $250,000 total |
| **New Term Loan:** | $100 million |
| | 2nd lien on all assets |
| | Maturity date 8/1/16 (~5.25 years) |
| | Pricing: L + 8.00%. Rate declines by 1.00% (i.e. to L+7.00%) if Covenant EBITDA for any audited period exceeds $50MM. Rate returns to L+8.00% if Covenant EBITDA for any audited period is less than or equal to $50MM. |
| | LIBOR Floor of 2.00% |
| | May be pre-paid at any time without a premium |

| | | Minimum EBITDA | Maximum Average Total Leverage |
|---|---|---|---|
| **Financial Covenants Applicable to New Term Loan:** | | | |
| | Closing to 1st anniversary | $35 million | 4.25x |
| | 2nd full year | $37 million | 4.10x |
| | 3rd full year to maturity | $40 million | 3.80x |
| | | | |
| | | | |

| | |
|---|---|
| **Reporting Requirements:** | Reporting will be generally consistent with leveraged middle market credits. |
| **Control of Cash** | Cash subject to acceptable deposit account control agreements. The Company will covenant not to retain more than $15 million in cash at any time that there is an outstanding revolver balance. This covenant may not be modified without the consent of 90% of Lenders. |
| **Required Lenders:** | (a) For so long as Bayside holds twenty percent or more of the outstanding principal amount of the New Term Loan, lenders holding two-thirds of the outstanding principal amount of the New Term Loan; provided, however, that a majority of the non-Bayside Lenders may direct the Administrative Agent to declare an event of default and exercise rights and remedies thereafter; (b) Otherwise, Lenders holding a majority of the outstanding principal amount of the New Term Loan. |
| **Other Terms** | Credit Agreement to include representations, warranties, affirmative covenants, negative covenants, events of default and other provisions generally consistent with leveraged middle market credits. |

EXHIBIT C

TO

JOINT PREPACKAGED PLAN OF REORGANIZATION
<u>OF JACKSON HEWITT TAX SERVICE INC. AND ITS AFFILIATES</u>

# SHAREHOLDERS' AGREEMENT TERM SHEET

| | |
|---|---|
| **Board:** | Jackson Hewitt shall be managed by a board of **5** directors (the "**Board**") elected by a majority of shareholders. |
| **Pre-emptive Rights:** | Except in connection with a registered public offering of shares, each shareholder shall have a right to subscribe to any issuance by Jackson Hewitt of shares or any securities exercisable, convertible or exchangeable for shares (other than the issuance of shares to management through an incentive plan and such other exemptions as may be agreed to by the parties) in an amount that would allow each such shareholder to maintain its fully diluted equity ownership interest percentage in Jackson Hewitt. |
| **Tag Along Rights:** | In the event of a sale, transfer or other disposition by a shareholder, in one or more transactions, of more than 25% of the outstanding shares (including by means of merger), the other shareholders shall have the right to participate on a pro rata basis in such transaction, on identical terms and conditions and for the same consideration (subject to customary exclusions for transfers to affiliates and public offerings). |
| **Right of First Refusal:** | No shareholder may transfer (other than to a permitted transferee) any of its shares comprising less than 49.9% of the fully diluted equity of Jackson Hewitt (the "**Subject Shares**"), without first offering the Subject Shares to the other shareholders. Such offer must remain outstanding for not less than fifteen (15) days and shall allow shareholders acquiring Subject Shares not less than fifteen (15) additional days to close such sale transaction. In the event other shareholders desire to purchase the Subject Shares, they may do so on a pro rata basis among those so wishing to purchase subject to an overallotment right until such time as no shareholders elect to purchase any additional Subject Shares. The right of first refusal shall apply regardless of whether the other shareholders elect to purchase less than all of the Subject Shares. The selling shareholder is free to sell any shares not sold in accordance with the above terms to any non-shareholder on the same terms and conditions offered to the other shareholders during the 30 day period following the expiration of the period during which the other shareholders have the right to exercise their right of first refusal, provided that such selling shareholder will not sell such shares (a) to any competitor of Jackson Hewitt, or (b) in contravention of any transfer restrictions imposed on the shares (including, without limitation, those transfer restrictions imposed to preserve Jackson Hewitt's non-reporting status) by any legend contained thereon, by an restriction contained in the Shareholders' Agreement, or by any restriction in the organizational documents of Reorganized Jackson Hewitt. Any proposed transfer that would be in contravention of these provisions shall be void and of no force or effect. The right of first refusal and the procedures described in this section shall not apply to any transfer of shares to another shareholder, where the agreement to sell or transfer such shares was made prior to the Effective Date of the Plan. |
| **Drag Along Rights:** | In the event of a sale, transfer or other disposition of more than a majority of the outstanding shares to a third party (including by means of a merger), the selling shareholders may exercise a drag-along right in connection with such transaction to compel all other shareholders to dispose of their shares on identical terms and conditions and for the same per share consideration, provided that the other shareholders shall only be required to sell the same percentage of their shares as the selling shareholders are selling of their shares. |
| **Information Rights:** | Jackson Hewitt will provide to each shareholder party to the Shareholders' Agreement (i) within 120 days after the end of each fiscal year, audited financial statements for Jackson Hewitt and its consolidated subsidiaries for such year, together with a copy of the audit report of Jackson Hewitt's independent public accountants; (ii) within 45 days after the end of each fiscal quarter, unaudited |

| | quarterly financial statements for the quarterly period then ended and the comparable period in the prior year; and (iii) any other financial information, including budgets and projections, that such Shareholder may reasonably request from time to time.  In addition, each Shareholder party to the Shareholder Agreement that holds more than 3% of the outstanding shares shall have the right, two times per year, upon reasonable notice and at reasonable times, to meet with management of the Company and one time per year to attend an annual group meeting with the auditors and other representatives of the Company; subject to appropriate confidentiality agreements and to the right of the Company to limit such access if necessary to preserve any privilege that the Company is entitled to claim; _provided, however_, that there shall be no limitation on meetings with auditors and other representatives of the Company after the occurrence and during the continuation of any event of default under the New Term Loan, New Revolver or any other material contract. |
| --- | --- |

EXHIBIT D

TO

JOINT PREPACKAGED PLAN OF REORGANIZATION
OF JACKSON HEWITT TAX SERVICE INC. AND ITS AFFILIATES

SCHEDULE OF SUB-CLASSES

Set forth below are the sub-Classes for Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured Senior Credit Facility Claims), Class 4 (General Unsecured Claims), Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests):

| SUB-CLASSES FOR CLASS 1 (OTHER PRIORITY CLAIMS) | DEBTOR |
|---|---|
| 1.1 | Hewfant Inc. |
| 1.2 | Jackson Hewitt Corporate Services Inc. |
| 1.3 | Jackson Hewitt Inc. |
| 1.4 | Jackson Hewitt Tax Service Inc. |
| 1.5 | Jackson Hewitt Technology Services LLC |
| 1.6 | Tax Services of America, Inc. |

| SUB-CLASSES FOR CLASS 2 (OTHER SECURED CLAIMS) | DEBTOR |
|---|---|
| 2.1 | Hewfant Inc. |
| 2.2 | Jackson Hewitt Corporate Services Inc. |
| 2.3 | Jackson Hewitt Inc. |
| 2.4 | Jackson Hewitt Tax Service Inc. |
| 2.5 | Jackson Hewitt Technology Services LLC |
| 2.6 | Tax Services of America, Inc. |

| SUB-CLASSES FOR CLASS 3 (SECURED SENIOR CREDIT FACILITY CLAIMS) | DEBTOR |
|---|---|
| 3.1 | Hewfant Inc. |
| 3.2 | Jackson Hewitt Corporate Services Inc. |
| 3.3 | Jackson Hewitt Inc. |
| 3.4 | Jackson Hewitt Tax Service Inc. |
| 3.5 | Jackson Hewitt Technology Services LLC |
| 3.6 | Tax Services of America, Inc. |

| SUB-CLASSES FOR CLASS 4 (GENERAL UNSECURED CLAIMS) | DEBTOR |
|---|---|
| 4.1 | Hewfant Inc. |
| 4.2 | Jackson Hewitt Corporate Services Inc. |
| 4.3 | Jackson Hewitt Inc. |
| 4.4 | Jackson Hewitt Tax Service Inc. |
| 4.5 | Jackson Hewitt Technology Services LLC |
| 4.6 | Tax Services of America, Inc. |

| SUB-CLASSES FOR CLASS 7 (INTERCOMPANY CLAIMS) | INTERCOMPANY CLAIMS |
|---|---|
| 7.1 | Intercompany Claim held by Jackson Hewitt Inc. against Jackson Hewitt |
| 7.2 | Intercompany Claim held by Jackson Hewitt Corporate Services Inc. against Jackson Hewitt Inc. |
| 7.3 | Intercompany Claim held by Jackson Hewitt Inc. against Tax Services of America, Inc. |

| SUB-CLASSES FOR CLASS 8 (INTERCOMPANY INTERESTS) | INTERCOMAPNY INTERESTS |
|---|---|
| 8.1 | Jackson Hewitt's Intercompany Interests in Jackson Hewitt Inc. |
| 8.2 | Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Technology Services LLC |
| 8.3 | Jackson Hewitt Inc.'s Intercompany Interests in Jackson Hewitt Corporate Services Inc. |
| 8.4 | Jackson Hewitt Inc.'s Intercompany Interests in Tax Services of America, Inc. |
| 8.5 | Jackson Hewitt Inc.'s Intercompany Interests in Hewfant Inc. |

APPENDIX B

LIQUIDATION ANALYSIS

This liquidation analysis, a copy of which is at the end of this Appendix B (the "Liquidation Analysis"), was prepared by Alvarez & Marsal for the Debtors and represents their best estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the United States Bankruptcy Code. This Liquidation Analysis assumes that the Debtors' chapter 11 Cases are converted into liquidations under chapter 7 as of June 30, 2011.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors, and upon assumptions which could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth above, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated in the liquidation of the Debtors under chapter 7 of the United States Bankruptcy Code. The liquidation valuations have been prepared solely for purposes of estimating the proceeds available in chapter 7 and do not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plan. Nothing contained in these valuations is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis.

**General Assumptions**

In chapter 7, a trustee (the "Chapter 7 Trustee") would be appointed to manage the Debtors' affairs and conduct a liquidation. This Liquidation Analysis assumes that the Debtors would be forced to liquidate. For the reasons described below, the Debtors would be forced to cease substantially all operations almost immediately and use their cash position to liquidate their assets and pay the costs of liquidation and all creditor claims in accordance with the priorities established in chapter 7. For ease of presentation, the Liquidation Analysis presents the results of liquidation of each of the Debtors on a consolidated basis. Even if the presentation were made on an entity-by-entity basis, the result would be the same because the Lenders have blanket liens on all of the Debtors assets to secure claims that are vastly in excess of the estimated liquidation proceeds. The likely consequences of the conversion to chapter 7 include the following:

- The Company's workforce would be terminated, except for a very small number of employees necessary to assist with the liquidation. Even if termination did not occur immediately, with the Company facing certain liquidation, employees would quickly leave the Company and find employment elsewhere. The loss of employees would make an orderly wind down significantly more difficult and would render the possibility of continuing operations in an effort to complete a going concern sale highly remote, if not impossible.

- The Company's approximately 700 franchisees are geographically diverse and in the event of a chapter 7 the best franchisees would be courted by, and would transfer to, competitor's platforms. Outside the tax season, there would be few, if any, operational barriers for a franchisee to transfer to a competitor's platform. Indeed, in a liquidation, with the Debtors unable to operate and support their franchisees, the Chapter 7 Trustee likely would immediately reject all franchise agreements. The rejection would give rise to significant damage claims that would be offset against any claims back against franchisees.

- The bulk of the Company's revenues are derived from tax preparation services. Customers have the ability to very quickly shift their purchases from the Company's owned or franchised locations to competition,

desktop software, online platforms, or manual returns. It is highly unlikely that any customer would remain in a liquidation.

- Outstanding receivables would be difficult to collect in full. Franchisees likely would hold/slow the payment of royalties because, as noted above, the Debtors likely would no longer provide the services necessary to continue operations, though after some period of time some partial payments would likely be received. The sale of new tax services would cease entirely.

- Prepaid expenses are primarily composed of deferred expenses and various deposit balances. Deferred expenses might be offset against past due balances and, therefore, uncollectible. Deposits would be held by insurance or benefit providers to cover any tail coverage issues. Prepaid rent would be used to offset final bills/obligations.

- The majority of the Company's property, plant and equipment ("PP&E") is substantially depreciated hardware and/or software assets that have been specifically tailored to the Jackson Hewitt brand and product offering. These assets are of very limited value on the secondary market and it is unlikely that any meaningful value would be realized upon liquidation.

- The bulk of the Company's assets is intangible and is in the form of reacquired franchise rights, customer relationships, patents, trademarks and goodwill. The value of these assets would be severely compromised under a liquidation scenario. Some value may be realized from the sale of the Jackson Hewitt customer lists and from the Company's brand name, trademarks and URLs.

- The Debtors have a series of legal actions against other parties, the largest of which is the HR Block litigation in which the Debtors have sued for damages for, among other things, false advertising, alleging that HR Block harmed the Debtors' franchise value. The value of the litigation is uncertain at this time, though in a liquidation where the franchise ceases to exist, the value would be assumed to be very low. There also would be significant costs of maintaining the suit, which would be compounded by the likely need to simultaneously litigate against Block on its patent infringement claim against the Debtors. The smaller, individual actions are primarily against terminated franchisees. For the reasons mentioned above, we have assumed zero recovery on these individual actions.

- In the 90 days prior to filing the Debtors made payments to vendors, employees and other creditors that could be subject to potential preference actions. This analysis assumes that recoveries from any potential preference action are zero, as such payments were largely made in the ordinary course of business; the amounts for each payee were de minimis; and because the cost to pursue such actions would likely exceed any potential recoveries.

The bulk of the information concerning the Company's assets for this analysis was taken from the Debtors' public financial statements, and from Appendix C ("The Financial Projections of Reorganized Debtors") of the Debtors' Disclosure Statement dated May 23, 2011 (the "Debtors' Disclosure Statement").

## Specific Assumptions

*Note 1*
The Company projects a consolidated cash balance of approximately $68.2 million at June 30, 2011, all but approximately $3.0 million would be held in a segregated account for the benefit of the lenders. Under a liquidation scenario, it is assumed that all funds in the segregated account would be paid to the lenders.

*Note 2:*
Accounts receivable: The table below shows the composition of A/R as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Franchisee royalties, TSA tax prep | $30.1 |

| | |
|---|---|
| Revenue accrual | 32.3 |
| Financial products, transmitter fees | 10.9 |
| Total | $73.2 |

A/R is projected to approximate $15.9 million, in the aggregate, as of June 30, 2011. The Company was able to collect the majority of its pre-season franchise A/R balances by garnishing a portion of the financial product proceeds due to franchisees over the course of the tax season. The balance outstanding on June 30th would be primarily comprised of slower moving franchisee obligations which are largely uncollectable in the off-season, as franchisees have limited means to fund payment in the off-season and because franchisees would hold payments. The Debtors may recover some final payments, though the vast majority of receivables would be uncollectable in chapter 7 liquidation. This analysis assumes that 10% to 30% of receivables would be able to be collected by the Trustee.

**Note 3:**

Notes receivable, current and long-term, approximated $15.8 million at January 31, 2011, and are estimated to approximate $11.2 million at June 30, 2011. The balance outstanding on June 30th would be largely uncollectable as these are long and medium-term loans to franchisees, typically either to expand new territory sales or restructure current receivables on a long-term basis. Without the prospect of a future with Jackson Hewitt and limited additional revenues in the off-season, it is probable that the borrowers would cease making payments on their notes. The Debtors may recover some final payments, though the vast majority of receivables would be uncollectable in chapter 7 liquidation. This analysis assumes that 10% to 30% of receivables would be able to be collected by the Trustee.

**Note 4:**

Prepaid and Other Current Assets: The table below shows the composition of prepaid assets as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Prepaid Gold Guarantee | $4.9 |
| Other receivable, net | 4.5 |
| Deferred financing costs | 3.6 |
| Wal-Mart location subsidy to franchisees | 3.6 |
| Wal-Mart kiosk lease receivable, net | 2.0 |
| Prepaid expenses | 1.9 |
| Prepaid rent | 1.4 |
| Prepaid insurance | 1.4 |
| Total | $23.3 |

Prepaid expenses and other assets are estimated to approximate $13.4 million at June 30, 2011. The prepaid Gold Guarantee balance is a deferred warranty purchased to cover taxpayer claims for certain errors in the preparation of the customers' tax returns and would be required to cover future obligations as they come due. The Wal-Mart subsidies and kiosk lease receivables would not be realizable in a liquidation scenario, as franchisees have limited means to fund payment in the off-season, and because franchisees would hold payments. Prepaid rent, insurance and other prepaid balances would be used to fund payment of the final invoices and any remaining credit balance would be held as an offset against future costs.

Given the factors mentioned in the above discussion, the Debtors may recover some of the smaller deposits, though the vast majority of prepaid assets would be uncollectable. This analysis assumes that 0% to 5% of prepaid expenses would be collected by the Chapter 7 Trustee.

*Note 5:*

Property Plant & Equipment, net:  The following table shows the composition of the Company's PP&E account as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Computer hardware and software | $13.7 |
| Construction | 2.8 |
| Wal-Mart Kiosks | 1.6 |
| Furniture and fixtures | 1.5 |
| Leasehold Improvements | 1.1 |
| Equipment | 1.1 |
| Signage and other | 0.3 |
| Total | $22.1 |

PP&E is estimated to approximate $19.8 million at June 30, 2011.  The Debtors' computer hardware, computer software, and signage is very use-specific to the Company's tax preparation business and would have limited or no value in a liquidation.  The Wal-Mart kiosks are relatively inexpensive individually and the cost of gathering, inventorying and reselling the kiosks from over 1,900 Wal-Mart stores would exceed any realizable value. Furniture, fixtures and equipment from the Debtors' headquarters in Parsippany, NJ and IT center in Sarasota, FL could be resold to a liquidator though recoveries would be low.  Construction and leasehold improvements would yield no economic value.  Given the limited resale value of the Debtors' PP&E and factors mentioned above, recovery in liquidation is estimated at a range of 0% to 10% of projected net PP&E.

*Note 6:*

The following table shows the composition of goodwill as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Franchise operations | $113.0 |
| Company-owned offices | 37.3 |
| Total | $150.3 |

Goodwill is estimated to approximate $150.3 million at June 30, 2011.  In the event of liquidation, goodwill is assumed to have no inherent economic value and would be written down to zero.

*Note 7:*

The following table shows the composition of other intangible assets as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Amortizable | |
| Customer relationships | 1.9 |
| Reacquired franchise rights | 0.8 |
| Franchise agreements | 0.3 |
| Acquired tradenames | 0.0 |
| | |
| Unamortizable | |
| Jackson Hewitt trademark | 81.0 |
| Reacquired franchise rights | 2.6 |
| Total | $86.6 |

Intangibles are estimated to approximate $86.0 million at June 30, 2011. In the event of liquidation, intangible assets would have limited or no economic value. There would be some value to the Jackson Hewitt customer lists and the Company's trademarks and URLs. While the market for such information is limited, management has estimated a value of approximately 0% to 5% of the Petition Date value.

**Note 8:**

The following table shows the composition of other long-term assets as of January 31, 2011:

| (US$ in millions) | 1/31/2011 |
|---|---|
| Development advances – L/T | $4.0 |
| Deferred Gold Guarantee exp. – L/T | 3.3 |
| Wal-Mart kiosk lease – L/T | 2.3 |
| Prepaid rent | 1.0 |
| Deposits | 0.3 |
| Other | 0.2 |
| Total | $11.1 |

Long-term assets are estimated to approximate $11.1 million at June 30, 2011. In the event of liquidation, deferred Gold Guantatee expense and Wal-Mart kiosk leases would be assumed to have no inherent economic value and would be written down to zero. Pre-paid rent balances would be set off against future losses by landlords. Deposits would be realizable. Development advances and other long-term assets would be difficult to collect and have been assumed to have an estimated value of approximately 0% to 5%.

**Note 9:**

The costs of liquidation include the following:
- Chapter 7 Trustee fees - estimated at 3.0% of the net proceeds, excluding cash, from the sale/wind down of assets/business units, net of cash on hand.
- Professional fees - estimated at $250,000 per month for one month in a best case scenario and three months in a worst case scenario.
- Payroll - estimated to approximate 30 days of off-peak season payroll expense at $2.5 million per month. The Worker Adjustment and Retraining Notification Act (29 U.S.C. section 2101) may require 60 days notice for all full-time employees. The actual payroll expense could be lower to the extent the liquidation is completed more quickly, but could increase to pay necessary stay bonuses or WARN Act liabilities, if applicable.
- General and administrative expenses - estimated at 15% of the approximately $998,000 per month run rate based on June 2010 SG&A expense and assumed to run for one month in a best case scenario and three months in a worst case scenario.

**Note 10:**

Secured debt balances (including capitalized PIK interest, but excluding earned but unpaid cash interest), as of the petition date are as indicated below. These amounts are comprised of the Debtors' obligations under the Credit Agreement, which are secured by perfected liens on all of the Debtors' assets. Accordingly there are no de minimis or unencumbered assets.

| (US$ in millions) | 5/24/2011 |
|---|---|
| Term loan | $214.4 |
| Non-revolving revolver | 65.8 |
| Revolver | 75.2 |
| Swaps | 1.9 |
| Total | $357.3 |

Cash and PIK interest have not been paid or accrued post-petition.

*Note 11:*

Administrative and professional fees claims, including post-petition trade, are paid monthly. The Debtors are assuming that, at conversion, the remaining fees, which have priority status in chapter 7, would approximate $1.0 million in a best case scenario and $2.0 million in a worse case scenario.

*Note 12:*

Priority claims are primarily comprised of approximately $5,000 for sales tax claims, approximately $20,000 for property tax claims, and approximately $26.6 million for estimated income tax. The Debtors' tax year is January 1st to December 31st. The Debtors make the bulk of their revenues in the first quarter and typically show losses through the second through fourth quarters. In a normal year, estimated quarterly tax payments would be based on forecast pre-tax income through December 31. If the Debtors entered liquidation they would show a sizable income tax liability as a result of income during the first quarter, offset by only a small tax loss as result of projected losses during the second quarter. Unlike prior years, they would not be able to utilize the projected income tax losses during the third and fourth quarters to offset first quarter taxable income, hence there would be an unusually large income tax bill.

*Note 13:*

The Debtors' estimated unsecured claims as of June 30, 2011 are as follows:

| (US$ in millions) | 6/30/2011 |
|---|---|
| Lender unsecured deficiency claims | $283.7 |
| Contract rejection damage claims | 48.3 |
| Lease rejection damage claims | 16.2 |
| Unsecured trade claims | 3.0 |
| Total | $351.2 |

Lender unsecured deficiency claims are shown as the midpoint between the high and low recovery estimate for the secured lenders and includes principal and interest on a term loan, revolver, non-revolving revolver and two swap facilities as of the petition date. Contract rejection damage claims, including franchise agreements, were estimated to approximate one year's accounts payable for vendors with contracts at approximately $48.3 million. Bankruptcy code section 502(b)(6) calculates lease rejection damage claims as the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease. Since the bulk of the company's approximately 700 real estate leases are one to three years in duration, lease rejection damage claims are estimated to approximate one year's rent at approximately $16.2 million per annum. Unsecured trade claims as of June 30, 2011 are estimated to approximate $2.5 million.

In addition, the Debtors would have a number of litigation claims, including the RAL-related claims listed in the body of the Disclosure Statements, though those amounts could not be quantified at this time.

**Jackson Hewitt Tax Service, Inc.**
**Chapter 7 Liquidation Analysis**
(US$000's)
Estimated as of 6/30/2011

| | Notes | Net Book Value as of 1/31/2011 (Unaudited) | Additions and/or (Eliminations) | Remaining Book Value as of 6/30/2011 Low | High | Estimated Recovery Percentage Low | High | Estimated Liquidation Low | High |
|---|---|---|---|---|---|---|---|---|---|
| Cash | 1 | $ 6,246 | $ 61,939 | $ 68,185 | 68,185 | 100% | 100% | $ 68,185 | $ 68,185 |
| Accounts receivable | 2 | 73,180 | (57,242) | 15,938 | 15,938 | 10% | 30% | 1,594 | 4,782 |
| Notes receivable | 3 | 15,791 | (4,632) | 11,159 | 11,159 | 10% | 30% | 1,116 | 3,348 |
| Prepaid and other current assets | 4 | 23,314 | (9,924) | 13,390 | 13,390 | 0% | 5% | - | 670 |
| Property & equipment, net | 5 | 22,053 | (2,266) | 19,787 | 19,787 | 0% | 10% | - | 1,979 |
| Goodwill, net | 6 | 150,339 | (0) | 150,339 | 150,339 | 0% | 0% | - | - |
| Intangible assets, net | 7 | 86,576 | (551) | 86,025 | 86,025 | 0% | 5% | - | 4,301 |
| Other long-term assets | 8 | 11,075 | 118 | 11,193 | 11,193 | 0% | 5% | - | 560 |
| Total | | $ 388,574 | $ (12,558) | $ 376,016 | $ 376,016 | | | $ 70,895 | $ 83,823 |
| Less: | | | | | | | | | |
| Liquidation Costs | | | | | | | | | |
| Trustee fees (calc. excludes cash) | | 3.0% | of proceeds | (81) | (469) | | | (81) | (469) |
| Ch. 7 Professional fees | | 250 | /month | (750) | (250) | | | (750) | (250) |
| Payroll | | 2,500 | /month | (5,000) | (2,500) | | | (5,000) | (2,500) |
| SG&A expenses | | 150 | /month | (449) | (150) | | | (449) | (150) |
| Estimated cost of ch 7 liquidation | 9 | | | | | 100% | 100% | (6,280) | (3,369) |
| Secured lender claims | 10 | | | $ (357,347) | $ (357,347) | 18% | 23% | $ (64,614) | (80,455) |
| Amount available (shortfall to) for admin, priority, and unsecured claims | | | | | | | | $ (292,732) | (276,892) |
| Ch. 11 admin/professional claims | 11 | | | $ (2,000) | $ (1,000) | 0% | 0% | $ - | $ - |
| Priority claims/tax claims | 12 | | | $ (26,025) | $ (26,025) | 0% | 0% | $ - | $ - |
| Unsecured claims | 13 | | | $ (351,200) | $ (351,200) | 0% | 0% | $ - | $ - |

> *This analysis should be read only in conjunction with the assumptions, qualifications and explanations set forth in the attached assumptions and those in the Disclosure Statement, including, without limitation, those set forth in Article VIII.C "Best Interests Test" and Appendix B "Liquidation Analysis."*

FINANCIAL PROJECTIONS

*Projected Financial Information*

The Debtors believe that the Plan meets the Bankruptcy Code's requirements that Plan confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. In this regard, the management of the Debtors developed and refined the Business Plan and prepared consolidated financial projections (the *"Projections"*) for the years ending April 30, 2011 through April 30, 2014 (the *"Projection Period"*). Included in 2011 projected amounts are actual unaudited financial results through January 31, 2011. The Projections have been prepared on a consolidated basis consistent with the company's financial reporting practices and include all Debtor and non-Debtor entities.

The Debtors do not, as a matter of course, make public projections of their anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or Interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission or otherwise make such information public.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTS ("*AICPA*") OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS IN THE UNITED STATES ("*U.S.GAAP*"), THE FINANCIAL ACCOUNTING STANDARDS BOARD "FASB"), OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, NEITHER THE DEBTORS INDEPENDENT AUDITORS, NOR ANY OTHER INDEPENDENT ACCOUNTANTS, HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE PROJECTIONS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR IT'S ACHIEVABLILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WTH, THE PROSPECTIVE FINANCIAL INFORMATION. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTANTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY ANY OF THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATION AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN. NEITHER THE DEBTORS' INDEPENDENT AUDITORS NOR THEIR FINANCIAL ADVISORS HAVE EXPRESSED AN OPINION ON OR MADE A REPRESENTATION REGARDING THE ACHIEVABILITY OF THE FINANCIAL PROJECTIONS.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: These Projected Financial Statements contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. "Forward looking statements" in the Projected Financial Statements include the intent, belief or current expectations of the Debtors and members of their management team with respect to the timing of, completion of, and scope of the current restructuring, reorganization plan, strategic

business plan, lender financing, and the Debtors future liquidity, as well as the assumptions upon which such statements are based. While management believes that its expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, holders of claims and prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projected Financial Statements include, but are not limited to, those risks and uncertainties set forth in the Debtors' most recent 10Q and 10K filings entitled "RISK FACTORS" and other adverse developments with respect to the Debtors' liquidity position or operation of the various businesses of the Reorganized Debtors, adverse developments in the bank financing market or public or private markets for debt or equity securities, or adverse developments in the timing or results of the Debtors' current strategic business plan (including the current timeline to emerge from Chapter 11).

### Summary of Significant Assumptions

The projections were developed by management and are based upon: a) current and projected market conditions in each of the Debtors' markets for tax preparation services; b) no material acquisitions or divestures; c) emergence from Chapter 11 at or around July 1, 2011 under the terms contemplated in the Plan; and d) the ability to close on exit financing at rates similar to those outlined in the Plan of Reorganization. Consistent with the Debtors financial reporting, the Projections are consolidated and in U.S. dollars.

The projected consolidated financial statements of the Debtors set forth below have been prepared based on an assumed Effective Date of July 1, 2011. Although the Debtors presently intend to seek to cause the Effective Date to occur as soon as practicable, there can be no assurances as to when the Effective Date will occur.

### Note about Fresh Start Accounting

The forgoing assumptions and resulting computations were made solely for purposes of preparing the Projections. The Financial Accounting Standards Board (FASB) has issued Accounting Standards Codification ("ASC") Topic 852 Reorganizations ("FASB ASC 852"). The Reorganized Debtors will be required to determine the amount by which their reorganization value as of the Effective Date exceeds or is less than, the fair value of their assets as of the Effective Date. Such determination will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the foregoing computations and may be based on, among other things, a different methodology with respect to the valuation of the Reorganized Debtors' reorganization value. In all events, such valuation, as well as the determination of the fair value of the Reorganized Debtors' assets and the determination of their actual liabilities, will be made as of the Effective Date, and the changes between the amount of any or all of the foregoing items as assumed in the Projections and the actual amounts thereof as of the Effective Date may be material.

The Projections have been prepared to reflect a simplified "fresh-start" presentation, assuming an Effective Date of July 1, 2011. The Projections reflect a downward adjustment to goodwill and other intangible assets of $25 million, accounting for the reorganization value of assets and liabilities in excess of amounts allocable to identifiable assets based on the estimated reorganization equity value of approximately $85 million, see section, entitled "MATERIAL TERMS OF THE PLAN OF REORGANIZATION-Valuation of the Reorganized Debtors".

### Significant Assumptions

**Revenue:** The Reorganized Debtors' revenue projections are based on an analysis of the business prospects prepared by the managers responsible for each of the Debtors' business segments. The Debtors used accepted industry research and their own expertise to form their opinions on the outlook for the business. No material acquisitions or divestitures are reflected in the Projections.

For 2012, the projections estimate revenue growth of 1.0% overall, with higher Company Owned Operations (COO) revenue, due principally to the expansion of retail operations, partially offset by revenue declines in royalty and advertising revenue due to the reduction in unprofitable storefront locations. Key assumptions affecting the Company's revenue prospects in 2012 are the expected inability for the Company, and the industry in

general, to source refund anticipation loans ("RALs"), given regulatory actions impacting provider banks over the last two tax seasons, and continued competitive pricing pressures. As mentioned above, the Company's success in expanding its relationship with retail partners in 2010 and 2011, and the anticipated further expansion of these operations over the next few years, has been and will be an important counterbalance to the negative impact associated with the loss of RALs and pricing pressures. Overall, revenue per year is anticipated to grow between 3 and 4 percent over the period 2013 and 2014 as a result of retail expansion and the stabilization in core storefront distribution. While management acknowledges that a bankruptcy filing could have a temporary negative impact on revenue growth, we believe revenue will not be meaningfully impacted by the anticipated short duration of a prepackaged Chapter 11 filing.

**Controllable Expenses:** There are several elements of the Company's controllable expenses: cost of franchise operations, including costs associated with online operations, marketing and advertising expenditures, cost of company-owned operations, and SG&A expenses. Cost of franchise operations, which includes field support to franchisees, sales activities, and technology expenditures, is anticipated to grow approximately 3 percent in 2012, and to be approximately 1 percent per year higher for the projection period, as the increased costs of supporting these operations are partially offset by a declining impact associated with uncollectible franchise receivables. Marketing and advertising expenses are incurred, per a contractual relationship with franchisees, to support the brand and for advertising and promotional activities of the company in attracting tax clients to our franchise and the COO and are projected to increase in the later plan years consistently with the recognition of the marketing revenue which funds these expenses. Cost of company owned operations, which include the personnel, store location lease costs and related expenses associated with running operations to directly prepare client tax returns in certain areas of the country, are projected to grow 12% in 2012 and between 3 and 4 percent per year for the projection years 2012 through 2014, reflecting the increased costs of the expansion of retail store locations in the COO distribution system. SG&A expenditures are projected to be lower in 2012 by 6%, reflecting the absence of certain retention payments that were made in 2011 and stock based compensation expense and are expected to grow between 4 and 5 percent over the remaining projection period reflecting somewhat higher incentive compensation and inflationary growth.

**Depreciation and Amortization:** Depreciation and amortization expenses ("*D&A*") are principally related to capitalized costs associated with the development of our proprietary tax preparation software for our business and the recurring depreciation expense associated with fixed assets employed during the projection period.

**Restructuring Items, Net:** Other non-operating amounts are primarily comprised of a gain in connection with: (i) the settlement of the Debtors' pre-petition debt balances as the Effective Date and (ii) the disposition of liabilities subject to comprise, partially offset by the write-down of, or expenses associated with: (iii) goodwill and intangible assets, (iv) advisory fees associated with the Company's balance sheet restructuring, and (v) deferred financing costs in connections with prior amendments to the Company's credit agreement.

**Other Unusual/Non-Recurring Items:** Other unusual/non-recurring items includes gains and losses associated with litigation and other contractual matters, and severance.

**Consolidated Interest Expense:** Interest expense is based upon projected debt levels and applicable interest rates, as outlined under Debt Structure below. Interest expense also includes the non-cash amortization of certain transaction fees associated with emergence and the new credit facility.

**Income Tax Expense:** The effective tax rate is assumed to be approximately 41 percent for the projection period. The COD income will not be taxable to the Debtors. However, the Debtors will be required to reduce certain tax attributes and basis in assets as a result of the COD income not being taxable in bankruptcy. The impact of the reduction in tax attributes has not currently been estimated. As a result of forecasted earnings and the reduced tax basis of assets, the Debtors project that they will pay cash taxes in 2012 and beyond.

**Debt Structure:** Upon emergence, the Debtors' long-term debt structure is expected to include the New Term Loan Facility component of the Exit Financing of $100 million and initial borrowings of $25 million against a new $115 million revolving credit facility. The company expects to exit bankruptcy with $5 million cash on its balance sheet to fund its off-season preparations for the 2012 tax season. Once this cash is consumed, the company expects to borrow against the revolving credit facility to further fund its off-season preparedness.

**Capital Expenditures:** Capital expenditures have been estimated based upon the anticipated requirements of the Debtors' revenue plan, modernization activities associated with its proprietary Profiler tax software and other IT requirements, and the costs associated with the expansion of its retail operations. Capital expenditures are forecasted at $16 million in 2012 and $19 million in 2013, including between $5 and $6 million each year for IT modernization activities, and thereafter declining to approximately $10 million in the final year of the plan.

The "SOURCES" AND USES", set forth below, presents the estimated sources and uses of funds for the Restructuring Transaction. The actual amounts are subject to adjustment and may differ at the time of the consummation of the Restructuring Transactions, depending on several factors, including differences from our estimated transaction fees and expenses, differences between actual and projected operating results and any differences in the contemplated debt financings when consummated.

## JACKSON HEWITT TAX SERVICE, INC.
## SOURCES AND USES
## JULY 1, 2011
## (UNAUDITED)
## (DOLLARS IN MILLIONS)

| Cash Sources [1] | Amount | Cash Uses [1] | Amount |
|---|---|---|---|
| Cash on Balance Sheet at 5/23/11 | $94 | Cash Distributed to Lenders[2] | $72 |
| | | Cash Use During Bankruptcy | $17 |
| | | Cash for Initial Liquidity | $5 |
| New Revolving Credit Facility | $25 | New Revolver Draw | $25 |
| New Term Loan | $100 | New Term Loan to Existing Lenders | $100 |
| **Total Cash Sources** | **$219** | **Total Cash Uses** | **$219** |

[1] Assumes an Effective Date of July 1, 2011
[2] Distribution to selected Lenders who have committed to new revolving credit facility

The Debtors' projected consolidated balance sheet set forth below presents: (a) the projected consolidated financial position of the Debtors as of June 30, 2011, prior to the consummation of the transactions contemplated in the Prepackaged Plan; (b) the pro forma adjustments to such projected consolidated financial position required to reflect consummation of the transactions contemplated by the Prepackaged Plan ("Emergence Adjustments"); and, (c) the pro forma projected consolidated financial position of Reorganized Debtors as of June 30, 2011, after giving effect to the Emergence Adjustments. The Emergence Adjustments set forth in the columns captioned "Recapitalization Adjustments" and "Fresh Start" reflect the anticipated effects of the consummation of the transactions contemplated by the Prepackaged Plan. The various Balance Sheet Adjustments are described in greater detail in the "NOTES TO REORGANIZED DEBTORS PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET".

**Jackson Hewitt Tax Service Inc.**
**Projected Pro Forma Consolidated Balance Sheet**
**As of June 30, 2011**
**(Unaudited)**
**(Dollars in thousands)**

| | Predecessor Projected 6/30/11 | Emergence Adjustments Recapitalization Adjustments | Fresh Start | Successor Pro Forma 6/30/11 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 77,410 | (72,410) A | | $ 5,000 |
| Accounts receivable, net | 12,458 | | | 12,458 |
| Notes receivable, net | 6,481 | | | 6,481 |
| Other current assets | 14,337 | (1,712) B | | 12,626 |
| Total current assets | 110,686 | (74,122) | - | 36,564 |
| | | | | |
| Property and equipment, net | 20,248 | | | 20,248 |
| Goodwill and intangibles, net | 236,361 | | (29,776) G | 206,585 |
| Notes receivable, net | 4,638 | | | 4,638 |
| Other non-current assets, net | 11,241 | (833) C | | 10,408 |
| Total assets | $ 383,174 | $ (74,955) | $ (29,776) | $ 278,443 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities | $ 42,007 | | | $ 42,007 |
| Total current liabilities | 42,007 | - | - | 42,007 |
| | | | | |
| New Term Loan | - | 100,000 D | | 100,000 |
| New Revolving Credit Facility | - | 25,000 D | | 25,000 |
| Other non-current liabilities | 26,436 | | | 26,436 |
| Total liabilities not subject to compromise | 68,443 | 125,000 | - | 193,443 |
| | | | | |
| Liabilities subject to compromise | 362,528 | (362,528) E | | - |
| Total liabilities | 430,971 | (237,528) | - | 193,443 |
| | | | | |
| **Stockholders' equity:** | | | | |
| Total stockholders' equity | (47,797) | 162,573 F | (29,776) G | 85,000 |
| Total liabilites and stockholders' equity | $ 383,174 | $ (74,955) | $ (29,776) | $ 278,443 |

Note: Incorporates estimate of fresh start accounting adjustments, actual fair market value adjustments could vary materially from those used in the projections.

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "- PROJECTED FINANCIAL INFORMATION".

*NOTES TO REORGANIZED DEBTORS PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET ARE AS FOLLOWS:*

A     Represents cash settlement of a portion of the pre-petition borrowings.

B     Represents the write-off of the following:

| | | |
|---|---:|---|
| $ | 1,519 | Deferred financing costs related to extinguished debt; |
| | 193 | Premiums related to Directors & Officers run-off insurance. |
| $ | 1,712 | Total |

C     Represents write-off of premiums related to Directors & Officers run-off insurance.

D     Represents New Term Loan and obligation under the new Revolving Credit Facility issued in exchange for predecessor debt.

E     Represents the write-off of the following:

| | | |
|---|---:|---|
| $ | 1,900 | Breakage costs associated with early termination of interest rate swap/collar agreements; |
| | 200 | Pre-petition accrued interest owed to banks in connection with extinguished debt; |
| | 1,500 | Pre-petition vendor liabilities; |
| | 3,481 | Vacated leases and other amounts due to lessors in connection with leased tax preparation offices; |
| | 355,447 | Pre-petition debt. |
| $ | 362,528 | Total liabilities subject to compromise |

F     Reflects the cancellation of pre-petition equity, gain on extinguishment of debt and the issuance of New Common Stock based on the estimated reorganization business enterprise mid-point value (approximately $225 million) calculated using an average expected revolving credit facility draw of $40 million.

G     Represents adjustment to reflect the reorganization value in excess of amounts allocable to identifiable assets based on the estimated reorganization equity value (approximately $85 million). Amounts will be further allocated when determined through additional valuations.

The balance sheet above does not yet include an adjustment to deferred taxes that will be made to reflect the anticipated reduction in the tax basis of the Company's assets that will result from the Cancellation-of-Debt (COD) income not being taxable in bankruptcy.

UPON EMERGENCE FROM CHAPTER 11, THE REORGANIZED DEBTORS WILL BE REQUIRED TO ADOPT "FRESH START ACCOUNTING" IN ACCORDANCE WITH FASB, ASC 852, WHICH REQUIRES THE REORGANIZED DEBTORS TO REVALUE ASSETS AND LIABILITIES AT THEIR ESTIMATED FAIR VALUE.  FRESH START ACCOUNTING REFLECTS THE VALUE OF THE REORGANIZED DEBTORS AS DEFINED IN THE PREPACKAGED PLAN.  UNDER FRESH START ACCOUNTING, THE REORGANIZED DEBTORS' ASSET VALUES ARE REMEASURED USING FAIR VALUE, AND ARE ALLOCATED IN CONFORMTIY WITH FASB ASC TOPIC 805, "BUSINESS COMBINATIONS" ("ASC 805").  THE EXCESS OF REORGANIZATION VALUE OVER THE FAIR VALUE OF NET TANGIBLE AND IDENTIFIABLE INTANGIBLE ASSETS AND LIABILITIES IS RECORDED AS GOODWILL IN THE ACCOMPANYING STATEMENTS.  THE FOREGOING ESTIMATES AND ASSUMPTIONS ARE INHERENTLY SUBJECT TO

SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE REORGANIZED DEBTORS CANNOT PROVIDE ASSURANCE THAT THE ESTIMATES, ASSUMPTIONS, AND VALUES REFLECTED IN THE VALUATIONS WILL BE REALIZED, AND ACTUAL RESULTS COULD VARY MATERIALLY. IN ACCORDANCE WITH ASC 805, THE PRELIMINARY ALLOCATION OF THE REORGANIZATION VALUE IS SUBJECT TO ADDITIONAL ADJUSTMENT WITHIN ONE-YEAR AFTER EMERGENCE FROM BANKRUPTCY TO PROVIDE THE REORGANIZED DEBTORS TIME TO COMPLETE THE VALUATION OF ASSETS AND LIABILITIES.

The "PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEETS" set forth below presents the projected consolidated financial position of the Reorganized Debtors as of April 30, 2011, after giving effect to the consummation of the transactions contemplated by the Prepackaged Plan to occur on the Effective Date, and as of each April 30, 2012, 2013, and 2014.

## Balance Sheet

| | 2010A | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|
| **ASSETS:** | | | | | |
| Cash | $ 10.8 | $ 101.3 | $ 21.0 | $ 35.5 | $ 58.2 |
| Accounts Receivable | 24.2 | 17.5 | 14.1 | 13.0 | 12.2 |
| Notes Receivable, Current | 5.8 | 7.4 | 5.4 | 3.4 | 3.7 |
| Other Current Assets | 20.7 | 19.2 | 12.7 | 13.1 | 14.0 |
| Total Current Assets | 61.5 | 145.4 | 53.2 | 65.0 | 88.1 |
| | | | | | |
| PP&E | 24.6 | 20.1 | 23.9 | 31.2 | 27.8 |
| Goodwill | 148.9 | 150.3 | 121.6 | 122.6 | 123.6 |
| Other Intangibles | 87.1 | 86.3 | 85.0 | 83.6 | 82.1 |
| Notes Receivable, Non-Current | 3.3 | 2.8 | 4.2 | 3.3 | 3.6 |
| Other Non-Current Assets | 21.0 | 10.5 | 10.0 | 10.2 | 11.4 |
| Total Non-Current Assets | 284.9 | 270.0 | 244.7 | 250.9 | 248.5 |
| | | | | | |
| **Total Assets** | $ 346.4 | $ 415.4 | $ 297.9 | $ 315.9 | $ 336.6 |
| | | | | | |
| **LIABILITIES AND EQUITY:** | | | | | |
| Current Liabilities | 65.0 | 61.6 | 57.8 | 59.1 | 63.3 |
| Non-Current Liabilities | 32.5 | 31.1 | 31.4 | 32.6 | 32.9 |
| Total Liabilities (Excl. Debt) | 97.5 | 92.7 | 89.2 | 91.7 | 96.2 |
| | | | | | |
| Revolver | 4.0 | 65.6 | - | - | - |
| Non-Revolving Revolver | 70.0 | 74.7 | - | - | - |
| Term Loan | 200.0 | 213.6 | 100.0 | 100.0 | 100.0 |
| Total Debt | 274.0 | 353.9 | 100.0 | 100.0 | 100.0 |
| | | | | | |
| **Total Liabilities** | $ 371.5 | $ 446.6 | $ 189.2 | $ 191.7 | $ 196.2 |
| | | | | | |
| Equity | (25.0) | (31.2) | 108.6 | 124.1 | 140.3 |
| | | | | | |
| **Total Liabilities and Equity** | $ 346.5 | $ 415.4 | $ 297.8 | $ 315.8 | $ 336.5 |

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PROJECTED FINANCIAL INFORMATION".

The "PROJECTED PRO FORMA CONSOLIDATED INCOME STATEMENT" set forth below presents the projected consolidated results of operations of the Reorganized Debtors for the period commencing April 30, 2011, after giving effect to the consummation of the transactions contemplated by the Prepackaged Plan to occur on the Effective Date, and for the fiscal years ending April 30, 2012, 2013, and 2014.

| Income Statement | Fiscal Year Ending April 30, | | | | |
|---|---|---|---|---|---|
| | 2010A | 2011E | 2012E | 2013E | 2014E |
| Royalty Fees | $ 61.8 | $ 59.8 | $ 57.1 | $ 58.0 | $ 60.1 |
| Marketing and Advertising Fees | 27.2 | 26.6 | 25.7 | 26.0 | 27.2 |
| Financial Product Fees | 46.3 | 39.7 | 38.0 | 37.7 | 38.1 |
| Other Revenue | 5.1 | 3.5 | 3.0 | 5.6 | 6.7 |
| Service Revenue | 73.3 | 84.8 | 90.6 | 92.7 | 96.9 |
| **Net Sales** | **213.8** | **214.4** | **214.4** | **220.0** | **229.0** |
| **Operating Expenses:** | | | | | |
| Cost of Franchise Operations | 34.7 | 36.3 | 36.1 | 31.8 | 32.0 |
| Marketing Expenses | 37.9 | 33.6 | 33.1 | 37.5 | 37.5 |
| Cost of Company-Owned Operations | 57.0 | 61.5 | 66.5 | 69.4 | 72.6 |
| SG&A | 37.3 | 34.7 | 32.3 | 32.6 | 34.6 |
| Depreciation and Amortization | 14.2 | 13.2 | 13.0 | 11.8 | 14.2 |
| Restructuring Items, net | - | 6.1 | (122.2) | - | - |
| Other Unusual/Non-Recurring Expense | 284.5 | (2.0) | - | - | - |
| **Operating Profit** | **(251.8)** | **31.0** | **155.6** | **36.9** | **38.2** |
| Consolidated Interest Expense | 19.6 | 43.2 | 17.5 | 12.1 | 12.5 |
| Other Non-Operating Expenses | - | - | - | - | - |
| Income Tax Expense | 0.8 | (2.8) | 56.5 | 10.2 | 10.5 |
| **Net Income** | **$ (272.3)** | **$ (9.4)** | **$ 81.6** | **$ 14.7** | **$ 15.2** |
| **Memo: Adjusted (Pro Forma) EBITDA** | **$ 46.8** | **$ 48.3** | **$ 46.4** | **$ 48.7** | **$ 52.3** |

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATION UNDER THE CAPTION "PROJECTED FINANCIAL INFORMATION".

The "PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF CASH FLOWS" set forth below present the projected cash flows of the Reorganized Debtors commencing April 30, 2011, after giving effect to the consummation of the transactions contemplated by the Prepackaged Plan to occur on the Effective Date, and for the fiscal years ending April 30, 2012, 2013, and 2014.

| *Cash Flows* | 2010A | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Net Income | $ (272.3) | $ (9.4) | $ 81.6 | $ 14.7 | $ 15.2 |
| | | | | | |
| Plus: Depreciation & Amortization | 14.2 | 13.2 | 13.0 | 11.8 | 14.2 |
| Plus: Non-Cash Interest Expense | - | 20.9 | 0.5 | - | - |
| Plus: Other Non-Cash Add Back/Normalized items | 274.2 | 1.4 | (71.6) | 1.0 | 0.8 |
| | | | | | |
| Changes in Operating Assets & Liabilities: | | | | | |
| Accounts Receivable | 0.1 | 6.6 | (0.5) | 1.1 | 0.9 |
| Notes Receivable, Current | 0.7 | (1.6) | 1.3 | 2.0 | (0.3) |
| Other Current Assets | (0.9) | 1.5 | 1.7 | (0.5) | (0.9) |
| Notes Receivable, Non-Current | 0.9 | 0.5 | 0.6 | 0.9 | (0.3) |
| Other Non-Current Assets | 2.4 | 10.6 | 0.6 | (0.2) | (1.2) |
| | - | | | | |
| Current Liabilities | (28.9) | (3.4) | 4.1 | 1.3 | 4.2 |
| Non-Current Liabilities | (7.6) | (1.4) | 0.8 | 1.2 | 0.4 |
| **Total Change in Operating Assets & Liabilities** | (33.3) | 12.8 | 8.6 | 5.8 | 2.7 |
| | | | | | |
| **Total Cash From Operating Activities** | (17.2) | 38.9 | 32.1 | 33.2 | 32.9 |
| | | | | | |
| **INVESTING ACTIVITIES** | | | | | |
| Capital Expenditures & Acquisitions | (9.5) | (7.4) | (16.2) | (18.6) | (10.3) |
| Acquisitions | (1.9) | - | - | - | - |
| **Total Cash from Investing Activities** | (11.4) | (7.4) | (16.2) | (18.6) | (10.3) |
| | | | | | |
| **FINANCING ACTIVITIES:** | | | | | |
| Borrowing / (Repayment) - debt | 42.0 | 59.0 | (96.1) | - | - |
| Debt issuance costs | (4.0) | - | - | - | - |
| Change in cash overdrafts | 1.3 | - | - | - | - |
| Other | (0.2) | - | - | - | - |
| **Total Cash Used In Financing Activities** | 39.1 | 59.0 | (96.1) | - | - |
| | | | | | |
| **Total Change in Cash** | 10.5 | 90.5 | (80.3) | 14.6 | 22.6 |
| | | | | | |
| Beginning Cash Balance | 0.3 | 10.8 | 101.3 | 21.0 | 35.7 |
| **Ending Cash Balance** | $ 10.8 | $ 101.3 | $ 21.0 | $ 35.7 | $ 58.3 |

THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PROJECTED FINANCIAL INFORMATION".

APPENDIX D

VALUATION ANALYSIS

At the Debtors' request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors. Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations and qualifications described herein, Moelis' view, as of May 20, 2011, was that the estimated going concern enterprise value of the Reorganized Debtors, as of an assumed Effective Date of June 30, 2011, would be in a range between $200 million and $250 million with a midpoint of $225 million. Moelis' views are necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to Moelis as of the date of its analysis (May 20, 2011). It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise or reaffirm its estimate.

Moelis' analysis is based, at the Debtors' direction, on a number of assumptions, including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Plan which will be effective on or prior to June 30, 2011, (ii) the Reorganized Debtors will achieve the Projections (as defined in this Disclosure Statement) provided to Moelis by the Debtors for fiscal years 2011 to 2015; (iii) Reorganized Debtors' capitalization and available Cash will be as set forth in the Plan and this Disclosure Statement and (iv) Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections. Moelis makes no representation as to the achievability or reasonableness of such assumptions. In addition, Moelis assumed that no material change in economic, market, financial and other conditions as of the assumed Effective Date.

Moelis assumed, at the Debtors' direction, that the Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors. The future results of Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. See Appendix C – Projected Financial Information. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Projections and as a result, the actual enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

The estimated enterprise value in this section represents a hypothetical enterprise value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on certain valuation methodologies as described below. The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, its securities or its assets, which may be significantly higher or lower than the estimated enterprise value range herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, assets, liabilities and prospects of the Reorganized Debtors, including the Projections, furnished to us by the Debtors; (iii) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business and prospects before and after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data, including valuation multiples, for certain other companies in lines of business that Moelis deemed relevant; (v) reviewed a draft of the Plan, dated May 18, 2011; and (vi) conducted such other financial studies and analyses and took into account such other information as we deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities

(contingent, derivative, off-balance-sheet, or otherwise) of the Reorganized Debtors, nor was Moelis furnished with any such evaluation or appraisal. Moelis also assumed, with the Debtors' consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any Holder of a Claim as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

## Valuation Methodologies

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a selected publicly traded companies analysis, and (b) a discounted cash flow analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.

**Selected Publicly Traded Companies Analysis.** The selected publicly traded companies valuation analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors, for example, comparable lines of business, business risks, growth prospects, market presence and size and scale of operations. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' Projections to imply an enterprise value for the Reorganized Debtors. Moelis used, among other measures, enterprise value (defined as market value of equity plus book value of debt, book value of preferred stock and minority interests less cash, subject to adjustment where appropriate) for a selected company as a multiple of such company's fiscal 2012 EBITDA according to IBES consensus estimates. Although a selected company is used for comparison purposes, no selected company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of a selected company to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Reorganized Debtors. The selection of appropriate companies for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information. The lack of publicly traded pure-play tax preparation businesses comparable to the Reorganized Debtors made the selection of companies for comparison to the Reorganized Debtors challenging.

**Discounted Cash Flow Analysis.** The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Moelis' DCF analysis used the Reorganized Debtors' Projections of its debt-free, after-tax cash flows for the period covered by the Projections and estimated a terminal value for the period after the Projection period. These cash flows and estimated terminal value were then discounted at a range of appropriate weighted average costs of capital, which are determined by reference to, among other things the average cost of debt and equity of selected publicly traded companies. The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

**Selected Transactions Analysis.** Moelis considered whether there were any transactions involving companies in the tax preparation business or other businesses that might be meaningful for comparison purposes to the Debtors and determined there were no relevant transaction to analyze.

**Valuation Considerations**

        As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.   Accordingly, none of the Debtors, Moelis or any other person assumes responsibility for the accuracy of such estimated enterprise value.  Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Effective Date may differ from the estimated enterprise value set forth herein as of an assumed Effective Date of June 30, 2011.  In addition, the market prices, to the extent there is a market, of Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

APPENDIX E

PLAN SUPPORT AGREEMENT

To the Holders of Lender Claims
Referred to Below

Ladies and Gentlemen:

       This letter agreement and related attachments (this "<u>Agreement</u>") set forth the terms and conditions pursuant to which Jackson Hewitt Tax Service Inc. ("<u>Jackson Hewitt</u>") and all of its direct and indirect subsidiaries (collectively, the "<u>Company</u>") propose a restructuring (the "<u>Restructuring</u>") of the Company's outstanding obligations under the Existing Credit Agreement (as defined below), to be effectuated pursuant to a joint "pre-packaged" chapter 11 plan of reorganization with the support of the persons signatory hereto in such parties' capacity as parties to that certain Amended and Restated Credit Agreement, dated as of October 6, 2006, as amended, by and among Jackson Hewitt, Jackson Hewitt, Inc., Tax Services of America, Inc. and Hewfant, Inc. as borrowers; the lenders from time to time party thereto as lenders and all Hedge Parties under any Hedge Agreements (as each such term is defined in the Existing Credit Agreement (defined herein)) (collectively the "<u>Lenders</u>"); Jackson Hewitt Technology Services LLC and Jackson Hewitt Corporate Services Inc. as guarantors; and Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association, as administrative agent (the "<u>Existing Credit Agreement</u>").  The Company, each Participating Lender (as defined below) and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

       For purposes of this Agreement, the term "<u>Participating Lenders</u>" shall be defined as Lenders that are signatories to this Agreement.  Participating Lenders are the holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of the aggregate amount of outstanding claims under the Existing Credit Agreement and of Hedge Parties under any Hedge Agreements (the "<u>Lender Claims</u>").  Also, for the purposes of this Agreement, "<u>Participating Lenders</u>" shall not include (A) a holder of Lender Claims signatory hereto in its capacity as a broker, dealer or market maker of Lender Claims or any other claim against or security in the Company, (B) any subsidiary or affiliate of a holder of Lender Claims signatory hereto (x) over which the holder of Lender Claims does not have corporate authority or control or (y) whose credit decisions, including credit decisions to be bound by agreements such as this Agreement, under the internal policies or rules of such subsidiary or holder, are not subject to control by such signatory holder.  For purposes of this Agreement, the term "Required Participating Lenders" shall mean Participating Lenders holding two thirds (2/3) in dollar amount of the aggregate dollar amount of Lender Claims held by the Participating Lenders. Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Plan (as defined below).

       The Parties hereto hereby agree as follows:

1.     Restructuring

The principal terms of the Restructuring are set forth in (i) the proposed pre-packaged plan of reorganization (the "Plan") in the form attached hereto as Exhibit A; (ii) the disclosure statement (the "Disclosure Statement") in the form attached hereto as Exhibit B; (iii) the term sheet for the new term loan facility (the "New Term Loan Facility") in the form attached to the Plan as Exhibit B (the "New Term Loan Facility Term Sheet"); (iv) the term sheet for the new revolving credit facility (the "New Revolving Credit Facility") in the form attached to the Plan as Exhibit A (the "New Revolving Loan Facility Term Sheet"); and (v) the term sheet for the shareholders' agreement (the "Shareholders' Agreement") in the form attached to the Plan as Exhibit C (the "Shareholders' Agreement Term Sheet") (as such documents may be modified in accordance with Section 8 hereof).

The Company will effectuate the Restructuring by commencing voluntary "pre-packaged" cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on or before the Anticipated Filing Date (as defined in Section 5(c)(ii) below).  As part of the Chapter 11 Cases, the Company intends to file (i) the Plan and (ii) the Plan-related documents (the "Plan-Related Documents"), which shall include, but not be limited to, (a) the Disclosure Statement, (b) the materials related to the solicitation of votes for the Plan pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (the "Solicitation"), (c) any other documents or agreements required in connection with the Plan and Disclosure Statement, including, but not limited to, (1) a proposed confirmation order, (2) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, (3) the New Term Loan Facility, (4) the New Revolving Credit Facility, (5) the Shareholders' Agreement, (6) such other definitive documentation relating to financing (including, without limitation, various releases of liens and guarantees) as is necessary to consummate the Restructuring, all on the same economic terms and otherwise in all material respects on the terms set forth in the Plan, and (7) any required organizational documents for reorganized Jackson Hewitt and its subsidiaries, including terms required in accordance with the Shareholders' Agreement.  Each of the Plan-Related Documents shall, (i) to the extent applicable, be in the form attached as an exhibit hereto; (ii) to the extent applicable, be consistent with the terms set forth in the Term Sheets  attached hereto or with any applicable form attached to the Plan, as the case might be, or (iii) if no applicable form exists, be in form and substance acceptable to the Company and the Required Participating Lenders (each of the Plan-Related Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "Approved Plan Documents").

2.     Representations of the Parties

Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)     It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this

Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(d)     If such Party is a Participating Lender, except as otherwise set forth on such Participating Lender's signature page hereto, such Participating Lender (i) either (A) is the sole legal and beneficial owner of the Lender Claims set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Lender Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Lender Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Lender Claims in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Lender Claims.  Furthermore, except as otherwise set forth on such Participating Lender's signature page hereto,  such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Lender Claims that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(e)     If such party is a Participating Lender, such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

3. <u>Agreements of the Participating Lenders</u>

(a)     Subject to the terms and conditions hereof and for so long as no Support Termination Event, as defined in <u>Section 5</u> below, shall have occurred, each Participating Lender shall:

(i)     (A) vote (when solicited to do so and by the applicable deadline for doing so) its Lender Claims in favor of the Plan, (B) deliver its duly executed and completed ballot voting in favor of such Plan on a timely basis following commencement of the Solicitation for such Plan, and (C) not change or withdraw such agreement or vote (or cause or direct such agreement or vote to be changed or withdrawn), <u>provided</u> that such agreement and vote may be revoked or withdrawn immediately upon occurrence of a Support Termination Event (as defined in <u>Section 5</u> below);

(ii)     not object to, or vote any of such Lender Claims to reject or impede, the Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Plan or, to the extent applicable, any of the Approved Plan Documents filed by the Company in connection with the Chapter 11 Cases, and confirmation of the Plan; and

(iii)     not directly or indirectly seek, solicit, support, encourage, vote such Lender Claims for, or consent to (A) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company (each, an "<u>Alternative Proposal</u>") other than the Plan or (B) any other action that is inconsistent with, or that would delay or obstruct the Plan.

The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support, other than (i) the New Term Loan Facility, on terms consistent with those set forth in the New Term Loan Facility Term Sheet, attached to the Plan as <u>Exhibit B</u>; and (ii) the New Revolving Credit Facility, on terms consistent with those set forth in the New Revolving Credit Facility Term Sheet, attached to the Plan as <u>Exhibit A</u>; <u>provided</u> that this clause (ii) shall only apply to those Participating Lenders who separately elect to participate in the New Revolving Credit Facility.

(b)     Each Participating Lender agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any Lender Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Lender Claims (including, without limitation, any participation therein), unless (i) the transferee, participant or other party (A) is a Participating Lender or (B) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended) and agrees in writing to assume and be bound by all of the terms of this Agreement with respect to all Lender Claims such transferee, participant or other party currently holds or shall acquire in the future by

executing the Joinder attached hereto as Exhibit C (such transferee, participant or other party, if any, to also be a "Participating Lender" hereunder), and (ii) the transferor complies with any applicable transfer restrictions and/or conditions to transfer set forth herein. If a transferee of any of the Lender Claims is not a Participating Lender or does not execute a Joinder in substantially the form attached hereto as Exhibit C prior to the completion of such transfer, participation or other grant or otherwise agree to be bound by all of the terms of this Agreement, then such sale, transfer, assignment or other disposition of the Lender Claims or related option, right or interest shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Participating Lender from acquiring additional Lender Claims; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Participating Lender agrees that such additional Lender Claims shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Lender Claims in a manner consistent with this Section 3. Subject to the terms and conditions of any order of the Bankruptcy Court, each Participating Lender agrees to provide to counsel for the Company (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Lender Claims, in each case within three (3) business days of the consummation of the transaction disposing of, or acquiring, Lender Claims.

4.     Agreements of the Company

(a)     As long as a Support Termination Event (as defined in Section 5 below) has not occurred, and except as the Participating Lenders may expressly release the Company, as applicable, in writing from any of the following obligations,

(i)     The Company hereby agrees (A) to prepare or cause the preparation of the Plan-Related Documents, (B) to provide draft copies of the Plan-Related Documents to Reed Smith LLP ("Reed Smith") and to Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), within a reasonable amount of time prior to the launch of the Solicitation, commencement of the Chapter 11 Cases, or execution of any such documents, as might be applicable, and (C) that it shall, except in an emergency where it is not reasonably practicable, provide draft copies of all motions, including "first day" motions, and applications and other documents the Company intends to file with the Bankruptcy Court, to Reed Smith and Milbank as soon as reasonably practicable, but in no event less than three (3) business days before such documents are filed with the Bankruptcy Court, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(ii)     The Company agrees to use commercially reasonable efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Plan and the Plan-Related Documents, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Plan and the Plan-Related Documents, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions

inconsistent with this Agreement, the Plan, the Approved Plan Documents or the confirmation and consummation of the Plan.

        (iii)     The Company shall cause each of its subsidiaries and affiliates to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Plan and the Plan-Related Documents, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Plan and the Plan-Related Documents, and (C) not take any actions inconsistent with this Agreement, the Plan, the Approved Plan Documents or the confirmation and consummation of the Plan.

        (iv)     Subject to <u>Section 24</u>, the Company shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than the Plan (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; <u>provided</u>, <u>however</u>, that the Company may agree to modifications to the Plan and the Plan-Related Documents, as provided herein.

    (b)     The Company shall pay all reasonable fees and expenses of (i) Milbank; (ii) Reed Smith; and (iii) FTI Consulting ("<u>FTI</u>"), which are due and owing prior to the termination of this Agreement.

    5.    <u>Termination of Obligations</u>.  This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect, as follows (each, a "<u>Support Termination Event</u>"),

    (a)     upon termination of this Agreement by the mutual written consent of the Company and the Participating Lenders, <u>provided</u>, <u>however</u>, that notice of such termination is provided within one (1) business day to the persons and entities listed on <u>Schedule 1</u> annexed hereto, in accordance with <u>Section 13</u> hereof;

    (b)     at 5:00 P.M. prevailing Eastern Time on September 1, 2011 , as to each Participating Lender who has not agreed to extend such date;

    (c)     upon the occurrence of any of the following, unless such Support Termination Event is waived or extended in writing by the Company and the Required Participating Lenders:

        (i)     at 11:59 P.M. prevailing Eastern Time on May 23, 2011 unless the Company has commenced the Solicitation (the "<u>Solicitation Commencement Date</u>");

(ii)     at 11:59 P.M. prevailing Eastern Time on May 27, 2011 (the "Anticipated Filing Date") unless the Company shall have commenced the Chapter 11 Cases;

(iii)     at 5:00 p.m. prevailing Eastern Time on the date that is six (6) business days after the Anticipated Filing Date unless the Company shall have commenced the Chapter 11 Cases (the date that the Chapter 11 Cases are commenced is referred to herein as the "Commencement Date") and the Company has filed, and is pursuing confirmation of, the Plan;

(iv)     at 5:00 p.m. prevailing Eastern Time on the date that is sixty (60) calendar days after the Commencement Date, unless the Bankruptcy Court shall have approved the Disclosure Statement and confirmed the Plan;

(v)     at 5:00 p.m. prevailing Eastern Time on the date that is fifteen (15) calendar days following entry by the Bankruptcy Court of an order confirming the Plan if the Plan has not been substantially consummated (as defined in section 1101 of the Bankruptcy Code) on or before such date;

(vi)     upon the filing by the Company of any motion or other request for relief seeking to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(vii)     upon the entry of an order by the Bankruptcy Court (A) dismissing any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (D) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(viii)     upon the withdrawal, amendment or modification by the Company or any other party of the Plan or any of the Approved Plan Documents or the filing of a pleading seeking to amend or modify the Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing has not been approved by the Required Participating Lenders or is materially inconsistent with the Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is materially adverse to any Participating Lender, or if the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement or the Plan or any of the Approved Plan Documents (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice

from the Required Participating Lenders that such motion or pleading is inconsistent with this Agreement or the Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

(ix)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof);

(x)     the Company files, proposes or otherwise supports any plan of reorganization other than the Plan;

(xi)     unless otherwise waived by the Required Participating Lenders, three (3) business days after the Company furnishes the Participating Lenders with notice (in accordance with Section 13 hereof) of its intent, in the exercise of its fiduciary duties (set forth in Section 24 below), to take any action that is otherwise prohibited hereunder or to refrain from taking any action that is required hereunder, which notice shall set forth (A) the acts that the Company intends to take or refrain from taking and (B) the specific dut(y)/(ies) that the Company believes it would breach as a result of such action or inaction;

(xii)     upon the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Section 4, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Required Participating Lenders;

(xiii)     upon the material breach by any of the Participating Lenders of any of the undertakings, representations, warranties or covenants of such Participating Lender(s) set forth in this Agreement that would have a material adverse effect on the Company or the consummation of the Restructuring, which breach remains uncured for a period of three (3) business days after the receipt by the Participating Lender(s) of notice of such breach from the Company; provided however that the foregoing shall constitute a Support Termination Event in favor of the Company only, and shall not constitute a Support Termination Event in favor of any of the Participating Lenders (including the breaching Participating Lender);

(xiv)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring;

(xv)     the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable,

the enforceability, priority, or validity of the Lender Claims or liens securing them; or

> (xvi)  any material breach of or default under the Existing Credit Agreement that is not waived or forborne under any waivers or forbearance agreements executed by the lenders required under the Existing Credit Agreement to so waive or forbear, provided, however that none of the Restructuring, the Solicitation, or the commencement of the Chapter 11 Cases shall constitute a breach of or default under any of the foregoing.

For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving of any such notice).

Upon occurrence of a Support Termination Event, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and the Plan Documents, and there shall be no liability or obligation on the part of any Party hereto; provided, however, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination or (ii) obligations under this Agreement which by their terms expressly survive any such termination; and provided, further that, notwithstanding anything to the contrary herein, any Support Termination Event may be waived in accordance with the procedures established by Section 8 hereof, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver.  Upon termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.  Upon the occurrence of the Support Termination Event under this Agreement, the fees and expense reimbursements required by Section 4(b) hereof shall be payable for work through the termination date.

6.    Good Faith Cooperation; Further Assurances; Transaction Documents

> The Parties shall, and the Company shall cause each of its subsidiaries and affiliates to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall, and the Company shall cause each of its subsidiaries and affiliates to, take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Each Party hereby covenants and agrees (a) to negotiate in good faith (to the extent not attached hereto as an exhibit) the Approved Plan Documents, each of which shall (i) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Plan (as amended, supplemented or otherwise modified as provided herein), (ii) except as otherwise provided for

herein, be in form and substance reasonably acceptable in all respects to the Parties signatory thereto, and (iii) be consistent with this Agreement and the Plan in all material respects, (b) to negotiate in good faith any amendments, supplements or modifications to the Plan or any Approved Plan Document attached hereto (in each case as provided herein) as the Company and the Required Participating Lenders agree are beneficial to the Restructuring and are otherwise consistent with the terms of this Agreement, and (c) to execute the Plan and the Approved Plan Documents (in each case to the extent such Party is a party thereto).

7.  Remedies

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party; provided, however, that if there is a breach of the Agreement by a Party, money damages shall be an insufficient remedy to the other Parties hereto, and the other Parties hereto can seek specific performance as against another Party; provided further that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

8.  Amendments

(a)  The Plan and the Approved Plan Documents may be amended only upon written approval of (i) the Company and (ii) the Required Participating Lenders; provided, however, that no amendment, waiver, modification or other supplement to the Plan or the Approved Plan Documents may (A) impose less favorable treatment of any Participating Lender's Lender Claims, or any group of Participating Lenders' Lender Claims, or its rights and obligations hereunder and under the Plan and Approved Plan Documents compared to those of the Participating Lenders generally, without such Participating Lender's, or such group of Participating Lenders', express written consent, or (B) materially and adversely affect the treatment of the Participating Lenders without the written consent of all of the Participating Lenders, in each case in addition to express written consent of the Company.

(b)  This Agreement may be amended (so long as any such amendment is consistent with the Plan and the Approved Plan Documents (as the Plan and the Approved Plan Documents may be amended in accordance with Section 8(a))) only upon written approval of (i) the Company and (ii) each Participating Lender.

9.  Independent Analysis

Each Participating Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

10. <u>Representation by Counsel</u>

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

11. <u>Governing Law</u>

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

12. <u>Effective Date</u>

This Agreement shall become effective, and each Participating Lender shall be bound to the terms of this Agreement, upon delivery of its duly executed counterpart signature page, <u>provided</u>, <u>that</u>, the Company has received signature pages to this Agreement from the Participating Lenders.

13. <u>Notices</u>

All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by courier or by registered or certified mail (return receipt requested), or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 a.m. to 6:00 p.m. at the place of receipt) at the addresses and facsimile numbers set forth on <u>Schedule 1</u> hereto.

14. Reservation of Rights

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including the Lender Claims and any other claims against the Company or other parties, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, after a Support Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 5, in the case of any claim for breach of this Agreement. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as any appearance by a Party and the positions advocated by such Party in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and would not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring. Notwithstanding anything contained in this Agreement, this Agreement and all other exhibits, schedules and appendices thereto are subject to Rule 408 of the Federal Rules of Evidence and shall not be admissible into evidence other than in a proceeding seeking to enforce their terms.

15. Rule of Interpretation

Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a plan of reorganization under the Bankruptcy Code.

16. Successors and Assigns; Severability; Several Obligations

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Participating Lenders under this Agreement are, in all respects, several and not joint.

17. Third-Party Beneficiary

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

18. Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

19. Entire Agreement

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan and, to the extent applicable, the Approved Plan Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Participating Lender shall continue in full force and effect.

20. Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

21. Acknowledgment

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of each of the Participating Lenders will not be solicited until the Participating Lenders have received the Disclosure Statement and related ballot.

22. Settlement Discussions

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

23. Publicity

The Company shall not (a) use the name of any Participating Lender in any press release without such Participating Lender's prior written consent or (b) disclose to any person, other than legal, accounting, financial and other advisors to the Company, the principal amount or percentage of Lender Claims held by any Participating Lender or any of its respective subsidiaries; provided, however, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Lender Claims held by the Participating Lenders as a group. Notwithstanding the foregoing, the Participating Lenders hereby consent to the disclosure by the Company in the Plan and the Approved Plan Documents, as applicable, as well as any required filings by the Company with the Bankruptcy Court or as otherwise required by law or regulation, and any press releases, of the execution, terms and contents of this Agreement and the aggregate principal amount of, and aggregate percentage of, any class of Lender Claims held by the Participating Lenders as a group. Notwithstanding the foregoing, the Company will submit to Reed Smith and Milbank all press releases, public filings, public announcements or other communications with any news media relating to this Agreement

or the transactions contemplated hereby and any amendments thereof for review and prior approval.

24. <u>Fiduciary Duties</u>

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company or its affiliated entities or any directors or officers of the Company or its affiliated entities, in such person's capacity as a director or officer of the Company or its affiliated entities, to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law.

25. <u>Survival</u>

Notwithstanding (i) any sale of the Lender Claims in accordance with <u>Section 3(b)</u> or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Sections 4(b)</u> (solely to the extent of fees and expenses accrued before termination), <u>14</u>, <u>23</u> and <u>24</u> shall survive such sale and/or termination and shall continue in full force and effect in accordance with the terms hereof.

26. <u>Conflicts Between the Plan and this Agreement</u>

In the event of any conflict among the terms and provisions in the Plan and this Agreement, the terms and provisions of the Plan shall control. Nothing contained in this <u>Section 26</u> shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Plan set forth in <u>Section 8</u> hereof.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**JACKSON HEWITT TAX SERVICE INC.**
**(on behalf of itself and all of its direct and indirect affiliates)**

By: _____

Name: _____

Its: _____

Dated: _____, 2011

**PARTICIPATING LENDER**

Name of Institution: _____

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

**Lender Claims**

$ _____

# SCHEDULE 1

## NOTICE ADDRESSES

If to the Company:

Jackson Hewitt Tax Service Inc.
3 Sylvan Way
Parsippany, NJ 07054
Attn: Steven L. Barnett, Esq.
Steve.Barnett@JTax.com

with a copy to:

Skadden, Arps, Slate, Meagher and Flom LLP
4 Times Square
New York, NY 10036
Attn: Mark McDermott, Esq.
Mark.McDermott @skadden.com


If to Wells Fargo Bank, N.A.:

See signature pages

with a copy to:

Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Attn.: Matthew E. Tashman, Esq.
mtashman@reedsmith.com


If to Dolphin Tax, LLC; Flamingo Tax, LLC; Gator Tax, LLC; Seminole Tax, LLC; Southeast Tax, LLC; Citrus Tax, LLC; Brickell Tax, LLC; Flagler Tax, LLC; Biscayne Tax, LLC; and Orange Tax, LLC:

See signature pages

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
Attn: Dennis F. Dunne, Tom Matz
DDunne@milbank.com, TMatz@milbank.com

If to any Participating Lender, at the address shown for such Participating Lender on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Participating Lender.

## EXHIBIT A

PLAN

<u>EXHIBIT B</u>

DISCLOSURE STATEMENT

## EXHIBIT C

JOINDER

JOINDER

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 23, 2011 (the "<u>Agreement</u>"), by and among (i) Jackson Hewitt Tax Service, Inc. and all of its direct and indirect affiliates, (collectively, the "<u>Company</u>"), **[Transferor's Name]** ("<u>Transferor</u>"), and the other holders of claims against the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "<u>Participating Lender</u>" under the terms of the Agreement.

Date Executed:  May \_\_, 2011

**TRANSFEREE**

Name of Institution: _____

**By:** _____

Name: _____

Its: _____

Telephone: _____

Facsimile: _____

**Lender Claims**

$ _____