IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

In re:                           :    Chapter 11
                              :

JACKSON HEWITT TAX SERVICE   :    Case No. 11-11587 (MFW)
INC., et al.,                   :
                              :    Jointly Administered
            Debtors.[1]     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING (A) THE DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §§ 1125 AND 1126(c), (B) PREPETITION SOLICITATION PROCEDURES, (C) FORM OF BALLOT, AND (D) PUBLICATION NOTICE, AND (II) CONFIRMING THE AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION OF JACKSON HEWITT TAX SERVICE INC. AND SUBSIDIARIES

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Jackson Hewitt Tax Service Inc. (9692), Jackson Hewitt Inc. (9705), Jackson Hewitt Technology Services LLC (2409), Tax Services of America, Inc. (7427), Jackson Hewitt Corporate Services Inc. (2415), and Hewfant Inc. (0545).  The address for each of the Debtors, with the exception of Jackson Hewitt Technology Services LLC, is 3 Sylvan Way, Parsippany, NJ 07054.  The address for Jackson Hewitt Technology Services LLC is 501 N. Cattlemen Rd., Sarasota, FL 34232.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................iv

I.      OVERVIEW OF THE PLAN ..................................................................................1

II.     THE DISCLOSURE STATEMENT SHOULD BE APPROVED ...................................3

III.    THE SOLICITATION PROCEDURES SHOULD BE APPROVED ..............................5

        A.      The Debtors Have Complied With The Applicable Notice Requirements ............5

                1.      The Debtors' Customers Are, At Best, "Unknown" Creditors....................6

                2.      The Publication Notice Is Reasonable Under the Circumstances of This Case ................................................................................................10

        B.      The Debtors' Form Of Ballot Should Be Approved ............................................13

        C.      No Further Solicitation Is Required On Account of the Lenders Settlement With the Committee ..........................................................................................13

IV.     THE PLAN SHOULD BE CONFIRMED ..............................................................15

        A.      The Plan Complies With The Applicable Provisions Of Title 11 (Section 1129(a)(1)) .......................................................................................................15

                1.      Classification Of Claims And Interests ..................................................16

                2.      Mandatory Contents Of The Plan..........................................................17

                        (a)     The Plan Designates Classes Of Claims And Interests................17

                        (b)     The Plan Identifies Unimpaired Classes ....................................17

                        (c)     The Plan Specifies The Treatment Of Impaired Classes ..............17

                        (d)     The Plan Provides The Same Treatment Within Each Class ........18

                        (e)     The Plan Provides Adequate Means For Implementation.............18

                        (f)     The Plan Prohibits The Issuance Of Non-Voting Securities.........19

                        (g)     The Selection Of Officers And Directors Of The Reorganized Debtors Is Consistent With The Interests Of Creditors And Equity Security Holders And With Public Policy .......................................................................................19

i

3.      Discretionary Contents Of The Plan......................................................20

    (a)      The Plan's Releases By The Debtors Are Permissible And Should Be Approved......................................................20

    (b)      The Releases By The Participating Lenders Are Permissible And Should Be Approved ......................................22

    (c)      The Plan's Exculpation Provision Is Permissible ........................22

4.      Executory Contracts And Unexpired Leases ...........................................23

B.      The Debtors Have Complied With The Applicable Provisions Of Title 11 (Section 1129(a)(2)).......................................................23

C.      The Plan Was Proposed In Good Faith (Section 1129(a)(3))...............................24

D.      All Payments To Be Made By The Debtors In Connection With These Cases Are Subject To The Approval Of The Court (Section 1129(a)(4)) ............25

E.      The Plan Discloses All Required Information Regarding Postconfirmation Directors, Management And Insiders (Section 1129(a)(5)).................................26

F.      The Plan Does Not Provide For Any Rate Change Subject To Regulatory Approval (Section 1129(a)(6)) ......................................................28

G.      The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7)).......................28

H.      The Plan Has Been Accepted By The Requisite Classes Of Creditors and Equity Security Holders Other Than With Respect To Classes 4, 5 and 6 (Section 1129(a)(8)).......................................................31

I.      The Plan Provides For The Payment Of Priority Claims (Section 1129(a)(9))...........................................................31

J.      The Plan Has Been Accepted By At Least One Impaired, Non-Insider Class (Section 1129(a)(10))........................................................32

K.      The Plan Is Feasible (Section 1129(a)(11))...........................................32

L.      The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12)) ......................................................34

M.      The Plan Provides For The Continuation Of Retiree Benefits (Section 1129(a)(13))........................................................34

N.      The Plan Satisfies The "Cramdown" Requirements ...........................................35

1.  The Plan Does Not Discriminate Unfairly With Respect To The Deemed Rejecting Classes ........................................................................ 35

2.  The Plan Is "Fair And Equitable" With Respect To The Deemed Rejecting Classes ..................................................................................... 37

V.  RESPONSE TO OUTSTANDING OBJECTIONS ........................................................ 40

VI.  IMMEDIATE EFFECTIVENESS ................................................................................. 40

VII.  CONCLUSION ............................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

In re 203 North LaSalle Street Ltd. Partnership, 190 B.R. 567 (Bankr. N.D. Ill. 1995), aff'd sub nom. Bank of Am. v. 203 North LaSalle Street Partnership, 195 B.R. 692 (N.D. Ill. 1996) ...................................................................35

In re 203 North LaSalle Street Partnership, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds sub nom. Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999).......................................15

In re Adelphia Business Solutions, Inc., 341 B.R. 415 (Bankr. S.D.N.Y. 2003) .........................33

In re Armstrong World Industries, Inc., 348 B.R. 136 (D. Del. 2006) .........................................16

In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...........................................................36

Brown v. Seaman Furniture Co., 171 B.R. 26 (E.D. Pa. 1994)....................................................12

Certain Underwriters at Lloyd's London v. Federal-Mogul Global Inc. (In re Federal-Mogul Global), 402 B.R. 625 (D. Del. 2009) .....................................................16

Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.), 125 B.R. 650, 656 (M.D. Fla. 1991) .............................................................................................................9

Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995) .....................................................7, 10, 12

In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................4

In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr. S.D.N.Y. 1990).............................29

In re Drexel Burnham Lambert Group Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992)........ 28, 32, 33

Elsom v. Woodward & Lothrop, Inc., No. CIV. A. 97-3578, 1997 WL 476091 (E.D. Pa. Aug. 14, 1997)....................................................................................................12

In re Exide Technologies, 303 B.R. 48, 61 (Bankr. D. Del 2003)................................................37

Fogel v. Zell, 221 F.3d 955 (7th Cir. 2000) ................................................................................10

In re Freymiller Trucking, Inc., 190 B.R. 913 (Bankr. W.D. Okla. 1996)...................................35

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) ..................................14

In re Gilbertson Restaurants LLC, No. 04-00385, 2005 WL 783063 (Bankr. N.D. Iowa Apr. 4, 2005)........................................................................................................25

Grogan v. Garner, 498 U.S. 279 (1991) .....................................................................................15

*In re Harry & David Holdings, Inc.*, No. 11-10884 (MFW) (Bankr. D. Del. Apr. 27, 2011) ...................................................................................................12

*Hebell v. NVR, Inc.*, No. 97 C 4000, 1997 WL 417363 (N.D. Ill. July 21, 1997).......................9

*In re International Wireless Communications Holdings, Inc.*, No. 98-2007 (MFW), 1999 Bankr. LEXIS 1853 (Bankr. D. Del. Mar. 26, 1999), aff'd and modified, 1999 Bankr. LEXIS 1832 (Bankr. D. Del. Dec. 29, 1999)..............................22

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009)..................................38

*IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589 (3d Cir. 1997)........................................................32

*In re Jartran, Inc.*, 44 B.R. 331 (Bankr. N.D. Ill. 1984) ............................................................29

*John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates*, 987 F.2d 154 (3d Cir. 1993)...........................................................................................16

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987)........................................................................................................26

*In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009)........................................ 14, 36

*In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), aff'd, 343 B.R. 88 (D. Del. 2006)...............................................................16

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)................................................28, 33

*In re Leslie Fay Cos.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ....................................................28

*Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership)*, 115 F.3d 650 (9th Cir. 1997) ................................................36

*In re Machne Menachem, Inc.*, 233 F. App'x 119 (3d Cir. 2007)...............................................16

*In re Magnatrax Corp.*, No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003) .......................................................................................................................16

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006)............................................................23

*In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339 (Bankr. D. Del 1998), aff'd, 324 F.3d 197 (3d Cir. 2003) .................................................................................................25

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) ......................................................23, 24

*In re Ritz Camera Centers, Inc.*, No. 09-10617 (MFW) (Bankr. D. Del. June 29, 2009)........................................................................................................................13

In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999) ................................................24

In re Sherwood Square Associates, 107 B.R. 872 (Bankr. D. Md. 1989)....................27

In re Sound Radio, Inc., 103 B.R. 521 (D.N.J. 1989), aff'd mem., 908 F.2d 964
    (3d Cir. 1990) ....................................................................................................32

In re Source Enterprises, Inc., No. 06-11707, 2007 WL 2903954 (Bankr. S.D.N.Y.
    Oct. 1, 2007), aff'd, 392 B.R. 541 (S.D.N.Y. 2008)........................................25

In re Spiegel, Inc., No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25,
    2005) ..................................................................................................................18

Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d
    1142 (5th Cir. 1988) ............................................................................................4

In re Teligent, Inc., 282 B.R. 765 (Bankr. S.D.N.Y. 2002) .......................................14

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988)........................................27, 33

In re Texaco Inc., 182 B.R. 937 (Bankr. S.D.N.Y. 1995) ............................................9

In re Trans World Airlines, Inc., 185 B.R. 302 (Bankr. E.D. Mo. 1995) ...................27

Trump Taj Mahal Associates v. Alibraham (In re Trump Taj Mahal Associates),
    156 B.R. 928 (Bankr. D.N.J.), aff'd sub nom. Trump Taj Mahal Associates
    v. O'Hara (In re Trump Taj Mahal Associates), No. 93-3571, 1993 WL
    534494 (D.N.J. Dec. 13, 1993) ..........................................................................9

United States v. Energy Resources Co., 495 U.S. 545 (1990) ....................................32

Vancouver Women's Health Collective Society v. A.H. Robins Co., 820 F.2d
    1359 (4th Cir. 1987) ..........................................................................................10

In re Victory Construction Co., 42 B.R. 145 (Bankr. C.D. Cal. 1984).......................29

In re W. E. Parks Lumber Co., 19 B.R. 285 (Bankr. W.D. La. 1982) ........................27

White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings,
    Inc.), No. 10-55357, 2011 WL 2259743 (Bankr. D. Del. June 7, 2011) .................8, 9, 10

In re Washington Mutual, Inc., 442 B.R. 314 (Bankr. D. Del. 2011)....................21, 23

In re Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999) ...........................22

**Statutes**

11 U.S.C. § 1123(a)(1)................................................................................................17

11 U.S.C. § 1123(a)(2) ..................................................................................... 17

11 U.S.C. § 1123(a)(3) ..................................................................................... 18

11 U.S.C. § 1123(a)(4) ..................................................................................... 18

11 U.S.C. § 1123(a)(5) ..................................................................................... 18

11 U.S.C. § 1123(a)(6) ..................................................................................... 19

11 U.S.C. § 1123(a)(7) ..................................................................................... 19

11 U.S.C. § 1123(b)(2) ..................................................................................... 23

11 U.S.C. § 1125(a)(1) ....................................................................................... 4

11 U.S.C. § 1125(g) ........................................................................................... 3

11 U.S.C. § 1126(b)(1) ....................................................................................... 3

11 U.S.C. § 1126(b)(2) ....................................................................................... 4

11 U.S.C. § 1126(g) ......................................................................................... 14

11 U.S.C. § 1129(a)(1) ..................................................................................... 16

11 U.S.C. § 1129(a)(2) ..................................................................................... 24

11 U.S.C. § 1129(a)(3) ..................................................................................... 24

11 U.S.C. § 1129(a)(4) ..................................................................................... 26

11 U.S.C. § 1129(a)(5) ..................................................................................... 26

11 U.S.C. § 1129(a)(5)(A)(ii) ........................................................................... 27

11 U.S.C. § 1129(a)(6) ..................................................................................... 28

11 U.S.C. § 1129(a)(10) ................................................................................... 32

11 U.S.C. § 1129(a)(11) ................................................................................... 32

11 U.S.C. § 1129(a)(12) ................................................................................... 34

11 U.S.C. § 1129(a)(13) ................................................................................... 35

11 U.S.C. § 1129(b)(1) ..................................................................................... 35

11 U.S.C. § 1129(b)(2)(B) ............................................................................... 37

11 U.S.C. § 1129(b)(2)(C)................................................................37

Fed. R. Bankr. P. 3017(d)..............................................................5

Fed. R. Bankr. P. 3018(b)..............................................................6

Fed. R. Bankr. P. 3018(c)..............................................................13

**Other Authorities**

7 <u>Collier on Bankruptcy</u> ¶ 1123.01[7] (Alan N. Resnick & Henry J. Sommer eds.,
    16th ed. 2011).......................................................................19

7 <u>Collier on Bankruptcy</u> ¶ 1129.02 [11] (Alan N. Resnick & Henry J. Sommer
    eds., 16th ed. 2011).................................................................32

H.R. Rep. No. 95-595 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963........................16

S. Rep. No. 95-989 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787 ...........................16

Jackson Hewitt Tax Service Inc. and its subsidiaries, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this memorandum of law in support of approval of the disclosure statement accompanying their proposed plan of reorganization (the "Disclosure Statement") and related solicitation procedures, and in support of confirmation of their proposed plan of reorganization, as amended (the "Plan"), pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").[2]

## I.   OVERVIEW OF THE PLAN

1.      The Plan, which is described below, is very straightforward.  It is supported by the Debtors' secured lenders, who collectively hold approximately $357 million in claims against the Debtors that are secured by liens on all the Debtors' assets (the "Lenders"). Moreover, as amended, the Plan is supported by the Official Committee of Unsecured Creditors (the "Committee"), who recently reached an agreement with the Debtors and the Lenders whereby the Lenders will allocate a portion of their recovery to unsecured creditors as described below.

2.      Because the mid-point of the Debtors' estimated enterprise value is only $225 million, the Lenders are entitled to all value under the Bankruptcy Code and the Plan, whereas no other stakeholder, including unsecured creditors and equity holders, are entitled to any value.  Under the Plan, the Lenders therefore will receive their pro rata share of all equity of the reorganized Debtors, subject to dilution on account of a management incentive plan.  They

---

[2]   This memorandum of law and confirmation of the Plan are further supported by the Declaration of Daniel P. O'Brien in Support of Confirmation of Amended Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (the "O'Brien Declaration"), the Declaration of Steven Panagos in Support of Confirmation of Amended Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (the "Panagos Declaration") and the Declaration of Richard J. Mizak in Support of Confirmation of Amended Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (the "Mizak Declaration" and together with the O'Brien Declaration and the Panagos Declaration, the "Declarations"), which are being filed in these chapter 11 cases (the "Chapter 11 Cases") in advance of the confirmation hearing.

also will receive a new term loan in the amount of $100 million, plus the opportunity to participate pro rata in a new, $115 million revolving facility.

3.     Those Lenders who have chosen to participate in the new revolving facility will receive their pro rata distribution of all the cash, less $5 million, that the Debtors accumulated during the 2011 tax season but have not yet spent in anticipation of the 2012 tax season.  Based on the Company's latest cash forecasts, subject to revision for ongoing work activities, the Company estimates that such cash totals approximately $76 million, which is subject to a perfected lien in favor of the Lenders.  Under the Plan, all existing, outstanding shares and other equity interests in Jackson Hewitt will be cancelled.

4.     While the Lenders are entitled to all value, the Lenders nonetheless have agreed with the Committee to deposit $1.1 million of their cash collateral into a trust for the benefit of general unsecured creditors.  The Lenders have also agreed to deposit into the trust certain preference actions, which the Lenders have super-priority claims to, against a small number of former vendors and other parties who are not necessary to the Debtors' go-forward operations.  The Lenders have agreed to share with the Committee any recoveries on account of these preference actions.  The trust will establish a bar date and pay for notice of the bar date out of the funds the Lenders have agreed to deposit into the trust.

5.     As the Debtors previously advised this Court, prior to the May 24, 2011, petition date (the "Petition Date"), the Lenders voted unanimously in favor of the Plan.  In accordance with orders entered by this Court on the first-day of the case, the Debtors served approximately 33,000 parties with notice of the combined hearing on approval of the Disclosure

Statement and confirmation of the Plan.  They also published the notice in the 52 largest newspapers in the country and on approximately 2,700 websites. [3]

6.       A total of seventeen objections were filed to confirmation.  The objections, the Debtors' responses, and the terms of proposed resolutions to certain of the objections are summarized in a chart attached hereto as <u>Exhibit A</u>.  As can be seen from <u>Exhibit A</u>, the Debtors have resolved seven of the objections as of the filing of this memorandum.  As described below and in <u>Exhibit A</u>, none of the unresolved objections present any impediment to immediate confirmation.  Accordingly, the Disclosure Statement should be approved, and the Plan should be confirmed.

## II.       THE DISCLOSURE STATEMENT SHOULD BE APPROVED

7.       Bankruptcy Code section 1125(g) provides that "[n]otwithstanding subsection (b) [prohibiting solicitation absent a court-approved disclosure statement], an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law."  11 U.S.C. § 1125(g).

8.       A pre-petition solicitation of votes on a chapter 11 plan must be "in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation . . . ."  11 U.S.C. § 1126(b)(1).  Alternatively, "if there is not any such law, rule, or regulation . . . acceptance or rejection [of the Plan must

---

[3]    The Debtors' claims and notice agent, The Garden City Group, Inc., filed several affidavits in support of service of the combined notice.  <u>See</u> Docket Nos. 81, 90, 91, and 96.

have been] solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of [the Bankruptcy Code]." 11 U.S.C. § 1126(b)(2). "[A]dequate information" is

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

9. The adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties." In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988). As such, in examining the adequacy of the information contained in a disclosure statement, the bankruptcy court enjoys broad discretion. See Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988).

10. The Debtors submit that the Disclosure Statement complies with both the disclosure requirements and the process requirements imposed by Bankruptcy Code section 1125. The only persons entitled to vote on the Plan are the Lenders, each of whom is a major, sophisticated financial institution. The solicitation therefore was exempt from registration, and constituted a private placement of securities, as contemplated by section 4(2) of the Securities Exchange Act of 1934. Moreover, the Disclosure Statement is extensive and comprehensive and hence, also satisfies the adequate information standard of section 1125(a) of the Bankruptcy Code.

11. While certain parties have objected to the Disclosure Statement, those objections are without merit and should be overruled.[4] None of the objectors was entitled to vote on the Plan and hence, were not entitled to receive the Disclosure Statement. The only audience for the Disclosure Statement was the Lenders. The Lenders not only are highly sophisticated entities, but they were involved in very protracted, pre-petition negotiations with the Debtors that spanned many months during which they learned the Debtors' business in detail. The Lenders therefore were highly informed about the Debtors. In light of this background, the Disclosure Statement afforded them more than adequate information.

12. In short, the Disclosure Statement complies with the applicable provisions of Bankruptcy Code section 1125 and applicable non-bankruptcy law and should be approved.

## III. THE SOLICITATION PROCEDURES SHOULD BE APPROVED

### A. The Debtors Have Complied With The Applicable Notice Requirements

13. Rule 3017(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires that, unless otherwise ordered, a debtor shall transmit to all creditors, equity security holders and the United States Trustee (the "U.S. Trustee") a copy of "(1) the plan or a court-approved summary of the plan; (2) the disclosure statement . . . (3) notice of the time within which acceptances and rejections of the plan may be filed; and (4) any other information as the court may direct . . . ." Fed. R. Bankr. P. 3017(d). This rule also requires that all creditors and equity security holders be given notice of the time fixed for filing objections to the proposed disclosure statement and the hearing on confirmation, and that a ballot be mailed to each creditor and equity security holder entitled to vote on the plan. Id.

---

[4]    See Docket Nos. 208, 209, 210, 211, 213, 240, 256, 262 and 339.

14.     In accordance with these requirements, on May 23, 2011, the Debtors' solicitation, voting and tabulation agent caused copies of the Disclosure Statement, the Plan, and the ballot[5] to be transmitted to the Lenders, defined in the Plan as Class 3 Secured Senior Credit Facility Claims.[6] Such Claims were the only ones entitled to vote on the Plan. The Debtors established 1:00 p.m. (prevailing Eastern Time) on May 24, 2011 as the voting deadline, which was then extended to May 26, 2011. While short, this was ample time for every Lender to submit a vote in favor of the Plan. Indeed, as pointed out above, they were intimately involved in restructuring negotiations with the Debtors for weeks, and were already intimately familiar with the terms of the Plan by the time the solicitation commenced. See Fed. R. Bankr. P. 3018(b) (time for voting must not be unreasonably short).

15.     In addition to the foregoing, the Debtors served the combined notice on 33,000 parties. The Debtors also provided extensive mail and publication notice of these chapter 11 cases. This notice is reasonable under the circumstances, and sufficient to bind all persons to the discharge and injunction provided for by the Debtors' Plan.

### 1.      The Debtors' Customers Are, At Best, "Unknown" Creditors

16.     A "known" creditor is one whose identity is known or "'reasonably ascertainable,'" whereas an "'unknown'" creditor is one whose "'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business

---

[5]     The form of the ballot is attached to the Debtors' Motion Under 11 U.S.C. §§ 102, 105, 341, 1125, 1126 and 1128, Fed. R. Bankr. P. 2002, 3017, 3018 and 3020 and Del. Bankr. L.R. 3017-1 (I) for Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form and Manner of Notice of Combined Hearing and Commencement of the Chapter 11 Cases, (C) Establishing Procedures for Objecting to Disclosure Statement and Plan and (D) Waiving Requirement for Meeting of Creditors and (II) for Order (A) Approving Prepetition Solicitation Procedures, (B) Approving Adequacy of Disclosure Statement and (C) Confirming Plan of Reorganization [Docket No. 14] as Exhibit D (the "Ballot").

[6]     See Declaration of Craig E. Johnson of The Garden City Group, Inc. Certifying the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the Joint Prepackaged Plan of Reorganization of Jackson Hewitt Tax Service Inc. and Subsidiaries (Docket No. 76) (the "Tabulation Declaration").

come to knowledge of the debtor.'" Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)).  A known creditor is entitled to direct mail notice, while publication notice suffices for unknown creditors. Id.  As the Third Circuit stated in Chemetron, "[d]ebtors cannot be required to provide actual notice to anyone who potentially could have been affected by their actions; such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates."  Id. at 348 (emphasis added).

17.     As previously explained to this Court, the Debtors have millions of current and former customers – they prepared approximately 2.6 million tax returns in 2011 alone.  A significant percentage of those customers historically have obtained financial products offered by third-party lenders, including so-called "refund anticipation loans" ("RALs").  While limited litigation over the propriety of RALs was pending as of the Petition Date, it does not follow that every current and former customer is a "known" creditor.  Indeed, only four RAL cases are pending against the Debtors, with a total of only five named plaintiffs.  Each case purports to be a separate, state class action, but none of those classes has been certified, and no judgments have been rendered.

18.     Moreover, aside from one experience with the State of California many years ago that was resolved, no state attorney general or any other state regulatory body has ever sued the Debtors or fined them on account of RALs.  All state attorneys general were given direct, mail notice of these bankruptcy cases, including the fact that RAL-related claims, if any, will be discharged, yet none of them but Maryland has appeared in the case; none of them has filed a claim; none of them contests confirmation or the discharge; and none of them has complained about the publication notice.

19.     Similarly, no individual RAL customer or RAL attorney has appeared in these cases; filed a claim; objected to confirmation; or complained about the publication notice. All the attorneys involved in pending RAL litigation were given direct mail notice. While the Debtors' publication notice program was very extensive – it included notice of the reorganization plan's proposed RAL treatment and discharge in the 52 largest newspapers in this country, plus banner ads on 2,700 websites that provided over 130 million opportunities to be viewed by the substantial majority of the entire United States adult, on-line population – no one has appeared in these cases to raise RAL matters.

20.     Based upon the foregoing, RAL customers are, at best, unknown creditors with claims that are only conjectural. The mere fact that the Debtors may have addresses of current and former customers – the Debtors do not know how many of those addresses are good – does not mean that all such customers are "known" claimants entitled to direct mail notice. In this regard, Judge Carey's very recent decision in White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.), No. 10-55357, 2011 WL 2259743 (Bankr. D. Del. June 7, 2011), is instructive.

21.     In New Century, mortgage customers of the debtor asserted a claim against the debtor based on alleged violations of various consumer disclosure and related laws. The customers argued that they were "known" creditors of the debtors because the Debtors maintained addresses of all their customers. Judge Carey disagreed: "The availability of the [customers'] names and address in the Debtors' loan files may have reflected that [they] were

known <u>customers</u>, but without more, it did not make them 'known <u>creditors</u>.'" <u>Id.</u> at *6 (emphasis in original).[7]

      22.     Judge Carey's statements apply with equal force in this case. Indeed, other courts in the Third Circuit and elsewhere have also held that where, as there, there is a threat of possible litigation by a class of alleged claimants, but only a nominal number, if any, actually bring suit, then the non-suing members of that class are "unknown" creditors of the debtor for notice purposes. <u>See</u> <u>Trump Taj Mahal Assocs. v. Alibraham</u> (In re Trump Taj Mahal Assocs.), 156 B.R. 928, 940 (Bankr. D.N.J.) ("[T]he O'Haras were one of several hundred potential claimants. . . . although many people in O'Hara's position threaten to file suit against the Taj, only a nominal number, if any, actually bring suit. . . . Thus, the O'Hara's claim, although conceivable, was speculative and conjectural."), <u>aff'd sub nom.</u> <u>Trump Taj Mahal Assocs. v. O'Hara</u> (In re Trump Taj Mahal Assocs.), No. 93-3571, 1993 WL 534494 (D.N.J. Dec. 13, 1993).[8]

      23.     The same reasoning applies here. The RAL cases have been pending for several years, yet in all that time, out of the millions of customers who have obtained financial products, including RALs, only a very tiny fraction of them have ever asserted claims. Because such a nominal number have actually sued, RAL claimants, if any, have conjectural claims at best and hence, are "unknown."

---

[7]    <u>See also</u> <u>Hebell v. NVR, Inc.</u>, No. 97 C 4000, 1997 WL 417363, at *2 (N.D. Ill. July 21, 1997) (homeowner-mortgagors were not known creditors, even though their identities were "reasonably ascertainable" from the debtors' loan service records, when those records did not indicate that mortgagors were potential class members who could file suit in the future, thereby becoming claimants).

[8]    <u>In re Texaco Inc.</u>, 182 B.R. 937, 957 (Bankr. S.D.N.Y. 1995) ("[E]ven assuming that Texaco knew there was a possibility of a claim by Respondents, Texaco was not required to give actual notice to creditors 'with merely conceivable, conjectural or speculative claims.'" (citation omitted)); <u>Charter Crude Oil Co. v. Petroleos Mexicanos</u> (In re Charter Co.), 125 B.R. 650, 656 (M.D. Fla. 1991) ("Even assuming that [the debtor] knew there was a possibility of a claim by [the claimant], [the debtor] was not required to give actual notice to creditors with merely conceivable, conjectural or speculative claims.").

**2.** **The Publication Notice Is Reasonable Under the Circumstances of This Case**

24.     The Third Circuit has held that in ascertaining the propriety of notice in bankruptcy cases, a court must be "guided by one of the principal purposes of bankruptcy law[:] to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." Chemetron Corp., 72 F.3d at 346. Following this guidance, Judge Carey said in New Century that when a debtor develops a program for notifying creditors, it "need not be omnipotent or clairvoyant, but need only do what is reasonable under the circumstances to provide notice to ascertainable creditors." In re New Century, 2011 WL 2259743, at *6.

25.     As Judge Carey further held, what is reasonable notice depends upon "the totality of the circumstances in each case in light of certain factors, including (1) whether the identity of the creditors or their claims are conjectural or can be reasonably ascertained, (2) whether the cost of giving actual notice would consume a disproportionate share of the debtor's resources, and (3) the obligation of the court to existing creditors and the debtor's stockholders in light of the potential delay and the balance of the debtor's resources." Id. at *6 n.12 (citing Gentry v. Circuit City Stores, Inc. (In re Circuit City Stores, Inc.), 439 B.R. 652, 660 (E.D. Va. 2010)).[9]

26.     As stated in the first-day declaration of the Debtors' chief financial officer, Mr. Daniel O'Brien, the estimated cost of direct mail notice to RAL customers would be over $5

---

[9]     Consistent with these basic propositions, the Seventh Circuit Court of Appeals has stated that "[n]otice by publication may thus be entirely appropriate when potential claimants are numerous, unknown, or have small claims [such that] the cost of ascertaining the claimants' names and addresses and mailing each one a notice [would] consume a disproportionate share of the assets of the debtor's estate." Fogel v. Zell, 221 F.3d 955, 963 (7th Cir. 2000). And as the Fourth Circuit has acknowledged, "[a] bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests when deciding how much to spend on notification." Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., 820 F.2d 1359, 1364 (4th Cir. 1987).

million – which is more than the entire pool of known unsecured claims, and five times the roughly $1 million that the Debtors incurred in connection with the publication notice program. A debtor should not be compelled to devote scarce resources to such an expensive campaign, solely to notify conjectural claimants that they are not entitled to anything in any event. Accordingly, the extensive, nationwide publication notice program that the Debtors constructed and implemented with the assistance of GCG is eminently reasonable and sufficient under the circumstances.

27.     In particular, the Debtors' publication notice program was constructed by Ms. Jeanne Finegan, Senior Vice President of The Garden City Group, Inc. and of GCG Communications, Inc.[10]  As described in Ms. Finegan's declaration, the combined notice of the confirmation hearing, objection deadline, and terms of the plan, including the discharge of any and all RAL claims, was published in The Wall Street Journal and USA Today, and also in the 50 largest regional newspapers in the United States.  The collective circulation of these newspapers is over 12.4 million.  The notice was also made available through approximately 2,700 websites.  This included banner advertising through Quadrant One, an online network of over 350 of the most widely read and respected local news and information websites in the United States.

28.     It also included banner advertising through 24/7 Network, which includes over 2,000 websites, including FoxNews, MySpace, Oprah, and Weather.com.  These sites had

---

[10]     Ms. Finegan is one of the most experienced notice advisors in the nation, with over 20 years of communications and advertising experience.  Ms. Finegan has testified before Congress on issues of notice, and has been directly responsible for the design and implementation of hundreds of class action and restructuring notice programs, some of which are the largest and most complex national and international notice programs ever filed.  Her declaration identifies her experience in over 70 mass tort and product recall cases, plus over 20 large chapter 11 cases, including mass tort cases such as Johns-Manville and Dow Corning.  Her other large chapter 11 cases include Enron, General Motors, and United Airlines.

over 40 million visitors daily during March 2011, which is 82% of all online adults 18 years of age or older. An additional 300 news, entertainment and lifestyle websites, such as Fox Sports and MSN, were accessed through the Microsoft Media Network. During March 2011, these sites hosted approximately 37 million daily visitors, or 73% of all online adults 18 years of age or older. Other cites included CNN and Yahoo, the latter of which reaches over 90% of all online adults 18 years of age or older.

29.     Notices, or "banners," appeared on these web pages advising of the Debtors' chapter 11 cases and inviting the viewer to click on the notice to learn more. Viewers were taken to a link where they could see the press release issued in connection with the Debtors' bankruptcy, plus a copy of the combined notice. The Debtors and Garden City estimate that the online portion of the publication notice program delivered over 130 million "impressions," or opportunities to see the banners.

30.     The foregoing program is more than sufficient to satisfy due process. As the Third Circuit said in Chemetron, "'[i]t is impracticable . . . to expect a debtor to publish notice in every newspaper a possible unknown creditor may read.'"  Chemetron Corp., 72 F.3d at 348 (alteration in original) (citation omitted). Accordingly, "[p]ublication in national newspapers is regularly deemed sufficient notice to unknown creditors, especially where supplemented, as here, with notice in papers of general circulation in locations where the debtor is conducting business."  Id. at 348-49; see also Elsom v. Woodward & Lothrop, Inc., No. CIV. A. 97-3578, 1997 WL 476091, at *2-3 (E.D. Pa. Aug. 14, 1997) (publication notice was sufficient where notice of bar date was published in sixteen different newspapers); Brown v. Seaman Furniture Co., 171 B.R. 26, 27 (E.D. Pa. 1994); In re Harry & David Holdings, Inc., No. 11-10884 (MFW) (Bankr. D. Del. Apr. 27, 2011) (authorizing publication notice in The Wall

Street Journal and The Oregonian where debtors operated approximately 70 retail stores throughout the United States); In re Ritz Camera Centers, Inc., No. 09-10617 (MFW) (Bankr. D. Del. June 29, 2009) (authorizing publication notice in the national editions of The Wall Street Journal and The New York Times; debtor operated 800 stores in 40 states).

**B.    The Debtors' Form Of Ballot Should Be Approved**

31.    Bankruptcy Rule 3018(c) provides, in relevant part, that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."  Fed. R. Bankr. P. 3018(c); see also Official Form of Ballot for Accepting or Rejecting a Plan.  The form for the Ballot in these cases is based on Official Form No. 14, but was modified to address the particular aspects of these cases and to include certain additional information that the Debtors believe to be relevant and appropriate for the Lenders.  The Debtors respectfully submit that the Ballot is adequate and appropriate and should be approved in all respects.

**C.    No Further Solicitation Is Required On Account of the Lenders' Settlement With the Committee**

32.    The Debtors did not solicit votes on the Plan by holders of general unsecured claims because, as noted above, holders of general unsecured claims are not entitled to receive any recovery.  Accordingly, general unsecured creditors were deemed to have rejected the Plan pursuant to section 1126(g).  The Lenders' agreement to allocate a portion of their recovery under the Plan to general unsecured creditors does not require any further solicitation of general unsecured creditors.

33.    As noted above, the Lenders, who have valid liens on all the Debtors' assets, are owed approximately $357 million; the mid-point of the Debtors' estimated enterprise value is $225 million; and the estimated recovery to the Lenders is only 51.8%.  Thus, unsecured

creditors are not entitled to any recovery under the Bankruptcy Code or the Plan. Section 1126(g) of the Bankruptcy Code provides, by its specific terms, that creditors who are entitled to no recovery are deemed to reject and hence, their votes are not required.

> [A] class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class <u>do not entitle</u> the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(g) (emphasis added).

34. Given the values and the Lenders' lien position, there is no dispute that unsecured creditors, and the terms of the Plan, do not and cannot "entitle" unsecured creditors to any recovery. That the unsecured creditors will now receive the benefit of $1.1 million in cash and recoveries on certain preference actions is exclusively a result of the Lenders' beneficence, as the Lenders have the exclusive, superior claims on the cash and preference actions to be contributed to the settlement trust. The Lenders' gift does not and cannot somehow create a new right of unsecured creditors to vote on the Plan, where no such right existed before. <u>See, e.g.</u>, <u>In re Teligent, Inc.</u>, 282 B.R. 765, 768-69 (Bankr. S.D.N.Y. 2002) (noting that debtor's lenders agreed to make a gift to out of the money unsecured creditors who were conclusively presumed to reject the Plan, and therefore did not vote on the plan); <u>In re Journal Register Co.</u>, 407 B.R. 520, 527, 533 (Bankr. S.D.N.Y. 2009) (confirming plan under which secured creditors contributed funds they would otherwise retain on account of their claims for distribution to class of trade creditors); <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 618 (Bankr. D. Del. 2001) (when gift is payable from proceeds otherwise distributable to senior secured creditors, they are "free to allocate such value without violating the 'fair and equitable' requirement" of 1129(b)).

35. This conclusion is also consistent with Bankruptcy Rule 3019. That Rule provides that creditors who have voted to accept a plan need not be re-solicited if the plan

thereafter is modified, so long as the modification is not "adverse" to those who have accepted the plan. While the unsecured creditors here were not and need not be solicited, there is no question that the settlement is not "adverse" to them. It instead affords them something, when they are otherwise entitled to nothing. If creditors who have a right to vote on a plan need not be re-solicited if the plan change is not adverse to them, then surely creditors who have no right to vote in the first instance also need not be solicited if the plan change is not adverse to them.

36.     Accordingly, while unsecured creditors will now be the beneficiaries of value allocated to them by the Lenders, such creditors should simply be deemed to reject the Plan. Indeed, even if they were solicited and voted against the Plan, the Plan nonetheless would be easily confirmed over their objections for all the reasons noted below, including, significantly, the fact that the Debtors already have an accepting vote by the Lenders which can be used to cram-down the unsecured creditors. For all these reasons, no further solicitation is required.

## IV.     THE PLAN SHOULD BE CONFIRMED

37.     To confirm the Plan, the Court must find that both the Plan and the Debtors are in compliance with each of the requirements of section 1129(a) of the Bankruptcy Code. See Grogan v. Garner, 498 U.S. 279, 291 (1991); In re 203 N. LaSalle St. P'ship, 126 F.3d 955, 960-61 (7th Cir. 1997), rev'd on other grounds sub nom. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999). As set forth below, the Debtors and the Plan satisfy all of the requirements of section 1129(a) of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

### A.     The Plan Complies With The Applicable Provisions Of Title 11 (Section 1129(a)(1))

38.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of

this title." 11 U.S.C. § 1129(a)(1). The legislative history of Bankruptcy Code section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and interests and the contents of the plan, respectively. See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368; see also In re Machne Menachem, Inc., 233 F. App'x 119, 120 (3d Cir. 2007); Certain Underwriters at Lloyd's London v. Fed.-Mogul Global Inc. (In re Fed.-Mogul Global), 402 B.R. 625, 629 n.7 (D. Del. 2009); In re Armstrong World Indus., Inc., 348 B.R. 136, 158 (D. Del. 2006).

### 1.     Classification Of Claims And Interests

39.     Courts in this Circuit and elsewhere have recognized that plan proponents have significant flexibility in placing claims and interests into different classes, provided there is a rational legal or factual basis to do so and all claims or interests within a particular class are substantially similar. See, e.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 159 (3d Cir. 1993) (noting that a classification scheme is permissible if a legal difference exists between the classes); In re Kaiser Aluminum Corp., No. 02-10429, 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (finding that the classification was proper under section 1122 of the Bankruptcy Code because the classification scheme reflected the "diverse characteristics" of those claims and interests), aff'd, 343 B.R. 88 (D. Del. 2006); In re Magnatrax Corp., No. 03-11402, 2003 WL 22807541, at *4 (Bankr. D. Del. Nov. 17, 2003) (finding that a plan that classified classes of claims and interests pursuant to valid business, factual, and legal reasons satisfied section 1122 of the Bankruptcy Code).

40.     The Plan meets these requirements. The Plan designates eight (8) Classes of Claims and Interests for each Debtor as follows (as each is defined in the Plan): Class 1 Other Priority Claims, Class 2 Other Secured Claims, Class 3 Secured Senior Credit Facility Claims,

Class 4 General Unsecured Claims, Class 5 Subordinated 510(b) Claims, Class 6 Interests in

Jackson Hewitt, Class 7 Intercompany Claims and Class 8 Intercompany Interests. This is a very

straightforward, non-controversial classification scheme that reflects the basic differences in the

legal rights of creditors and interest holders in each class. The Plan therefore satisfies the

classification requirements of section 1122 of the Bankruptcy Code.

### 2. Mandatory Contents Of The Plan

#### (a) The Plan Designates Classes Of Claims And Interests

41.     Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan

designate classes of claims and interests other than claims of a kind specified in section 507(a)(2)

of the Bankruptcy Code (administrative expense claims), section 507(a)(3) of the Bankruptcy

Code (claims arising during the "gap" period in an involuntary bankruptcy case), and section

507(a)(8) of the Bankruptcy Code (priority tax claims). See 11 U.S.C. § 1123(a)(1). Article III

of the Plan complies with this requirement by expressly classifying all Claims and Interests,

other than Administrative Claims and Priority Tax Claims (as each of such terms is defined in

the Plan).

#### (b) The Plan Identifies Unimpaired Classes

42.     Section 1123(a)(2) of Bankruptcy Code requires that a plan "specify any

class of claims or interests that is not impaired under the plan . . . ." 11 U.S.C. § 1123(a)(2).

Article III of the Plan satisfies this requirement by specifying that Classes 1, 2, 7 and 8 are

unimpaired.

#### (c) The Plan Specifies The Treatment Of Impaired Classes

43.     Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify

the treatment of any class of claims or interests that is impaired under the plan . . . ." 11 U.S.C.

§ 1123(a)(3). Article III of the Plan satisfies this requirement by specifying that Classes 3, 4, 5

and 6 are impaired, and by specifying the treatment of the Claims and Interests in each of those Classes.

**(d)     The Plan Provides The Same Treatment Within Each Class**

44.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class . . . ."  11 U.S.C. § 1123(a)(4). Article III of the Plan satisfies this requirement by providing the same treatment for each Claim or Interest in each respective Class, unless the Holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.

**(e)     The Plan Provides Adequate Means For Implementation**

45.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  Adequate means for implementation of a plan may include retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; extension of a maturity date or change in an interest rate or other term of outstanding securities; amendment of the debtor's charter; or the issuance of securities in exchange for cash, property, or existing securities, all in exchange for claims or interests or for any other appropriate purpose.  See generally In re Spiegel, Inc., No. 03-11540, 2005 WL 1278094, at *5 (Bankr. S.D.N.Y. May 25, 2005).

46.     Article V of the Plan and various other provisions of the Plan described above provide adequate means for the Plan's implementation.  Those provisions relate to, among other things, cancellation of the existing bank debt and issuance of new stock to the Lenders; the Debtors' entry into the new $100 million term loan and the new $115 million revolving facility; the assumption of all franchise agreements and almost all other executory contracts and

unexpired leases; and the assumption of all employee benefits, incentive plans, bonus program, and directors' and officers' liability insurance policies.

### (f)    The Plan Prohibits The Issuance Of Non-Voting Securities

47.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. See 11 U.S.C. § 1123(a)(6). In accordance with this requirement, the corporate governance documents of the Debtors have been amended to provide that the Debtors shall not issue any non-voting equity securities to the extent required by Bankruptcy Code section 1123(a)(6).

### (g)    The Selection Of Officers And Directors Of The Reorganized Debtors Is Consistent With The Interests Of Creditors And Equity Security Holders And With Public Policy

48.     Section 1123(a)(7) of the Bankruptcy Code requires that a plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ." 11 U.S.C. § 1123(a)(7). This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code which directs the scrutiny of the Court to the methods by which the directors and management of the reorganized corporation are to be chosen. See 7 Collier on Bankruptcy ¶ 1123.01[7] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011).

49.     Here, the Plan requires five new directors, to be elected by a simple majority of the shareholders in accordance with Delaware law. The new shareholders' agreement filed as part of the Plan supplement outlines additional agreements among the Lenders – who will own all the equity of the reorganized enterprise – for selecting directors. These provisions, which were heavily negotiated among the Lenders, are entirely consistent with the interests of all

stakeholders and public policy.  Accordingly, the Plan satisfies the requirements of section

1123(a)(7) of the Bankruptcy Code.

**3.**     **Discretionary Contents Of The Plan**

50.     Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization.  Most of such provisions have

already been described above.  Certain additional provisions relating to releases and exculpations

are described below.

**(a)**     **The Plan's Releases By The Debtors Are Permissible And<br>Should Be Approved**

51.     The Plan contemplates certain releases and exculpations.  However, there

are no non-consensual, "third-party" releases that purport to release claims held by one non-

debtor against another non-debtor.  Rather, pursuant to section 9.4(a) of the Plan, the Debtors

release any and all claims against their current and former directors and officers; their

professionals; and any Lender who voted in favor of the Plan.  Such releases are customary in

chapter 11 cases.  More importantly, the Debtors do not believe they have any claims against any

of these persons in any event.

52.     In determining whether a particular release is appropriate, this Court and

others examine a number of factors, including (i) whether there is an identity of interest between

the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against

the debtor or will deplete assets of the estate; (ii) whether the non-debtor has contributed

substantial assets to the reorganization; (iii) whether the release is essential to the reorganization;

(iv) whether a substantial majority of the creditors agree to the release; and (v) whether the plan

provides a mechanism for the payment of all, or substantially all, of the claims of the class or

classes affected by the release.  In re Washington Mut., Inc., 442 B.R. 314, 347-48 (Bankr. D. Del. 2011).

53.     As noted, the Debtors do not believe there are any claims or causes of action of any kind against their current and former officers and directors.  The Debtors have never received any indication from any shareholder, creditor or any other party, including the Lenders, that such parties believe that there are any such causes of action.  Moreover, the Debtors' current and former officers and directors have contributed significant efforts to resolution of the Debtors' affairs.  As a sign of the strength of the Debtors' and Lenders' views in this regard, the Lenders agreed that the Debtors would assume any and all prepetition indemnification obligations to their officers and directors under the Plan.  Such indemnification is, in fact, a further reason for approving the releases in the Plan.

54.     The Debtors' professionals and the Debtors' Lenders have also contributed significantly to these cases, and after investigation, the Debtors do not believe there are any claims or causes of action against either.  The Debtors stipulated to the fact that there are no claims against their Lenders in the cash collateral orders approved by this Court, and no party in interest contends otherwise.  Moreover, the Lenders are making very significant contributions to the Debtors' restructuring efforts, as evidenced by the material compromise of their claims; the fact that they will be receiving a recovery of only 51% under the Plan; their agreement to gift $1.1 million of their cash collateral and certain preference actions to the unsecured creditors; and their agreement to provide the new, $115 million revolving lending facility to the reorganized Debtors.

55.     Based on the foregoing, the Debtors' releases are appropriate and should be approved.

**(b)** **The Releases By The Participating Lenders Are Permissible And Should Be Approved**

56. Pursuant to section 9.4(b) of the Plan, the Participating Lenders agree to release one another and the Debtors and their officers, directors, and professionals, subject to certain limited exceptions outlined in the Plan. These releases are appropriate because they are entirely consensual and were granted by highly sophisticated parties who are intimately familiar with the Debtors' affairs. See In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving consensual release of voting parties' potential claims); In re Int'l Wireless Commc'ns Holdings, Inc., No. 98-2007 (MFW), 1999 Bankr. LEXIS 1853, at *24-25 (Bankr. D. Del. Mar. 26, 1999) ("[A]s to each creditor or shareholder who voted for the Plan which contains the Release language, we have no hesitation in concluding that they have consented to the Release and are bound thereby under contract law." (emphasis in original)), aff'd and modified, 1999 Bankr. LEXIS 1832 (Bankr. D. Del. Dec. 29, 1999).

**(c)** **The Plan's Exculpation Provision Is Permissible**

57. Section 9.7 of the Plan exculpates the Debtors' officers, directors and professionals and the Lenders and their professionals with respect to any act or omission in connection with, relating to, or arising out of, the cases, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, and the pursuit of confirmation of the Plan, among other things, except for any act or omission that is determined in a final order to have constituted gross negligence or willful misconduct. The Debtors believe the exculpation is appropriate, insofar as they formulated the Plan after negotiating extensively with the Lenders in good faith in the time leading up to the Petition Date.

58. The exculpation provision, including its carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others and should be approved.  See, e.g., In re PWS Holding Corp., 228 F.3d 224, 235, 245 (3d Cir. 2000) (approving plan provision that released claims except as to willful misconduct or gross negligence, and characterizing such a provision as "commonplace . . . in Chapter 11 plans"); In re Oneida Ltd., 351 B.R. 79, 94 & n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that covered prepetition Lenders, DIP Lenders, creditors committees and their members, and the respective affiliates of each, except in cases of gross negligence, willful misconduct, fraud or criminal conduct); Washington Mut., 442 B.R. at 350 (noting that the "Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence").

### 4. Executory Contracts And Unexpired Leases

59. Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, subject to section 365 of the Bankruptcy Code, "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section . . . ." 11 U.S.C. § 1123(b)(2).  In accordance with section 1123(b)(2) of the Bankruptcy Code, section 7.1 of the Plan provides for the assumption of all executory contracts and unexpired leases, except for those designated in the plan supplement to be rejected or otherwise already rejected by order of this Court.

### B. The Debtors Have Complied With The Applicable Provisions Of Title 11 (Section 1129(a)(2))

60. Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [title 11 of the Bankruptcy Code]." 11

U.S.C. § 1129(a)(2). The primary purpose of Bankruptcy Code section 1129(a)(2) is to ensure that the plan proponents have complied with the requirements of sections 1125 and 1126 of the Bankruptcy Code regarding solicitation of acceptances of the plan. See, e.g., PWS Holding, 228 F.3d at 248 n.23. As discussed above, the Debtors have complied with all applicable disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. Thus, the Plan complies with the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C. The Plan Was Proposed In Good Faith (Section 1129(a)(3))

61. Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "'[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" PWS Holding, 228 F.3d at 242 (alterations in original) (citation omitted); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that there must be "'some relation'" between the chapter 11 plan and the "'reorganization-related purposes that [Chapter 11] was designed to serve'" (alteration in original) (citation omitted); "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" (citations omitted)).

62. "[I]n the context of a Chapter 11 plan, courts have held [that] a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code.'" In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 347 (Bankr. D. Del 1998) (quoting In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)), aff'd, 324 F.3d 197 (3d Cir. 2003). The good faith

requirement is satisfied if the plan has been proposed "for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate and distributing that value to the creditors." In re Gilbertson Rests. LLC, No. 04-00385, 2005 WL 783063, at *4 (Bankr. N.D. Iowa Apr. 4, 2005); see also In re Source Enters., Inc., No. 06-11707, 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding good faith requirement satisfied in plan filed with legitimate and honest purposes of maximizing value of estate and effectuating equitable distribution), aff'd, 392 B.R. 541 (S.D.N.Y. 2008).

63.     The Plan has been proposed by the Debtors in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing their financial viability.  The Plan represents the culmination of a year-long process during which the Debtors and their advisors considered several strategic alternatives, attempted to obtain value for all their stakeholders, and worked with their Lenders to develop a plan that preserves value and jobs for the Debtors and their constituencies, including vendors, landlords and, importantly, their franchisees.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been satisfied.

### D.     All Payments To Be Made By The Debtors In Connection With These Cases Are Subject To The Approval Of The Court (Section 1129(a)(4))

64.     Section 1129(a)(4) of the Bankruptcy Code requires that:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or received from the estate in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review.  See In re Johns-Manville Corp., 68 B.R. 618, 632

(Bankr. S.D.N.Y. 1986) (implying that court must be permitted to review and approve reasonableness of professional fees made from estate assets), aff'd, 78 B.R. 407 (S.D.N.Y. 1987).

65.     Section 2.1 of the Plan provides for the payment of allowed Administrative Claims, including Professional Fee Claims.  Professionals must submit final fee applications seeking approval of all Professional Fee Claims no later than forty-five (45) days after the Effective Date.  These applications remain subject to Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, as applicable.  Payments to the Lenders' professionals are subject to a separate review process outlined in the cash collateral order.  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.      The Plan Discloses All Required Information Regarding Postconfirmation Directors, Management And Insiders (Section 1129(a)(5))**

66.     Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization may be confirmed if the proponent discloses the identity of those individuals who will serve as management of the reorganized debtor and the identity of any insider to be employed or retained by the reorganized debtor and the compensation proposed to be paid to such insider.  See 11 U.S.C. § 1129(a)(5).  In addition, under Bankruptcy Code section 1129(a)(5)(A)(ii), the appointment of, or continuation in office of, existing management must be consistent with the interests of creditors, equity security holders and public policy.  See 11 U.S.C. § 1129(a)(5)(A)(ii).

67.     In determining whether the post-confirmation management of a debtor is consistent with the interests of creditors, equity security holders and public policy, a court must consider proposed management's competence, discretion, experience and affiliation with entities

having interests adverse to the debtor.  See In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989); see also In re W. E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis" (emphasis added)).

68.     In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists . . . ."  Sherwood Square Assocs., 107 B.R. at 878.  The case law also is clear that a plan may contemplate the retention of the debtor's existing directors and officers.  See, e.g., In re Texaco Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (determining that section 1129(a)(5) was satisfied where plan disclosed debtor's existing directors and officers who would continue to serve in office after plan confirmation); see also In re Trans World Airlines, Inc., 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995).

69.     The Debtors have fully satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.  As more fully described above, the Plan and the shareholders' agreement provide for the manner of selection of the members of the reorganized Debtors' new board, including the fact that the new board will be selected by a majority of the new shareholders, which the Debtors anticipate to be Bayside Capital, Inc. ("Bayside").  The Debtors' existing management team, which is highly experienced and intimately familiar with the Debtors' affairs, will stay in place pursuant to new agreements negotiated with Bayside.  Under the Plan, ten percent of the reorganized Debtors' equity will be reserved for management, to be awarded in the discretion of the new board.

70. Each of these aspects of the Plan fully satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, and should be approved.

**F.      The Plan Does Not Provide For Any Rate Change Subject To Regulatory Approval (Section 1129(a)(6))**

71. Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval.  See 11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code does not apply here because there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Reorganized Debtors' rates.

**G.      The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7))**

72. The "best interests of creditors" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated under chapter 7.  See In re Leslie Fay Cos., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997); Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).  The best interests test focuses on individual dissenting creditors or equity security holders, rather than classes of claims or interests.  See Leslie Fay, 207 B.R. at 787; In re Drexel Burnham Lambert Grp. Inc., 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992).

73. A court, in considering whether a plan is in the "best interests" of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all of the debtor's assets under chapter 7 of the Bankruptcy Code.  See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300-01 (Bankr. S.D.N.Y. 1990); In re Jartran, Inc.,

44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash received would be insufficient to pay priority claims and secured creditors so that unsecured creditors and stockholders would receive no recovery); In re Victory Constr. Co., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984) (same).

74.     The Debtors, with the assistance of Alvarez & Marsal North America, LLC ("A&M"), performed a liquidation analysis, a copy of which is attached to the Disclosure Statement as Appendix B (the "Liquidation Analysis"), to determine whether the Plan satisfies the best interests test.  Additionally, A&M performed an analysis of possible preference recoveries in a chapter 7, and also considered the impact on the Liquidation Analysis of the delay in confirmation.  Based on this delay, A&M assumed a new liquidation date of August 8, 2011 (the current confirmation hearing date) rather than the original assumed liquidation date of June 30, 2011.  Based upon A&M's analysis, under any reasonable set of assumptions, stakeholders will receive at least as much under the Plan as they would in a chapter 7 liquidation.

75.     Specifically, the Liquidation Analysis shows that the secured Lenders – identified as Class 3 Secured Senior Credit Facility Claims – would receive an estimated 18% to 23% recovery in the event of a liquidation.  In contrast, under the Plan, holders of Claims in Class 3 will receive an estimated 51.8% recovery.  Moreover, while general unsecured creditors (absent the gift from the Lenders) and equity holders will receive no recovery under the Plan, the Liquidation Analysis shows that they will receive no recovery in a chapter 7, either.

76.     The Liquidation Analysis was done on a consolidated basis, i.e., it assumed that the Debtors' estates would be consolidated in a chapter 7.  That is consistent with the fact that the Debtors operate their businesses as a unitary enterprise.  Moreover, whether the Liquidation Analysis was done on a consolidated or a de-consolidated basis ultimately is

irrelevant, as the Lenders have liens on all the Debtors' assets and are vastly undersecured in any event.  Moreover, the Liquidation Analysis and A&M's related work show that the value of any preference recoveries would be insufficient in a chapter 7 to afford any recovery to general unsecured creditors.

77.     In particular, A&M conducted a sophisticated analysis of payments made by the Debtors in the two years prior to the Petition Date to assess the estimated recoverability of such payments under section 547 of the Bankruptcy Code.  After analyzing the Debtors' payment history, and after taking into account likely ordinary course defenses, subsequent new value defenses, contemporaneous value defenses, the very small amounts of many payments, estimated collection costs, and related matters, A&M estimated potential preference recoveries at approximately $3 million.

78.     As described in the Liquidation Analysis, however, if the Debtors were to shutter their operations and liquidate, a significant tax claim, in the range of $15 to $18 million, would be triggered that would be entitled to priority under the Bankruptcy Code, ahead of general unsecured creditors.  Moreover, under the cash collateral order, the Lenders have a super-priority administrative expense claim equal to the diminution of the value of their collateral.  At the commencement of these cases, the Debtors had $94 million in cash subject to the Lenders' liens.  They project that they will use $13 million of that cash by August 8th.

79.     Given the seasonal nature of the Debtors' business, the Debtors have not been able to replace that cash with new receivables and hence, have not been able to afford the Lenders any new collateral as adequate protection.  Accordingly, in a liquidation, the Lenders would have a significant, super-priority diminution claim equal to the amount of the cash the Debtors have used, and have not replaced, during the cases.  This diminution claim, plus the

large tax claim described above, total over $28 million – vastly in excess of any preference recoveries in a chapter 7 liquidation. Accordingly, there would be no recovery for general unsecureds in a liquidation.

80. For these reasons, stakeholders are receiving at least as much under the Plan as they would in a liquidation. Indeed, the Lenders' gift to the unsecured creditors will result in the unsecured creditors receiving more than they would receive in a liquidation. Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H. The Plan Has Been Accepted By The Requisite Classes Of Creditors and Equity Security Holders Other Than With Respect To Classes 4, 5 and 6 (Section 1129(a)(8))**

81. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan. This requirement is not met with respect to the Plan as Classes 4, 5, and 6 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. As discussed more fully below, however, the Debtors have met the "cramdown" requirements of section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan notwithstanding the deemed rejection of the Plan by Classes 4, 5 and 6.

**I. The Plan Provides For The Payment Of Priority Claims (Section 1129(a)(9))**

82. Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims – administrative and statutory priority claims – be paid in full on the effective date of the plan, and that the holders of certain other priority claims receive deferred cash payments that will pay them in full. The Plan satisfies these requirements. Subject to Article II of the Plan, each holder of an Administrative Claim will be paid in full. Moreover, holders of Priority Tax Claims, as defined in the Plan, are unimpaired. Other priority claims, such as wage-related claims, have already been honored pursuant to first-day orders entered by this Court.

### J. The Plan Has Been Accepted By At Least One Impaired, Non-Insider Class (Section 1129(a)(10))

83.     Section 1129(a)(10) of the Bankruptcy Code requires, as a condition of confirmation, that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10); <u>see also</u> <u>Drexel Burnham</u>, 138 B.R. at 771.  The Lenders in Class 3 voted unanimously to accept the Plan.  None of the Lenders is an insider.  Accordingly, Bankruptcy Code section 1129(a)(10) has been complied with.

### K. The Plan Is Feasible (Section 1129(a)(11))

84.     Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  This section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." 7 <u>Collier on Bankruptcy</u> ¶ 1129.02 [11] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011); <u>see also</u> <u>United States v. Energy Res. Co.</u>, 495 U.S. 545, 549 (1990); <u>IRS v. Kaplan</u> (In re Kaplan), 104 F.3d 589, 597 (3d Cir. 1997); <u>In re Sound Radio, Inc.</u>, 103 B.R. 521, 522-23 (D.N.J. 1989), <u>aff'd mem.</u>, 908 F.2d 964 (3d Cir. 1990).

85.     Section 1129(a)(11) does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a reasonable assurance of success.  <u>See</u> <u>Kane</u>, 843 F.2d at 649 (a plan may be feasible although its success is not guaranteed); <u>In re Adelphia Bus. Solutions, Inc.</u>, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) ("All [a bankruptcy court] needs to know is that the plan has a reasonable likelihood of success."); <u>Drexel Burnham</u>,

138 B.R. at 762 ("'It is not necessary that success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.' . . . The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." (citation omitted)); Texaco Inc., 84 B.R. at 910 ("All that is required is that there be reasonable assurance of commercial viability.").

86.     The Debtors' Plan is feasible.  As an initial matter, the Debtors are substantially reducing their debt obligations under the Plan.  The $357 million in secured debt owed to the Lenders will be reduced to a $100 million term loan.  Moreover, the Debtors are receiving the benefit of a new, $115 million revolving facility.  The Debtors prepared detailed and reasonable projections, which are included in Appendix C to the Disclosure Statement, that show that the Reorganized Debtors will have sufficient liquidity and capital resources to conduct their businesses.  The projections are premised on the Debtors' entry into a new agreement with Wal-Mart, which the Debtors anticipate doing in the very near term.

87.     The Debtors will have sufficient cash flows and working capital under the new revolver to satisfying all working capital needs.  Moreover, the reduction in debt results in dramatically improved credit metrics that will materially enhance the Debtors' position in the marketplace.  The projections show that the Debtors will generate cash flows beyond that required for servicing their debt in each year of the projections.  In addition, the reorganized Debtors are forecasted to have adequate and increasing liquidity throughout the projection period.

88.     The Debtors' total debt leverage, based on average expected drawn borrowings under the new revolving credit facility, is forecasted to be reduced to approximately 2.9 times pro-forma 2011 estimated adjusted EBITDA, after taking account of the effect of the

restructuring transactions contemplated by the Plan, and 3.0 times pro-forma 2012 estimated

adjusted EBITDA.  The estimated 2011 interest coverage ratio for cash and PIK interest is

forecasted to be approximately 3.9 times and the estimated 2012 interest coverage ratio is

forecasted to be approximately 3.7 times.  Based on these metrics and the other factors noted

above, the Plan is feasible and complies with section 1129(a)(11) of the Bankruptcy Code.

### L.    The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12))

89.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees

listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be

paid or that provision be made for their payment.  See 11 U.S.C. § 1129(a)(12).  All fees payable

under 28 U.S.C. § 1930 will be paid on the earlier of when due or the Effective Date.  From and

after the Effective Date, the Debtors shall be jointly liable for and shall pay the fees assessed

against the Debtors' estates under 28 U.S.C. § 1930 until entry of a final decree closing the

chapter 11 cases.  Thus, the Debtors have satisfied section 1129(a)(12) of the Bankruptcy Code.

### M.    The Plan Provides For The Continuation Of Retiree Benefits (Section 1129(a)(13))

90.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan of

reorganization provide for the continuation, after the effective date, of all retiree benefits at the

level established by agreement or by court order pursuant to section 1114 of the Bankruptcy

Code at any time prior to confirmation of the plan, for the duration of the period that the debtor

has obligated itself to provide such benefits.  See 11 U.S.C. § 1129(a)(13).  The Debtors do not

have any "retiree benefits" within the meaning given to such term in the Bankruptcy Code.

Accordingly, section 1129(a)(13) of the Bankruptcy Code is not applicable.

### N.     The Plan Satisfies The "Cramdown" Requirements

91.     Holders of Class 4 General Unsecured Claims, Class 5 Subordinated 510(b) Claims and Class 6 Interests in Jackson Hewitt – each as defined in the Plan –are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  As a result, section 1129(a)(8) of the Bankruptcy Code, which requires that all impaired classes accept the Plan, has not been satisfied.  Nonetheless, section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of . . . section [1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

### 1.     The Plan Does Not Discriminate Unfairly With Respect To The Deemed Rejecting Classes

92.     The Plan does not discriminate unfairly against holders of claims and interests in the deemed rejecting classes.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  See In re 203 N. LaSalle St. Ltd. P'ship, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), aff'd sub nom. Bank of Am. v. 203 N. LaSalle St. P'ship, 195 B.R. 692 (N.D. Ill. 1996).  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  See, e.g., In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").  At a minimum, however, the unfair discrimination standard prevents creditors and equity security holders with similar legal rights from receiving materially different treatment

under a proposed plan without compelling justifications for doing so.  See, e.g., Liberty Nat'l

Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 656

(9th Cir. 1997); In re Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989).

93.     There is no unfair discrimination among creditors and interest holders with

respect to Class 4 General Unsecured Claims, Class 5 Subordinated 510(b) Claims and Class 6

Interests in Jackson Hewitt.  While each class has a different priority with respect to the others,

none are entitled to receive any recovery because there is insufficient value to pay more senior

creditors.  While the Lenders have agreed to gift a portion of their collateral to holders of Class 4

General Unsecured Claims, this does not lead to unfair discrimination because the gift will not

impact the recoveries of holders of claims or interests in Classes 5 or 6, and the gift is not at their

expense – rather, the gift is at the Lenders' expense.  See In re Journal Register Co., 407 B.R. 520,

533 (Bankr. S.D.N.Y. 2009) (finding that gift plan did not unfairly discriminate under section

1123(a)(4) of the Bankruptcy Code because removing the gift from the plan would not change

the recovery of the objecting creditors, and so the creditors that received the gift did not do so at

the expense of other creditors in the same class).

94.     And while certain Class 7 Intercompany Claims and Class 8 Intercompany

Interests may be reinstated, such treatment does not constitute unfair discrimination with respect

to Classes 4, 5 or 6 because no Intercompany Claim or Intercompany Interest will receive any

distributions of actual value on account of such reinstatement.  In particular, because the Debtors

collectively comprise a unitary enterprise, none of the Debtors has any value separate and apart

from the other Debtors that could result in actual, distributable value on account of any

Intercompany Claims or Intercompany Interests.  Moreover, to the extent any such value exists,

the Lenders have prior liens on all such value, including the Intercompany Claims and

Intercompany Interests, and have consented to reinstatement of all Intercompany Claims and Intercompany Interests to preserve the going-concern attributes of the Debtors' business.

95.     In short, the Plan does not discriminate among any classes of claims or interests that rejected the Plan.

### 2. The Plan Is "Fair And Equitable" With Respect To The Deemed Rejecting Classes

96.     A plan is fair and equitable with respect to a class of general unsecured claims if either (i) the plan provides that each holder of a claim of such class will receive property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) the holder of any claim of or interest that is junior to the claims of such classes will not receive or retain any property under the plan on account of such junior claim or interest.  <u>See</u> 11 U.S.C. § 1129(b)(2)(B).  A similar concept applies with respect to classes of interests.  <u>See</u> 11 U.S.C. § 1129(b)(2)(C).  A corollary to these absolute priority rules is that no creditor in a more senior class may receive more than what it is owed.  <u>In re Exide Techs.</u>, 303 B.R. 48, 61 (Bankr. D. Del 2003).

97.     The Plan is fair and equitable with respect to the rejecting classes.  First, there are no holders of claims or interests junior to any creditors or interest holders in the rejecting classes who are receiving any recovery.  Second, as discussed above, the reinstatement of Class 7 Intercompany Claims and Class 8 Intercompany Interests does not violate the absolute priority rule.  The Lenders, who are entitled to all value under the Plan, have consented to these Classes, both of whom have lower priority, being reinstated.  More importantly, these Classes and their treatment are being done simply to maintain the Debtors' corporate structure and unitary business enterprise.

98.     The Debtors' maintenance of normal intercompany activities and modes of operations is in their best interests and neither harms nor prejudices any third party creditors. See Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of [intercompany] equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.  The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

99.     Third, no creditors senior to the deemed rejecting creditors are receiving more than what they are owed.  In this regard, the Debtors' EBITDA has been $46.8 million and $49 million for each of the last two tax seasons.  Consistent with this history, the Debtors' project EBITDA for each of the next three years as follows:  $46.4 million for 2012; $48.7 million for 2013; and $52.3 million for 2014.  Based in part upon these projections, the Debtors' investment banker, Moelis & Company LLC ("Moelis"), performed a valuation of the reorganized Debtors that estimates the value at between $200 million and $250 million, with a mid-point valuation of $225 million.  That is far less than the $357 million that the secured Lenders are owed.

100.     In fact, this estimated valuation results in an estimated recovery to the Lenders of only 51%.  Moelis arrived at this figure by deducting from the $225 million an amount equal to $40 million, which represents the estimated, average, outstanding, projected balance on the new, $115 million revolver.  The mid-point enterprise value of $225 million less a $40 million average revolver balance equals $185 million.  The Lenders will receive all of this value in two forms:  the $100 million new term loan described above, plus all the equity in the

reorganized enterprise, estimated to be worth the residual of $85 million. This $185 million value, divided by the Lenders' secured claims of $357 million, results in the estimated 51% recovery.

101.    While the Lenders also will receive cash in the total estimated amount of $76 million, that cash cannot be included as part of the value the Lenders are receiving under the Plan. As an initial matter, a Lender may receive cash only if it also agrees to its pro rata commitment under the new, $115 million revolver. Second, the cash is not excess cash that is not necessary to the Debtors' operations. To the contrary, it is. The Debtors need all this cash, plus additional revolver borrowings, simply to pay all their normal operating expenses so they can get to the next tax season. This cash, therefore, has no value separate and apart from, or in addition to, the Debtors' enterprise value: to the contrary, the Debtors need this cash simply to operate. The fact that the Debtors are distributing most of this cash to Lenders who participate in the new, $115 million revolver does not change the analysis.

102.    Even assuming, however, that the amount of the cash distribution were included in a calculation of the Lenders' recovery, it makes no difference. In that scenario, the Lenders' estimated recovery would be approximately 73%, resulting in a deficiency claim of over $96 million. And even if the cash were added to the high end of the Moelis valuation ($250 million), then the Lenders' estimated recovery would be approximately 80%, resulting in a deficiency claim of over $71 million.

103.    In short, there is no way anyone can credibly assert that the Lenders are receiving more than they are owed. Accordingly, the Plan satisfies the absolute priority rule and should be confirmed.

## V.     RESPONSE TO OUTSTANDING OBJECTIONS

104.     As explained above, the Debtors' responses to the various objections that have been filed are summarized in <u>Exhibit A</u> attached hereto.  None of those objections has any merit, and each should be overruled.

## VI.     IMMEDIATE EFFECTIVENESS

105.     The Debtors request that the terms of the Confirmation Order be effective immediately upon entry thereof, notwithstanding any stay that might be imposed by Bankruptcy Rules 3020(e), 6004(h), 7062, 8001, 8002 or otherwise.  Under the circumstances, the Debtors submit that allowing the terms of the Confirmation Order to be effective immediately is appropriate under the circumstances and will facilitate the Debtors' emergence from bankruptcy without undue delay.

# VII. CONCLUSION

106. The Plan complies with and satisfies all of the requirements of sections 1127 and 1129 of the Bankruptcy Code. Accordingly, the Debtors request that the Court (i) confirm the Plan, (ii) overrule any objections, if necessary, and (iii) grant the Debtors such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      August 3, 2011

                */s/ Mark S. Chehi*
                Mark S. Chehi (I.D. No. 2855)
                Ian S. Fredericks (I.D. No. 4626)
                SKADDEN, ARPS, SLATE, MEAGHER
                 & FLOM LLP
                One Rodney Square
                P.O. Box 636
                Wilmington, Delaware 19899-0636
                (302) 651-3000
                (302) 651-3001

                        - and -

                Mark A. McDermott
                J. Gregory Milmoe
                SKADDEN, ARPS, SLATE, MEAGHER
                 & FLOM LLP
                Four Times Square
                New York, New York 10036-6522
                (212) 735-3000
                (212) 735-2000

                Counsel for Debtors and Debtors in Possession